# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**JOHN DOE**, *an individual*,

     Plaintiff,

vs.

                                       Case No.  16-cv-
                                       Hon.

**DAVID H. BAUM, SUSAN PRITZEL, TABITHA BENTLEY, E. ROYSTER HARPER, and NADIA BAZZY,**
*employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally,*

     Defendants.

---

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Benjamin I. Shipper (P77558)
Irina L. Vaynerman (0396759)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
bshipper@deborahgordonlaw.com
ivaynerman@deborahgordonlaw.com

---

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiff John Doe, by his attorneys Deborah Gordon Law, complains against Defendants as follows:

**Claims, Jurisdiction, and Parties**

1.      This is an action for due process violations under the Fourteenth Amendment to the United States Constitution, and for free speech violations under the First Amendment to the United States Constitution brought pursuant to 42 U.S.C § 1983.

2.      This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3.      Plaintiff John Doe (hereinafter, "Plaintiff") is a former student at the University of Michigan (hereinafter, "University of Michigan" or "the University").  Plaintiff's claims arise out of actions taken against him by Defendants for Plaintiff's alleged violation of the University of Michigan "Policy on Sexual Misconduct by Students" (hereinafter, "the Policy").

4.      After completing a three-month investigation and interviewing 23 witnesses, the University of Michigan Office for Institutional Equality ("OIE") concluded that, based on a preponderance of the evidence, Plaintiff did not violate the Policy.

5.      Plaintiff was 13.5 credit hours short of his degree and carried a 3.95 GPA when he was forced to withdraw from the University of Michigan on June 27, 2016, based on an improper and erroneous determination by a University Appeals Board (hereinafter, "Appeals Board" or "the Board") that did violate the Policy.

2

6.     The Appeals Board applied an unconstitutionally vague or legally incorrect definition of the term "incapacitated," applied incorrect standards of review, and arbitrarily and capriciously set aside the investigator's findings and conclusions, thus denying Plaintiff due process.

7.     Defendant David H. Baum (hereinafter "Defendant Baum") is an Assistant Dean at the University of Michigan Law School, and was at pertinent times a member of the University of Michigan Appeals Board considering Plaintiff's alleged misconduct.  He is an attorney licensed in the State of Michigan, P43178.  He resides in the Eastern District of Michigan. He had a conflict of interest that he was required to report, but he chose to not do so.

8.     Defendant Susan Pritzel (hereinafter "Defendant Pritzel") is a retired Assistant Professor at the University of Michigan Dental School and was at pertinent times a member of the University of Michigan Appeals Board considering Plaintiff's alleged misconduct.  She resides in the Eastern District of Michigan.

9.     Defendant Tabitha Bentley (hereinafter "Defendant Bentley"), upon knowledge and belief, is a student at the University of Michigan, was at pertinent times a member of the University of Michigan Appeals Board considering Plaintiff's alleged misconduct, and resides in the Eastern District of Michigan.

10.     Defendant Nadia Bazzy (hereinafter "Defendant Bazzy") is or was at

pertinent times the Assistant Director, Office of Student Conflict Resolution (OSCR), at the University of Michigan and resides in the Eastern District of Michigan.

11.     Defendant E. Royster Harper (hereinafter "Defendant Harper") was at pertinent times Vice President for Student Affairs at the University of Michigan and resides in the Eastern District of Michigan.

12.     The above named individuals are sued both in their personal and official capacities.

13.     The events underlying this Complaint occurred in Ann Arbor, Michigan, within the Eastern District of Michigan.

## Background Facts

### Plaintiff Attends University of Michigan

14.     In September 2013, Plaintiff was admitted to and began attending the University of Michigan as an undergraduate student.

15.     From September 2013 through April 2016, Plaintiff successfully completed six semesters at the University of Michigan with a cumulative 3.95 GPA.  He was to begin his senior and final year at the University in the fall of 2016.

16.     Prior to the events described herein, Plaintiff had an excellent reputation, had no involvement with law enforcement, and was never disciplined

by a school or employer.

### The OIE Complaint, Investigation, and Decision

17. In January 2016, a University of Michigan student (the "Complainant") filed a complaint with the University of Michigan OIE, alleging that she had been incapacitated and thus unable to provide consent when she engaged in sexual activity with Plaintiff on January 16, 2016.

18. According to the University, the OIE "provides the delivery of programming and services for faculty, staff, students, and management to support diversity, inclusiveness, equal access, equitable treatment, and cultural understanding and competency. [It] offers training and consultation on achieving and supporting diversity in the workplace, on Americans with Disabilities Act issues, and on preventing and resolving discrimination and discriminatory harassment."

19. The OIE commenced an investigation to determine if Plaintiff violated the Policy.

20. The question at issue was whether the Complainant was "incapacitated" at the time of her sexual encounter with Plaintiff, and, if so, whether Plaintiff knew or should have known she was "incapacitated."

21. The OIE Investigator was tasked with determining whether a "preponderance of the evidence" supported a finding of Plaintiff's responsibility

under the Policy. In other words, the OIE Investigator had to determine whether a preponderance of the evidence supported a finding that, at the time they engaged in sexual activity, the Complainant was incapacitated, and that Plaintiff knew or should have known that the Complainant was incapacitated.

22.   A "preponderance of the evidence" standard means that the information supporting a finding of responsibility must be more convincing than the information in opposition to it.

23.   Under the Policy which was in effect at the time of the alleged misconduct, a person is considered "incapacitated" if he or she "lack[s] the physical and/or mental ability to make informed, rational judgments."

24.   While an incapacitated person is incapable of giving valid consent to engage in sexual activity, a person who is "intoxicated" or drunk is considered capable of giving consent.

25.   The Policy did not explain the difference between "intoxicated" and "incapacitated," nor did it provide information as to how a student could determine without outward signs, whether another student lacked the mental ability to make rational, informed judgments.

26.   To rectify the vagueness problem, on April 6, 2016, the University publicly circulated an amended Policy which more specifically explained this distinction.

27.     The amended Policy was circulated after the University found that the Policy had ambiguously defined "incapacitation" and "did not provide enough information regarding incapacitation, especially as it relates to intoxication from alcohol." *See* "Understanding Key Changes to the Policy on Sexual Misconduct by Students" (Apr. 6, 2016). The updated Policy, which went into effect in July 2016, explains that "incapacitation is a state beyond drunkenness or intoxication."

28.     The OIE investigation and fact finding was conducted by the Title IX Investigator Christina T. Kline.  Ms. Kline ("the OIE Investigator") is a former criminal defense attorney and Legal Fellow with the ACLU of Michigan.

29.     On April 15, 2016, the factfinder, Investigator Kline, issued a 41 page report (the "Report").

30.     The Report is striking in its depth, breadth, and detail.  Ms. Kline's investigation spanned three months, during which she personally interviewed 23 witnesses and reviewed evidence such as medical records, text messages, and video recordings.

31.     The Report includes the following findings.

32.     The Complainant and Plaintiff met for the first time in the late hours of January 15, 2016 or the early hours of January 16, 2016.

33.     Between 11:30 p.m. and midnight, the Complainant and her friends arrived to Plaintiff's house to attend a party that was in progress.

7

34.    Shortly after the Complainant and Plaintiff met, they went upstairs to his bedroom to have a drink.  It is uncontested that when they walked upstairs, the Complainant did not have any difficulty walking or talking.

35.    They engaged in conversation and the Complainant consumed one shot of vodka which Plaintiff offered her.

36.    Other than the single shot of vodka, Plaintiff did not serve the Complainant any additional alcohol.

37.    Although the Complainant had consumed alcohol before arriving to Plaintiff's house, Plaintiff had no knowledge of that.

38.    After the Complainant finished her drink, Plaintiff's suggested that they go back downstairs "to dance," and they did so.

39.    Several witnesses then saw the Complainant and Plaintiff dancing and kissing.  It is uncontested that the Complainant did not have difficulty dancing or talking.

40.    At or before 1:00 a.m., Plaintiff and the Complainant walked upstairs to Plaintiff's bedroom, continued kissing, and engaged in sexual activity in Plaintiff's bed.

41.    Around 1:00 a.m. or 1:30 a.m., Plaintiff's roommate entered Plaintiff's bedroom with another female student ("Witness 2").

42.    After realizing that Plaintiff was in the room, Plaintiff's roommate

and Witness 2 left the room. However, they returned to the room about twenty minutes later and engaged in sexual activity in Plaintiff's roommate's bed, which was located in a different part of the room than Plaintiff's bed.

43.    Because the room was dark, Plaintiff's roommate and Witness 2 had not seen the Complainant or Plaintiff.

44.    After the Complainant's and Plaintiff's sexual encounter, Plaintiff left his bedroom to use the bathroom and did not return for some time.

45.    While Plaintiff was out of the room, Plaintiff's roommate and/or Witness 2 turned on the bedroom light at approximately 2:00 a.m.

46.    Plaintiff's roommate and Witness 2 then saw the Complainant.

47.    At this point, Plaintiff had left the Complainant alone in his bed and he had not yet returned to his bedroom. The Complainant appeared emotionally distressed.

48.    Witness 2 and Complainant gathered her belongings. They left Plaintiff's house in an Uber car around 2:30 a.m. or 2:45 a.m. The car drove them to the Complainant's dormitory.

49.    The Complainant sent a very coherent and well-spelled text message to a friend at 2:53 a.m., stating that she had returned to her dormitory.

50.    The Complainant continued sending coherent text messages throughout the early morning.

9

51.     In her findings, the OIE Investigator categorized all witness testimony by the time and place witnesses observed or spoke to the Complainant or Plaintiff. This categorization was critical for the factfinder to determine whether the Complainant was incapacitated at the time the sexual activity occurred, and if so, whether Plaintiff knew or should have known of the incapacity at the time the sexual activity occurred.

52.     The Report concludes that "[b]ased on a thorough review and analysis of the evidence obtained during this investigation, it is determined that the preponderance of the evidence does not support the conclusion that the Respondent engaged in unwanted touching of a sexual nature in violation of the Policy … Respondent is determined not to have violated the University of Michigan Policy on Sexual Misconduct by Students" (emphasis added).

53.     The factfinder also noted that "… it is determined that there is insufficient evidence to suggest [the Complainant] was incapacitated and unable to provide valid consent at the time of the incident.  In other words, there is no evidence of the Complainant's outward signs of incapacitation that Respondent would have observed prior to initiating sexual activity" (emphasis added).

54.     The University's Title IX Coordinator, Anthony Walesby, reviewed and approved the Report.

55.     Mr. Walesby is and was the Associate Vice Provost for Academic and

Faculty Affairs and Senior Director of the Office for Institutional Equity, and also serves as the University's ADA and Title IX Coordinator.  He provides oversight of University policies and procedures with regard to discrimination and harassment.  The Title IX Coordinator is also in charge with monitoring the University's compliance with Title IX; ensuring appropriate education and training for students and employees; coordinating the University's investigation, response, and resolution of all reports under the Policy; and ensuring appropriate actions to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

56.    On April 19, 2016, Defendant Bazzy contacted Plaintiff by email to request a meeting with him and report the results of the OIE investigation and the Report.  The email stated in part:

> In evaluating allegations of sexual misconduct based on factors contained in the Policy, the "preponderance of the evidence" standard is used. This standard requires that the information supporting a finding of responsibility be more convincing than the information in opposition to it.  Under this standard, individuals are presumed not to have engaged in sexual misconduct unless a preponderance of the evidence supports a finding that sexual misconduct occurred.

> Based on a thorough review of the evidence obtained during this investigation, OIE has determined that there is insufficient evidence to conclude that the sexual misconduct policy was violated.  This finding is based on a detailed analysis of the evidence under the preponderance standard, which is contained in OIE's report.

57.    On April 22, 2016, Defendant Bazzy met with Plaintiff at the Office of Student Conflict Resolution (OSCR).  Defendant Bazzy explained the outcome

of the OIE Investigation, that the Complainant may appeal, and that she was not aware of any case where a decision by OIE for a similar situation was ever changed through appeal.

### The Appeal

58.     On April 28, 2016, Defendant Bazzy notified Plaintiff by email that the Complainant had appealed the OIE decision and that a formal notification would follow.

59.     The appeal process is administered principally by the OSCR Assistant Director, Defendant Bazzy.

60.     Defendant Bazzy's responsibilities include, but are not limited to: supervising and administering applicable campus policies and procedures, facilitating follow up and sanctioning after an investigation is concluded, managing complex cases, coordinating with other departments and stakeholders, and assessing and evaluating participants in the process.

61.     On May 3, 2016, Defendant Bazzy sent an email formally notifying Plaintiff about details of the appeal.  The email contained two attachments: (1) a letter dated May 3, 2016, which was signed by Defendant Bazzy and titled "APPEAL NOTIFICATION," and (2) the Complainant's Appeal.

62.     Due process protections exist to protect the accused and permit the accused to appeal an erroneous determination of guilt.  However, here, the

12

Complainant, or the accuser, was permitted to appeal the OIE decision in which Plaintiff had been found not to violate the Policy.

63.     Section VII of the Policy explains that a review of an OIE sexual misconduct report "will be efficient and narrowly tailored." The Policy's guidelines provide that a party may seek review only if:

> 1.     A material deviation from the procedures affected the outcome of the case;
> 2.     There is new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation that could reasonably affect the investigation findings;
> 3.     The sanctions/interventions are inappropriate or disproportionate to the determined violation(s); or
> 4.     A review of all available and relevant information indicates that the evidence clearly does not support the finding(s) and provides firm and definite support for modifying the original finding(s).

64.     The "APPEAL NOTIFICATION" letter stated that the Complainant was appealing the OIE Report on the basis of Policy guideline numbers 2 and 4 – she contended that "[t]here is new and relevant information that was unavailable" at the time the Report was written, and that "[t]he evidence clearly d[id] not support the [Report's] finding(s)."

65.     The Complainant's appeal was prepared by the Salvatore Prescott law firm, whose name was prominently displayed on the letterhead of the front cover sheet of the appeal.

66.     On May 11, 2016, Plaintiff filed a written response to the

Complainant's appeal.

67.     Plaintiff was not allowed to appear in front of the Appeals Board, nor was he provided with the names of the three Appeals Board members. The Appeals Board report revealed that the Board met twice, on May 20 and May 25, 2016.

68.     To arrive at its conclusion, the Board relied on the evidence contained in the OIE Report.

69.     Under the Policy, the Board could only reverse the conclusion in the OIE Report if "a review of all available and relevant information indicate[d] that the evidence <u>clearly d[id] not support the finding(s) and provide[d] firm and definite support for modifying the original finding(s)</u>" (emphasis added).

70.     The standard of review the Board had to apply was similar to a clearly erroneous standard applied by a federal appeals court.

71.      As applied to the facts of this case, the Board could only reverse the OIE's conclusion if the evidence clearly did not support the OIE's findings that at the time the sexual encounter occurred the Complainant was not "incapacitated" and the Plaintiff could not and should not have known that the Complainant was "incapacitated."

**The Appeals Board Decision**

72.     On May 25, 2016, the Appeals Board issued its decision.

14

73.     The Appeals Board determined that "[t]he OIE investigator [had] conducted a fair and thorough investigation and analyzed the evidence in good faith." It also determined that "there was not any new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation that could reasonably [have] affect[ed] the investigation findings."

74.     Nonetheless, the Board reversed the OIE Investigator's findings and concluded that:

> Review of all available and relevant information indicates that the evidence clearly does not support the OIE Investigator's conclusion and provides firm and definite support for modifying the original finding. Specifically, we submit that the Respondent should have been found responsible for violating the Policy.

75.     There was no evidentiary support for this conclusion.

76.     Nevertheless, Defendant Harper accepted the Board's recommendations on June 13, 2016.

## Policy's Definition of "Incapacitation" was Unconstitutionally Vague

77.     Under the Due Process Clause, an enactment is void if its prohibitions are not clearly defined or it does not provide explicit standards for enforcement. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972).

78.     The Policy in effect at the time the Complainant and Plaintiff engaged in sexual activity was unconstitutionally vague because it failed to properly define

15

the term "incapacitation."

79.     The Policy merely stated that a person is "incapacitated" if he "[l]ack[s] the physical and/or mental ability to make informed, rational judgments. This may have a variety of causes, including, but not limited to, being asleep or unconscious, having consumed alcohol or taken drugs, or experiencing blackouts or flashbacks."

80.     Complainant was not "asleep or unconscious," and Plaintiff had no knowledge of her having consumed alcohol [other than one drink] or experiencing blackouts or flashbacks."

81.     The Policy did not explain how to determine if an individual lacks the ability to make informed, rational judgments, where, as here, the individual displayed no outwards signs or symptoms of incapacitation.

82.     Moreover, the Policy did not explain the important legal distinction between signs and symptoms of "incapacitation" as opposed to "intoxication."

83.     The University of Michigan did not train its students on how to determine whether a fellow student is incapacitated or displays behavior indicating that he or she incapacitated or inform them of the difference until July 1, 2016.

84.     Determining capacity is often a task for medical and social care professionals, who must rely on a number of factors to determine whether an individual evidences the ability to make a choice, to understand relevant

16

information, and to appreciate a situation and its likely consequences.

85.   The University of Michigan and Defendants placed the burden on a student – here the Plaintiff – to determine "incapacity" with no guidance on how to determine incapacity or distinguish "incapacity" from "intoxication."

86.   The Policy was thus vague on its face.

87.   The Policy was also vague as applied to the facts in this case because Plaintiff did not know and had no reason to know that the Complainant was allegedly incapacitated.

88.   The Policy language, and lack thereof, violated Plaintiff's due process rights.

89.   The University has admitted that the Policy's definition of "incapacitation" was vague and problematic.  On April 6, 2016, the University circulated the updated policy, for the first time explaining that amendment was needed to clarify that "incapacitation" was distinguishable from "intoxication." Holly Rider-Milkovich, the University's Director of the Sexual Assault Prevention and Awareness Center, conceded that the Policy needed to be amended because the University "did not do a good enough job at defining incapacitation the first time around," Director Rider-Milkovich explained that the updated Policy, which went into effect on July 1, 2016, clarifies for the first time "that incapacitation is a state greater than mere intoxication."

90.    The  July  2016  updated  Policy  amended  the  definition  of
"incapacitation" and added information on how to determine whether an individual
is incapacitated:

> When alcohol or other drugs are involved, <u>incapacitation is a state
> beyond drunkenness or intoxication</u>.  A person is not necessarily
> incapacitated merely as a result of drinking or using drugs; the level of
> impairment must be significant enough to render the person unable to
> give consent.  The impact of alcohol and other drugs varies from
> person to person, and a person's level of intoxication may vary based
> upon the nature and quality of the substance imbibed, the person's
> weight, tolerance, ingestion of food and other circumstances. A
> person's level of impairment may also change rapidly.

*See* "The University of Michigan Policy and Procedures on Student Sexual

and Gender-Based Misconduct and Other Forms of Interpersonal Violence"

at 15 (emphasis added).

### The Appeals Board Decision Violated Plaintiff's Due Process Rights

91.    The Appeals Board failed to apply the correct standards of review.

92.    Rather than determining whether the OIE decision was clearly
erroneous, the Appeals Board essentially completed a de novo review of the
factual record.

93.    There was no review or check on whether the Appeals Board applied
the correct standard other than by Defendant Harper who clearly rubber stamped
the decision.

94.    The Board's erroneous determination violated Plaintiff's due process

rights because it failed to apply the correct standards of review.

95.    The Board's conclusion was based on conjecture, personal opinion, and bias.

96.    The Appeal Board's findings were arbitrary and capricious and negated the original investigation and findings which were made by a trained, full-time OIE employee and approved by the University's Title IX Coordinator in accordance with due process principles.

97.    The Appeals Board set out to selectively rely on evidence favorable to the Complainant and to ignore the OIE Investigator's findings that were neutral or favorable to the Respondent.

98.    There is no mention in the Appeals Board report that 23 witnesses were interviewed and that there was no evidence that Complainant was "incapacitated" at the time of the sexual encounter.

99.    The Board only relied on the testimony of a few witnesses who had made statements that were favorable to the Complainant.  The Board either simply ignored other witnesses' testimonies or improperly reassessed witnesses' credibility.

100.   A preponderance of the evidence clearly did not demonstrate that the Complainant was "incapacitated" or that Plaintiff "knew or should have known" the Complainant was "incapacitated."

19

101.   The record evidence did not clearly support "modifying the original finding(s)."

102.   Witness testimony demonstrated that prior to initiating sexual activity there was no evidence that Plaintiff observed the Complainant displaying "outward signs of incapacitation."

103.   No witness described the Complainant as lacking the ability to make informed, rational decisions, or as acting in a manner which indicated that she lacked the ability to make informed, rational decisions.

104.   Although the Appeals Board was tasked with determining whether the evidence clearly supported the OIE's determination that the Complainant was not incapacitated and did not appear incapacitated at the time she engaged in sexual activity with Plaintiff, the Board erred by relying heavily on the testimony of only 2 of the 23 witnesses' testimony describing the Complainant's behavior hours after she had engaged in sexual activity with Plaintiff.

105.   Moreover, the Appeals Board completely ignored and failed to mention the following findings contained in the factfinder's Report:

a.   Several minutes after the Complainant left Plaintiff's room when she was allegedly "incapacitated" she sent coherent, lucid, and well-spelled text messages to friends.

b.   Two witnesses who described the Complainant as "intoxicated,"

admitted that the Complainant's movements, speech, eyes, or face did <u>not</u> suggest that she was intoxicated immediately before she engaged in sexual activity with Plaintiff.

c.   Plaintiff had only seen the Complainant consume one drink in front of him, was unaware she had consumed any additional alcohol, and he was with her for a relatively brief time that evening.

106.   These findings were critical to the OIE Investigator's determination that at the time the Complainant engaged in sexual activity with Plaintiff she was not incapacitated, and she did not display any outward signs of incapacitation to Plaintiff.

107.   The Appeals Board recognized that "many of the behaviors [the Complainant] exhibited [such as leaning on Witness 2 while they were walking together] were consistent with those of a person experiencing "significant emotional distress," as opposed to behaviors of an overly intoxicated or incapacitated person.

108.   Despite recognizing this alternative explanation for the Complainant's behavior, the Appeals Board opined that "[i]t stands to reason that if Complainant was this intoxicated after her sexual encounter with the Respondent, then she was significantly intoxicated leading up to and during the encounter." It did not

however cite to any evidence, scientific or otherwise, to support this assumption. Nor was it the job of the Appeals Board to determine, without evidence, what "stands to reason."

109.   The Appeals Board report also includes irrelevant statements which show clear bias against Plaintiff.

110.   For instance, the Board began its report by noting that the "Complainant did not drink very much in high school; that is, she was not a very experienced drinker [, . . .] that since she was a freshman in college, she was not very experienced with college parties [, and . . . ] that she was not very sexually experienced."  Even if these "findings" are true, they are improper and immaterial to the issue before the Board, as evidenced by University of Michigan Policy and Title IX regulations.

111.   The Board's bias against Plaintiff was also evidenced by the fact that the Board noted that Plaintiff "should have asked Complainant how much she had to drink that evening," even though University policies did not require him to do so.  This requirement of what Plaintiff "should have" done appeared nowhere in any policy or guidance of the University.

112.   The Appeals Board failed to properly apply its own clearly erroneous standard of review and the "preponderance of the evidence" standard reviewing the OIE Investigator's decision.   The Board's misapplication of the standards of

22

review resulted in the Board improperly placing the burden of proof on Plaintiff.

113.   It is unclear whether the Appeals Board members were trained on how to apply the clearly erroneous and "preponderance of the evidence" standards.

114.   In contrast to the OIE Investigator and the University's Title IX Coordinator, none of the Appeals Board members are employed for the purpose of administering OIE policies and ensuring that the policies and the law are followed.

115.   The Appeals Board members are lay people who, on information and belief, volunteer to sit as Appeals Board members periodically.

116.   In short, the Appeals Board convened only for this appeal and is far less qualified than both the OIE Investigator and the University Title IX coordinator to investigate, assess, and make findings with regard to the OIE policy.

117.   The Board's erroneous determination also violated Plaintiff's due process rights because it was based on a fundamental misunderstanding of the difference between "incapacitated" and "intoxicated."

118.   The Appeals Board either intentionally or recklessly conflated "incapacitation" and "intoxication."

119.   The Appeals Board was apparently not familiar with the amended July 2016 Policy, the summary of the key changes to the Policy which had been disseminated publicly on April 6, 2016 (a month before the Board rendered its decision in this matter), or relevant media coverage by the Michigan Daily and

23

other sources that included statements by University officials explaining their rationale for amending the Policy – namely, to clarify that "incapacitation" was distinguishable from "intoxication."

120.   If the Appeals Board was aware that the Policy contained vague and ambiguous terms and that the Policy had been amended to cure its ambiguity, the Board arbitrarily, capriciously, and recklessly ignored these facts.

121.   Not a single witness stated that the Complainant was incapacitated at the time she engaged in sexual activity.  Rather, some witnesses stated that they saw the Complainant drinking that evening or said that she was intoxicated or "buzzed."   The Appeals Board then extrapolated those witness statements to erroneously conclude that the Complainant had been incapacitated when she engaged in sexual activity.

122.   The amended Policy of July 1, 2016 sets forth criteria for determining incapacitation:

> One is not expected to be a medical expert is assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual manifest signs of incapacitation differently, typical signs often include slurred or incomprehensible speech, unsteady manner of walking, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: Do you know where you are? Do you know how you got here? Do you know what is happening? Do you know whom you are with?

123.   Using the above criteria, at the time the Complainant and Plaintiff

24

engaged in sexual activity, the Complainant's speech was not noticeably slurred or incomprehensible, her walking appeared normal, and she was not combative, emotionally volatile, or incontinent. Although the Complainant vomited that evening, she did not do so until some time after she had engaged in sexual activity. There is no evidence Complainant did not know who she was and who was with her, where she was, and how she arrived there.

124. Although the Appeals Board purported to apply the correct "incapacitation" definition, in fact it appears that the Board applied a definition that is more similar to an improper and legally incorrect definition of the term provided by the Sexual Assault Prevention and Awareness Center (SAPAC).

125. The Policy links to general University resources including a link to SAPAC's website.

126. On SAPAC's website there is an article entitled "Defining Sexual Assault" which refers students to Michigan's Penal Code for further guidance.

127. One of SAPAC's webpages contains information specifically about "Alcohol & Sexual Assault."

128. The "Alcohol & Sexual Assault" page purports to relay Michigan Criminal Sexual Conduct Laws and the legal definition of "mentally incapacitated."

129. The "Alcohol & Sexual Assault" page states as follows:

The Michigan Criminal Sexual Conduct Laws further declare that it is a crime to have sex with someone while that person is "mentally incapacitated" – defined as being "temporarily incapable of appraising or controlling [their] conduct due to the influence of a narcotic, anesthetic, or other substance;" alcohol is considered one such substance. The language of the law does not specify a certain number of drinks, or a certain blood alcohol level that constitutes incapacitation, recognizing that each person reacts differently to alcohol.

Michigan State Law thus states that a person who is intoxicated is legally unable to give consent to sexual activity, meaning that sexual intimacy with someone who is "mentally incapacitated" meets the legal definition of a sexual assault.

(emphasis original).

130.   To the contrary, the State of Michigan provides that a person is mentally incapacitated if he or she:

is rendered temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic, or other substance administered to that person without his or her consent, or due to any other act committed upon that person without his or her consent.

Mich. Comp. Laws § 750.520a(k) (2014) (emphasis added).

131.   The definition of "mentally incapacitated" on SAPAC's website is an utterly incorrect misstatement of the law, and intentionally leaves out the entire second half of the law's language which modifies the language quoted on SAPAC's page. "Mentally incapacitated" does not just mean that an individual is "temporarily incapable of appraising or controlling [their conduct] due to the influence of a narcotic, anesthetic, or other substance." Rather, the "narcotic,

anesthetic, or other substance" must also be "administered to that person without his or her consent."

132. Contrary to SAPAC's website, state law does not provide that "that a person who is intoxicated is legally unable to give consent to sexual activity."

133. The information given on the "Alcohol & Sexual Assault" page of SAPAC's website is wholly incorrect, intentionally misconstrues Michigan law, and provides students with an incomplete and inaccurate picture of their rights and duties at the University.

134. The University intentionally or recklessly misstated the law, policy and legal definitions applicable to "incapacitation" and "intoxication."

135. Based on the Appeals Board's poorly reasoned and supported decision, it apparently relies on this incorrect definition of the term "incapacitation."

136. Here, there is no evidence the Complainant was incapacitated.

137. It is uncontested that the Complainant was neither asleep nor unconscious while she was with Plaintiff.

138. It is also uncontested that the Plaintiff had no reason to believe that the Complainant was experiencing blackouts.

139. While the Complainant was with Plaintiff she also did not fall down or speak incoherently.

27

140.   To Plaintiff and all of the witnesses who observed the Complainant prior to the sexual encounter, the Complainant was not "incapacitated."

## Appeals Board Member's Conflict of Interest Caused the Board to Reach an Erroneous Result

141.   Because the names of the members of the Appeals Board were kept secret until after the Board issued its decision, neither party was able to determine if a Board member had a real or perceived conflict of interest before the Board rendered its decision.

142.   On June 14, 2016, Plaintiff was advised of the Appeals Board decision, and for the first time learned the names of the Appeals Board members.

143.   The Appeals Board members in this case were: Susan Pritzel, a Faculty Senate Appointee; Tabitha Bentley, a Central Student Government Appointee, and David Baum, a Presidential Appointee.

144.   According to the University of Michigan Statement of Student Rights and Responsibilities, a sexual misconduct Appeals Board is composed of "one student appointed by the Central Student Government (CSG), one faculty member appointed by the Faculty Senate, and one administrator appointed by the President."   Additionally, "CSG, the Faculty Senate, and the President [] each appoint one alternate member to the Appeals Board."

145.   Defendant Pritzel, the Faculty Senate Appointee, formally resigned as an active University of Michigan faculty member on December 31, 2008.

28

146. Defendant Bentley was a student at the Rackham School of Graduate Studies.

147. Defendant Baum was and is the Assistant Dean for Student Life and Special Counsel to the Dean of the University of Michigan Law School. His appointment is set to expire on August 31, 2017.

148. After the bizarre Appeals Board decision, on June 17, 2016, Plaintiff retained Deborah Gordon as legal counsel. Ms. Gordon reviewed the Appeals Board report and recognized that Defendant Baum had a possible or actual conflict of interest which he should have disclosed and which should have barred him from serving on the Appeals Board in this case.

149. Defendant Baum's conflict was based on his long-time relationship with the Complainant's counsel, Sarah Prescott, and her spouse, University of Michigan Law School Professor James J. ("J.J.") Prescott, and he likely could not be completely impartial.

150. Sarah Prescott is one of the two named partners of Salvatore Prescott, the firm representing the Complainant who had filed the Appeal. The firm opened for business in March 2016, just two months before the Complainant's appeal letter was filed.

151. The Complainant's appeal letter was filed by Salvatore Prescott, and the firm's name and letterhead was displayed on the first page.

29

152. Professor J.J. Prescott became an instructor at the University of Michigan Law School in 2006, and obtained tenure in 2011. Throughout Professor Prescott's employment at the Law School, Defendant Baum has been a Dean.

153. Professor Prescott and Defendant Baum have worked closely on activities and academic affairs, served on the same Michigan Law School committees, conducted fundraising activities together, and participated together in several other activities.

154. For example, upon Professor Prescott's request, Defendant Baum selected him to teach a "mini-seminar" at the Law School in 2014.

155. Defendant Baum has also provided input into Professor Prescott's assignments and his academic schedule.

156. Defendant Baum has assisted Professor Prescott in scheduling his courses to accommodate Professor Prescott's and Sarah Prescott's schedules.

157. In May, 2014, Defendant Baum asked Professor Prescott to assist a friend by participating in or finding someone to participate in a seminar. Defendant Baum subsequently stated that Sarah Prescott should participate in the seminar.

158. Ms. Prescott and Defendant Baum have a relationship born out of Defendant Baum's relationship with her husband.

159. In addition, Ms. Prescott and Defendant Baum are or have been

colleagues. Ms. Prescott has lectured at the Law School on employment law issues and was an instructor at the Law School during Defendant Baum's tenure in the 2013 Winter Term, when she taught Law 493: Employment Litigation. Ms. Prescott's faculty resume is currently available on the Michigan Law School web site. On March 31, 2015, Defendant Baum asked Ms. Prescott to meet with a third year law student to discuss possible employment opportunities.

160. In short, Dean Baum knew and had worked with both Sarah Prescott and Professor Prescott. He was aware Ms. Prescott had recently started her own law firm and he knew her firm represented the Complainant.

161. Defendant Baum depends on Michigan Law School faculty for support in his job performance which, in turn, impacts his continued employment with the University of Michigan. Defendant Baum's performance is evaluated in part though faculty review. It is in Defendant Baum's economic and personal interest to satisfy and gain favor of the tenured faculty, including Professor Prescott.

162. Defendant Baum had a duty to disclose his possible or actual conflicts of interest to ensure impartiality in the review process. He was required to do so under the University of Michigan Standard Practice Guide 201.65-1; the University of Michigan Policy for Deans and Directors on Conflicts of Interest and Conflicts of Commitment; and the University of Michigan Law School Conflicts of Interest

31

and Conflicts of Commitment Policies for Staff.

163.  Under these guidelines, a potential conflict of interest includes a personal or professional relationship that may have the possibility or may appear to have the possibility of compromising or influencing a faculty/staff member's judgment or decision.

164.  Guidance from the U.S. Department Education, Office for Civil Rights specifically instructs all persons involved in implementing a sexual misconduct grievance procedure to disclose "any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties."

165.  Defendant Baum therefore had the duty to disclose his relationships with Professor Prescott and Sarah Prescott because these relationships either affected his impartiality or created the appearance of partiality.

166.  Unlike elected or appointed Judges, Defendant Baum's duty under the University policies is similar to the duty imposed on arbitrators by the American Arbitration Association in The Code of Ethics for Arbitrators.  Canon II of the Code states:

> An arbitrator should disclose any interest or relationship likely to affect impartiality or which might create an appearance of partiality.
> (A.) Persons who are requested to serve as arbitrators should, before accepting, disclose: . . . (2) any known existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or lack of independence in the eyes of any of the parties.  For example, prospective arbitrators should disclose any such relationships which they personally have with any

party or its lawyer, with any co-arbitrator, or with any individual whom they have been told will be a witness. They should also disclose any such relationships involving their families or household members or their current employers, partners, or professional or business associates that can be ascertained by reasonable efforts[.]

167. The Preamble of the Code states that an arbitrator has a duty to disclose all potential conflicts of interest because:

. . . unlike full-time judges, arbitrators are usually engaged in other occupations before, during, and after the time that they serve as arbitrators. Often, arbitrators are purposely chosen from the same trade or industry as the parties in order to bring special knowledge to the task of deciding. This Code recognizes these fundamental differences between arbitrators and judges.

(emphasis added).

168. Defendant Baum's intentional failure to disclose his relationship with the Complainant's counsel to the OIE and Defendants Harper and Bazzy violated Plaintiff's right to due process.

169. Defendant Baum's failure to disclose his conflict of interest is exacerbated the by the fact that he was the only lawyer and University Dean on the panel.

170. When Plaintiff learned of the possible conflict of interest on June 16, 2016, time was of the essence.

171. Immediately after the Appeals Board report was accepted by Defendant Harper, the University proceeded to the "resolution process," which was essentially the penalty phase.

172.   There was no further opportunity to appeal the finding of misconduct, which was now the University's official and final determination.

173.   Plaintiff was instructed that he would be punished and the penalty would likely be removal from the University.  He was required to attend a meeting with Defendant Bazzy on June 22.

174.   By letter dated Monday, June 20, 2016 Plaintiff's counsel notified Defendants Harper and Bazzy that Defendant Baum had a possible or actual conflict of interest, had a duty to disclose his conflict or possible conflict, that his failure to do so required a new appeal hearing before the penalty phase meeting occurred on June 22, 2016.

175.   Defendants Harper and Bazzy never responded to Ms. Gordon's June 20, 2016 correspondence or any other communications on the matter.

176.   By email dated June 21, 2016, Patricia Petrowski, Office of General Counsel, advised Ms. Gordon that Defendant "Baum's participation in the appeals board was not a conflict of interest.  The University will not set aside the appeals board decision.  Tomorrow's [penalty phase] meeting should proceed as previously scheduled."

177.   There was no explanation as to why there could not be a short delay to address the conflict issue.  School was not in session and Plaintiff was working in another state for the summer.

34

178.   On June 23, 2016, Plaintiff's attorney spoke with Patricia Petrowski, Office of General Counsel, regarding Defendant Baum's possible or actual conflict of interest, the University of Michigan's policy governing conflicts of interest, and Defendant Baum's duty to disclose.

179.   Ms. Petrowski notified Ms. Gordon that Defendant Baum did not disclose to the University any possible or actual conflict of interest in connection with the Appeals Board matter. She refused to answer whether any inquiry had been made of Dean Baum with regard to a conflict. She also refused to adjourn the penalty phase proceeding.

180.   By letter dated June 24, 2016 to Patricia Petrowski, Plaintiff's counsel made another attempt to avoid a calamitous result for Plaintiff, and sent an additional letter.

181.   The letter outlined the various University of Michigan conflict of interest policies relevant to Defendant Baum's participation on the Appeals Board and his duty to disclose his possible or actual conflict of interest and cited rules associated with hearings, which would require that Defendant Baum recuse himself.

182.   Again the University failed to act and inexplicably insisted the penalty phase move forward.

183.   A basic underlying principal of any due process proceeding is that the

decision-maker must be impartial and unbiased.

184.   Once Defendants Harper and Bazzy were put on notice of the conflict issue, they had a duty to investigate and take proper steps to resolve the conflict. Their intentional failure to do was a violation of Plaintiff's due process right.

185.   Defendants Harper and Bazzy intentionally failed to rectify the lack of due process afforded to Plaintiff.  They could have investigated and/or reassigned the matter to another Board or Board member or external reviewer.   These alternative solutions would not have been burdensome and this litigation may have been avoided.

186.   The University is aware that using students, faculty, and staff as Appeals Board members is problematic, which is why the Policy was amended on July 1, 2016, days after Plaintiff was forced out of the University on June 27.

187.   The amendment to the Policy requires the appeal review to be conducted by an external reviewer:

> The external reviewer will be a neutral party, most often an attorney outside of the University with significant legal experience, knowledge, and judgment.  The external reviewer will be chosen by OGC in consultation with VPSL.  The external reviewer will receive annual training regarding the University's policies and procedures, the handling of student sexual misconduct cases, and other relevant issues.  The external reviewer must also be impartial and free from bias or conflict of interest.

See "The University of Michigan Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence,"

36

Section C.2 (July 1, 2016) (emphasis added).

## The Penalty Phase is a Sham

188.  Plaintiff had no "external reviewer" who was a "neutral party," "an attorney with significant legal experience, knowledge and judgment" who received training," and who was "impartial and free from bias or conflict of interest."

189.  The result was an erroneous decision and a due process violation.

190.  It became clear that for strategic reasons Defendants intended to take action to remove Plaintiff from the University as quickly as possible.

191.  Defendants gave Plaintiff little opportunity to assess his options or mount a legal claim. This time pressure made it more likely Plaintiff would comply with the Defendants' penalty suggestions, as discussed below.

192.  At 9:00 a.m. on June 22, 2016, Defendant Bazzy conducted a telephone meeting with Plaintiff to discuss the penalty phase, also known to the University as the "resolution process."

193.  Plaintiff was told that a "resolution officer" (the "RO") would decide Plaintiff's punishment. But before that would occur, Defendant Bazzy would propose a "resolution agreement" or penalty for Plaintiff.  If the Complainant and Plaintiff agreed on the penalty, there would be no need for a decision by the currently unnamed RO.

194.  Defendant Bazzy made clear that if Plaintiff did not accept her penalty

recommendation, the RO would likely decide to permanently expel Plaintiff. She said that any other result would be "highly unlikely" since students had been expelled in every other case where they were found to have violated the sexual misconduct Policy under similar circumstances.

195.   She noted that even if an RO were to suspend Plaintiff, which would be highly unlikely, Plaintiff would still have a permanent disciplinary record that would state that he had violated the sexual misconduct Policy.

196.   No matter what the penalty, Plaintiff could not appeal the decision that he had violated the Policy that would be a permanent part of his record.

197.   Immediately after the meeting, via an emailed letter to Plaintiff, Defendant Bazzy set forth the terms and conditions of the "voluntary permanent separation" she was recommending as a "resolution agreement" in lieu of the RO deciding on the penalty.

198.   Under the terms of the "voluntary permanent separation," Plaintiff was immediately and permanently separated from the University, permanently prohibited from reenrolling, prohibited from attending University sponsored events or "accessing" University property, prohibited from returning to volunteer or act as a consultant or mentor, and given a permanent disciplinary record that would state that he violated the sexual misconduct Policy.

199.   Plaintiff was told he would suffer the same penalties if he was

38

expelled by an RO, but by accepting the "voluntary permanent separation" he would be "withdrawn" as opposed to being "expelled."

200.  Plaintiff was given only until June 27, 2016—three business days—to accept the proposed agreement or have the RO decide his penalty, which would be an expulsion.

201.  On June 22, 2016, Defendant Bazzy wrote to Plaintiff to explain that Plaintiff could prepare a "Statement of Rationale" for his student file if he chose to accept the proposed agreement, explaining for the record why he had done so.

202.  Because Defendant Bazzy had advised him that every other student who had proceeded to the RO under similar circumstances had been expelled, Plaintiff accepted the proposed "voluntary permanent separation" agreement on June 27, 2016 in lieu of being expelled.

203.  In fact, the two available OIE annual reports confirm that every student in Plaintiff's circumstances has been "permanently separated" from the University.

204.  When Plaintiff accepted the proposed agreement he submitted an accompanying "Statement of Rationale."  In part, he wrote: "The fact that I am being forced to withdraw from the University is shocking and devastating to me.  I am choosing to accept the proposed agreement only because I have been told that if I do not choose to do so, I will likely be expelled."

39

205.   On June 28, 2016, Defendant Bazzy emailed Plaintiff, "I wanted to follow up and confirm that agreement was reached by both parties "and that I did receive the documents."

206.   Both parties had agreed to the proposed agreement and the penalty phase was complete.

207.   Plaintiff was advised by Defendant Bazzy of the following:

If you are currently in any U of M affiliated clubs or hold office, you will need to send an email and resign your position.  You can forward me the email for confirmation.  If you are currently enrolled in courses or have signed up for anything you will need to email the following address today in order to dis-enroll from current courses and for the Fall.  Request to be dis-enrolled from any current courses and for the Fall term.  Please provide your name and UMID and the term you need to dis-enroll for.  Please forward me the email once this has been completed.  At this point, the case will be closing.

Plaintiff followed these directions.

208.   Then, on June 29, 2016, apparently after consulting with University counsel, Defendant Bazzy emailed Plaintiff:

On June 27, 2016, I received your purported acceptance of the proposed resolution agreement I sent you on June 22, along with an "Attachment to Resolution by Agreement Selection" that is captioned, "Statement of Rationale – [Plaintiff]."  In that statement, you claim that you are being "forced" to withdraw from the University and that you are "choosing to accept the proposed agreement only because I have been told that if I do not choose to do so, I will likely be expelled."

. . .

Unless you acknowledge by Friday, July 1, that you accept the resolution agreement on the basis set forth in this email, I will

40

<u>interpret your response as an objection to the agreement and I will proceed to the Resolution by Decision Phase as set forth in the Policy</u>.

(emphasis added).

209. Defendant Bazzy's June 29, 2016 email was a complete reversal of comments she made to Plaintiff during their June 22, 2016 meeting when she stated that the "RO will escalate to expulsion," "suspension is unlikely," and "in my review of all comparable cases, [the RO] always goes to voluntary permanent separation or expulsion." Defendant Bazzy had previously cited "over ten" cases where expulsion had been the result.

210. Defendant Bazzy's threat to revoke the "proposed agreement" compelled Plaintiff to amend his "Statement of Rationale" and chilled his right to free speech. Plaintiff therefore responded by email on June 30, 2016 that "I made my decision to accept the proposed agreement freely and voluntarily and was not forced into that decision."

### Irreparable Harm Suffered by Plaintiff as a Result of Defendants' Actions

211. Plaintiff has suffered irreparable harm to his reputation as a result of his disciplinary record at the University of Michigan and the underlying Appeals Board report which finds that Plaintiff violated the sexual misconduct Policy.

212. If Plaintiff's disciplinary record and the Appeals Board report are not vacated, he will suffer irreparable harm to his reputation, as well to his educational

41

and career opportunities.

213.   Plaintiff cannot graduate from the University of Michigan.

214.   Since Plaintiff was notified that he cannot attend the University of Michigan in the Fall 2016, Plaintiff has researched approximately 50 other undergraduate institutions to determine whether by Spring 2017 he could obtain the degree he was set to obtain at the University of Michigan.

215.   Many of these other institutions had application deadlines that had already passed, and others had policies only allowing admissions to students who had not accumulated credits beyond a certain amount.

216.   It was likely no similarly ranked institution would accept Plaintiff with the erroneous discipline record created by Defendants.

217.   In order to graduate in the Spring 2016, Plaintiff has been forced to enroll in a Tier 2 undergraduate institution in the State of Michigan (hereinafter, "the New School").

218.   On information and belief, the University of Michigan is a Tier 1 undergraduate institution.

219.   At the New School Plaintiff must complete an additional 44 credit hours in order to graduate in Spring 2016, not the 13.5 he needed to graduate from the University.

220.   Plaintiff will not be able to graduate with the same degree he would

42

have had if he was able to graduate from the University of Michigan. Rather Plaintiff will receive a degree in "accounting" instead of a Bachelor Degree in Business Administration (BBA), a far more prestigious and highly remunerated degree.

221.   Plaintiff's educational and career prospects will be irreparably harmed if he is unable to obtain the BBA degree he was so close to obtaining at the University of Michigan.

222.   Plaintiff had completed a summer internship with a financial institution during the Summer of 2016 based on his attendance at the University.

223.   As a result of Plaintiff's exceptional performance, the financial institution offered him a lucrative full-time position, which is contingent on his graduation of the University of Michigan.

224.   If Plaintiff is unable to graduate from the University of Michigan, he will be irreparably harmed by not being able to accept this job offer.

225.   On information and belief, Plaintiff's opportunities to secure a full-time position with a different company in the financial sector are limited because often these financial institutions hire from their summer internship class.

226.   On information and belief, Plaintiff's opportunities to secure a full-time position with a different company in the financial sector are now limited because the pre-recruiting process for the type of job Plaintiff sought to acquire has

43

already begun.

## COUNT I
### *42 U.S.C. § 1983 – Fourteenth Amendment Due Process Void for Vagueness*

227.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

228.   The University of Michigan's definition of "incapacitation" in its former Policy which was in effect when the alleged misconduct occurred is unconstitutionally vague and therefore violates the Due Process Clause.

229.   The University admitted that its Policy was ambiguous and that it "did not do a good enough job at defining incapacitation." To remedy this issue, the University amended its Policy in July 2016.

230.   Because the amended Policy was circulated to the University community on April 6, 2016, the Appeals Board was aware of the amended Policy and its clarification that incapacitation is a state greater than intoxication.

231.   Nonetheless, the Appeals Board applied an unconstitutionally vague definition of "incapacitation."

232.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. "[A] more stringent vagueness test" applies to enactments that threaten to inhibit

44

the exercise of constitutionally protected rights, such as Plaintiff's liberty and property interest in his education. *Village of Hoffman* Estates, 455 U.S. at 499.

233.   Moreover, the "stigmatizing effect" of discipline under the Policy warrants application of a stricter vagueness test. *Id.*

234.   The Policy does not provide an "ascertainable standard" for the term "incapacitation." *See Entertainment Concepts, Inc. III v. Maciejewski*, 631 F.2d 497, 501 (7th Cir. 1980) (quoting *Smith v. Goguen*, 415 U.S. 566, 578 (1974)).

235.   Due process requires "at least sufficient exactness to prevent arbitrary enforcement and give notice of what an individual must do to comply with the enactment." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 559 (6th Cir. 1999).

236.   The Policy therefore violates Plaintiff's due process rights because it is vague on its face and as applied to the facts of this case.

### COUNT II
#### *42 U.S.C. § 1983 - Fourteenth Amendment*
#### *Procedural and Substantive Due Process*
#### *Property and Liberty Interests*

237.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

238.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

45

239.   Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions.

240.   Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

241.   Plaintiff has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

242.   Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

243.   Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here the allegations were of the utmost seriousness, have lifelong ramifications, and were quasi-criminal in nature.

244.   Plaintiff had a significant interest in avoiding expulsion and being subjected to an impartial panel.

245.   Because the University provided an appeals process, it had the obligation to ensure that the process was completed in accordance with due process principles.

46

246. Plaintiff's liberty and property interests were invaded by Defendants by permitting the Complainant to appeal an OIE decision in which Plaintiff had been found not to violate the sexual misconduct Policy.

247. Plaintiff's liberty and property interests were invaded by Defendants in an arbitrary and capricious manner when the Appeals Board overturned the OIE decision and reached an erroneous result without due process of law.

248. Defendant Appeals Board members acted with bias and deliberate indifference to Plaintiff's presumed and actual innocence of wrongdoing.

249. The Appeals Board acted intentionally and/or recklessly.

250. The Appeals Board proceeding was a sham.

251. Defendant Appeals Board members improperly shifted the burden of proof to Plaintiff.

252. Defendant Appeals Board members refused to apply the proper "preponderance of the evidence" standard.

253. Defendant Appeals Board members violated Plaintiff's due process rights because their decision was based on a fundamental misunderstanding of the difference between "incapacitated" and "intoxicated."

254. The Appeals Board either intentionally conflated "incapacitation" and "intoxication" or did so recklessly.

255. Defendant Appeals Board members supplanted their own personal

opinions over the detailed evidence provided in the OIE report, and failed to comply with the Policy requirements that they must have "firm and definite support for modifying the original finding(s)."

256. It would have been plainly obvious to a reasonable official that the actions described above would deprive or lead to the deprivation of Plaintiff's constitutional rights.

257. Defendants further violated Plaintiff's due process rights by not ensuring that the Appeals Board was composed of fair and impartial members.

258. Providing a fair and impartial panel does not impose a great administrative burden on a university.

259. Defendant Baum recklessly disregarded his duty to disclose his possible or actual conflict of interest as required under the University of Michigan policy and denied Plaintiff his right to an impartial decision-maker.

260. Defendants Bazzy and Harper also violated Plaintiff's due process rights by disregarding notice that Defendant Baum had a possible or actual conflict of interest.

261. Defendants' actions and inactions as set forth above were fundamentally unfair to Plaintiff.

262. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but

not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III
### *42 U.S.C. § 1983 – First Amendment Free Speech*

263. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

264. At all times material hereto, Plaintiff had a clearly established right to freedom of speech pursuant to the First Amendment of the United States Constitution, of which a reasonable public official would have known.

265. Plaintiff's free speech rights included the right to freely set forth his reasons for accepting the proposed agreement in his "Statement of Rationale."

266.  Defendant Bazzy prohibited Plaintiff from engaging in protected speech when she threatened to withdraw the proposed agreement, which had already been effectuated, unless he retracted his prior statements.

267.  If Defendant Bazzy withdrew the proposed agreement, Plaintiff would have almost certainly been expelled from the University.

268.  Defendant Bazzy's actions compelled Plaintiff to express a message with which he disagreed.

269.  Defendant Bazzy's actions had a chilling effect on Plaintiff's right to free speech.

270.  Any other Defendant who supported Defendant Bazzy's actions or encouraged her actions also compelled or chilled Plaintiff's speech.

271.  Defendant Bazzy's actions would deter a person of ordinary firmness from exercising his or her First Amendment rights freely and would have compelled or chilled his or her speech.

272.  Plaintiff's speech, which was prohibited by Defendant Bazzy, would have neither substantially disrupted school activities nor impinged on the rights of other students.

273.  As a direct and proximate result of Defendant Bazzy's (and any other Defendants') unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to a coerced statement that is now a part of his

record, the imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## **Relief Requested**

Plaintiff demands judgment against Defendants as follows:

A.   Equitable Relief:

    1.   Removal of any and all references to the allegations or investigation at issue, discipline or sanctions from Plaintiff's files and records;

    2.   Plaintiff's immediate reinstatement to the University of Michigan as a student in good standing so he may enroll in classes in the Fall 2016 term

    3.   An injunction out of this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

    4.   An award of interest, costs and reasonable attorney fees; and,

    5.   Whatever other equitable relief appears appropriate at the time of final judgment.

B.   Legal Relief:

    1.   Compensatory damages in whatever amount he is found to be entitled;

    2.   Exemplary damages in whatever amount he is found to be entitled;

    3.   Punitive damages in whatever amount he is found to be entitled; and,

4.      An award of interest, costs, reasonable attorney fees, and expert witness fees.

> **DEBORAH GORDON LAW**
> /s/Deborah L. Gordon (P27058)
> Benjamin I. Shipper (P77558)
> Irina Vaynerman (0396759)
> Attorneys for Plaintiff
> 33 Bloomfield Hills Parkway, Suite 220
> Bloomfield Hills, Michigan 48304
> (248) 258 2500
> dgordon@deborahgordonlaw.com
> bshipper@deborahgordonlaw.com
> ivaynerman@deborahgordonlaw.com

Dated:  September 1, 2016

## JURY DEMAND

Plaintiff **John Doe** by his attorneys **Deborah Gordon Law** demands a trial by jury of all the issues in this cause.

> **DEBORAH GORDON LAW**
> /s/Deborah L. Gordon (P27058)
> Benjamin I. Shipper (P77558)
> Irina L. Vaynerman (0396759)
> Attorneys for Plaintiff
> 33 Bloomfield Hills Parkway, Suite 220
> Bloomfield Hills, Michigan 48304
> (248) 258 2500
> dgordon@deborahgordonlaw.com
> bshipper@deborahgordonlaw.com
> ivaynerman@deborahgordonlaw.com

Dated:  September 1, 2016

## **VERIFICATION**

I, John Doe, under penalty of perjury of the laws of the United States, state that I am a former student at the University of Michigan; that I have read, am familiar with, and have personal knowledge of the contents of the foregoing Verified Complaint; and that to the best of my knowledge, information, and belief the allegations thereof are true and correct.

Executed on the 1st day of September, 2016.

John Doe