UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE,

              Plaintiff,                                 Case Number 16-13174

v.                                                Honorable David M. Lawson

DAVID H. BAUM, SUSAN PRITZEL,
TABITHA BENTLEY, E. ROYSTER
HARPER, NADIA BAZZY, ERIK
WESSEL, UNIVERSITY OF MICHIGAN,
and BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,

              Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION AND RENEWED
MOTION FOR PRELIMINARY INJUNCTION AND MOTIONS FOR
EVIDENTIARY HEARING, AND GRANTING DEFENDANTS' MOTION TO DISMISS**

Plaintiff John Doe alleges in an amended complaint that he agreed under duress to withdraw

from the University of Michigan with only one semester left to complete his degree, after he was

found to have violated the school's Policy on Sexual Misconduct by Students.  An appeal board

assembled by the University's Office of Student Conflict Resolution (OSCR) determined that Doe

had sexual relations with a freshman when Doe should have known that she was too drunk to be able

to give consent.  Doe filed a seven-count amended complaint in this Court against the OSCR appeal

panel members, Office of Student Affairs personnel, the University, and its Board of Regents

alleging various constitutional and statutory violations that occurred during the disciplinary

proceedings, and seeking damages, attorney's fees, and an order reinstating him so he can complete

his degree.  The plaintiff has filed motions for temporary injunctive relief and the defendants have

filed a motion to dismiss.  The Court heard oral argument on December 8, 2016.  Because the

plaintiff was afforded all the protection to which he is entitled under the Due Process Clause, and

he has not stated claims based on the First Amendment, the Equal Protection Clause, or various anti-discrimination statutes for which relief can be granted, the Court will deny the motions for a temporary injunction, grant the motion to dismiss, and dismiss the case.

## I. Fact Summary

Plaintiff Doe enrolled in the University of Michigan in September 2013. He attended six semesters at the University through April 2016, earning a cumulative GPA of 3.95. He asserts that, before the events described in the complaint, he "had an excellent reputation, had no involvement with law enforcement, and was never disciplined by a school or employer." In January 2016, a female student filed a complaint with the University's Office of Institutional Equity. Her complaint stated that Doe sexually assaulted her by, among other things, manipulating her into performing oral sex on him, without her consent, after she became drunk at a party.

Christina Kline, an investigator with the University's Office of Institutional Equity (OIE), conducted a three-month investigation and interviewed 23 witnesses about the event, with the goal of determining whether the complainant was "incapacitated" at the time of the sexual contact, such that she could not, according to the University's policy, give valid consent to engage in the sex acts that occurred. On April 15, 2016, Investigator Kline issued a written report in which she concluded that the evidence she found did not show by a preponderance that Doe had engaged in any unwanted sexual activity with the complainant. The investigator also concluded that there was insufficient evidence to support a finding that the complainant was "incapacitated" and unable to give valid consent to the sexual contact that did occur.

The complainant appealed Investigator Kline's findings to the University's Office of Student Conflict Resolution, which, according to University policy, can engage in a limited scope review

-2-

of sexual assault complaints resolved by the OIE.  One of the grounds on which an OIE finding may be reversed is where the review panel determines that a "review of all available and relevant information indicates that the evidence clearly does not support the finding(s) and provides firm and definite support for modifying the original finding(s)."  On May 25, 2016, the review panel issued a decision in which the panel observed that the OIE investigator had performed a "fair and thorough investigation," but the panel also concluded that the finding of no violation clearly was not supported by the information gathered in the investigation.

Doe contends that the review panel's decision was procedurally flawed and violated his due process rights because (1) the definition of "incapacitated" that was applied during the investigation and review of his case (later revised in a new policy effective July 2016) is "unconstitutionally vague"; (2) the review panel improperly conducted a "de novo review" of the record, rather than properly applying the "clearly erroneous" standard of review called for under the appeal policy; and (3) the review panel selectively considered only evidence that supported their reversal of the OIE investigator's findings, while ignoring other evidence in the record that the OIE investigator relied upon in reaching her conclusion that no violation had been established.  Doe also contends that the review panel misconstrued or misstated comments in certain witness statements and relied upon "findings" supported only by speculation about the complainant's level of intoxication at the time of the events, rather than any information in the record or any scientific or medical basis.  Doe also alleges that the review panel exhibited gender bias in favor of the female complainant by accepting as true all of the information supporting her account, but rejecting all information that supported the male respondent's account.

-3-

Finally, Doe alleges that one of the review panel members, defendant David Baum, was biased in favor of the complainant, due to his personal and professional relationship with Sarah Prescott, a partner in the law firm that represented the complainant in the appeal proceedings, and also with Ms. Prescott's spouse, J.J. Prescott, who is a tenured professor on the University's law school faculty.  Doe asked for a reconsideration of the appeal by a different panel because of the conflict, but the University refused to reconsider or set aside the panel's decision.

On June 22, 2016, Doe was informed by University officials that if he, the complainant, and the officials could not reach an agreement as to a penalty for the policy violation, then a review officer would determine an appropriate penalty, which likely would be expulsion.  But the University informed Doe that if he agreed to accept "permanent voluntary separation" as a penalty, then his transcript would not indicate that he was expelled for violating the sexual misconduct policy.  Doe initially hesitated and submitted a response in which he "agreed" to leave the University voluntarily, but also stated that he felt he had been "forced to withdraw" under threat of being expelled and having his permanent transcript marred by a sexual misconduct violation.  The University replied that it construed the response as an objection to the penalty and not an agreement. Doe then submitted a second statement of consent to the penalty, without the previously-stated qualification.

Notwithstanding the "agreed" resolution of the disciplinary complaint, Doe filed a complaint in this Court on September 1, 2016, seeking judicial review of the disciplinary proceedings and declaratory and injunctive relief absolving him of the misconduct allegations and commanding the University to allow him to enroll for classes and complete his degree.  Doe originally sued several individual school officials who participated in the disciplinary proceedings.  He later filed an

amended complaint, which added as parties the University and its Board of Regents. The amended complaint raises claims that (1) the applicable definition of "incapacitated" in the University's sexual misconduct policy (which since has been revised) is "void for vagueness" (Count I); (2) the appeal process deprived Doe of his right to procedural due process because he had no meaningful opportunity for a fair hearing and review of his case by the appeal panel (Count II); (3) the University violated his rights under the First Amendment by denying him the opportunity to set forth his "objections" in his response to the penalty proposal (Count III); (4) the appeal panel discriminated against him on the basis of his sex, contrary to Title IX, by refusing fully and fairly to consider his side of the story (Count IV); and (5) the University's policy regarding sexual misconduct appeals had a disparate impact on Doe based on his sex, because students accused of sexual misconduct are not allowed to have an oral hearing before the appeal board, to pose questions to the complainant on the record, or to have certain other privileges inherent in a live hearing (Count V). The complaint also includes trailing claims for gender discrimination under Michigan's Elliot-Larsen Civil Rights Act (Counts VI and VII), on the same premises advanced in Counts IV and V.

## II. Motion to Dismiss

In their motion, the defendants argue that they are entitled to dismissal under Federal Rule of Civil Procedure 12(b)(6) because all of the individual defendants are entitled to qualified immunity, and defendants Bentley, Pritzel, and Baum are entitled to absolute "quasi-judicial" immunity. They also contend that the Due Process claims in Counts I and II must be dismissed because the plaintiff has not identified any protected liberty or property interest. And they assert that the definition of "incapacitated" under the University's policy is not unconstitutionally vague. Looking to the procedures as described in the amended complaint, the defendants argue that the

plaintiff was afforded ample notice and an opportunity to be heard in the course of the OIE investigation, and that his allegations are insufficient to raise the specter of bias against defendant Baum.  The defendants dispute the claimed violation of the First Amendment because no pleaded facts establish that Doe was compelled to make any statement about the disciplinary proceedings, and through counsel he represented that he entered into the agreement to withdraw from the University voluntarily.  The defendants contend that the gender discrimination claims in Counts IV and V are defective as a matter of law because (1) the plaintiff has not alleged any facts to show that gender bias motivated the panel to render its decision against him, other than the fact the plaintiff is male and the complainant is female; and (2) claims of disparate impact are not cognizable under Title IX where the policy challenged is facially neutral with respect to gender.  They attack the state law claims on similar grounds.  Finally, the defendants argue that the plaintiff has waived any right to seek reinstatement to the University, because he voluntarily agreed to withdraw his enrollment, as part of the penalty agreement to which he freely consented.

"The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)).  Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations."  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 228-29 (6th Cir. 1997) (quoting *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).  "However, while liberal,

this standard of review does require more than the bare assertion of legal conclusions." *Tatum*, 58 F.3d at 1109; *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488 (6th Cir. 2009). "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court but conclusions may not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss."

*Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)); *see also Koubriti v. Convertino*, 593 F.3d 459, 463 n.1 (6th Cir. 2010).  Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr.*, 508 F.3d at 335-36.  If the plaintiff does not directly refer to a document in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that plan documents could be considered without converting the motion to one for summary judgment even though the complaint referred only to the "plan" and not its associated documents).  In addition, "a court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Northville Downs v. Granholm*, 622 F.3d 579 (6th Cir. 2010) (citing *Commercial Money Ctr., Inc.*, 508 F.3d at 335-36).

The relevant portions of the administrative record are proper materials for the Court to consider on the motion to dismiss in this case, even though the administrative record was attached by the parties only to their motion papers and not to the original or amended complaint. *See Doe v. Ohio State Univ.*, No. 15-2830, 2016 WL 6581843, at *3 (S.D. Ohio Nov. 7, 2016).  The focus of the claims in this case necessarily will be the constitutional propriety of the procedures followed and the findings and conclusions expressed by the administrative entity.  Those findings are discussed in the amended complaint, and the parts not quoted still are "integral to Doe's claims and therefore appropriate to consider." *Ibid.*

-8-

A.  Immunity

The doctrine of qualified immunity will protect government officials from having to defend their discretionary decisions in a civil damage action, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008)).  Evaluating that defense requires two steps: first, the court must determine whether the plaintiff has made out a constitutional violation; and second, the plaintiff must show that the constitutional right was clearly established at the time of the violation.  *Id.* at 609-10 (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010)).  However, the Court need not adopt a "rigid order of battle," and may decide these elements in either sequence.  *Pearson v. Callahan*, 555 U.S. 223, 235 (2009) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 201-02 (2004) (Breyer, J., concurring)).  Because the qualified immunity argument is answered by the Court's determination of the merits of the plaintiff's claims, it need not be discussed further.

Individual defendants Bentley, Pritzel, and Baum also maintain that they are entitled to absolute quasi-judicial immunity as members of the adjudicatory appeal panel.  They are not.  In *Butz v. Economou*, 438 U.S. 478 (1978), on which the defendants principally rely, the Supreme Court held that certain federal administrative law judges, who operate under all the formal constraints and protections of the Administrative Procedures Act, are entitled to absolute quasi-judicial immunity when performing adjudicatory functions.  However, in *Wood v. Strickland*, 420 U.S. 308 (1975), the Court held that school board officials reviewing disciplinary complaints and deciding whether to expel students were not entitled to absolute immunity when acting in that

-9-

adjudicatory capacity.  *Id.* at 320 ("[A]bsolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations.").  With such clear contrary precedent from the nation's highest court, one wonders why these defendants advanced this argument.  In all events, defendants Bentley, Pritzel, and Baum are not entitled to absolute immunity from Doe's lawsuit.

### B. Waiver

The defendants' position that the plaintiff "waived" his right to challenge his expulsion or seek reinstatement to the university is groundless.  "'[W]aiver is the intentional relinquishment or abandonment of a known right.'"  *United States v. Doxey*, 833 F.3d 692, 702 (6th Cir. 2016) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotations omitted)).  Nothing in the record suggests that the plaintiff intentionally relinquished or abandoned his resistance to the appeal panel's decision to discipline him, notwithstanding the plaintiff's tactical decision — for reasons that are readily apparent — to agree to a negotiated penalty of "voluntary withdrawal" *in lieu* of a formal expulsion.  The plaintiff's election of the "lesser evil" of voluntary withdrawal after the disciplinary proceedings concluded and his fate was sealed does not in any way indicate his concession to abandon any challenge to the correctness of that decision in the first instance, particularly where, in his initial response to the penalty proposal, the plaintiff expressly stated his view that he was "forced" to withdraw under threat of certain expulsion.

### C. Due Process Claims

Via 42 U.S.C. § 1983, Doe alleges that the defendants' actions violated his rights under the Fourteenth Amendment's Due Process Clause.  There is no dispute that the defendants were acting

-10-

under color of state law when they effectively expelled Doe from a state-run university; that element of the plaintiff's § 1983 claim is satisfied. *See Baynes*, 799 F.3d at 607. Doe also must show that his rights under the Constitution or federal laws have been violated. *Ibid.* (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

### 1. Protected Interest

Doe alleges violations of his right to procedural due process, and also, although not in explicit terms, the substantive aspect of the Clause as well. "'Procedural and substantive due process claims are examined under a two-part analysis. First, the Court must determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment." *Puckett v. Lexington-Fayette Urban County Gov't*, 833 F.3d 590, 604-05 (6th Cir. 2016) (citations omitted). The defendants argue that the plaintiff has not identified any property or liberty interest that is protected by the Due Process Clause. Like their absolute immunity contention, however, this argument — that the plaintiff had no due-process-protected interest in his reputation or continued enrollment at the University — is a non-starter. The Sixth Circuit plainly has "held that the Due Process Clause is implicated by higher education disciplinary decisions." *Flaim v. Med. College of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (citing *Goss v. Lopez*, 419 U.S. 565 (1975); *Board of Regents v. Roth*, 408 U.S. 564 (1972)); *see also Doe v. Cummins*, --- F. App'x ---, 2016 WL 7093996, at *7 (6th Cir. Dec. 6, 2016) (recognizing that due process "protections apply to higher education disciplinary decisions").

The cases on which the defendants rely are readily distinguishable because those holdings rejected substantive — not procedural — due process claims, and only in the context of academic dismissals, not charges of misconduct. *See Rogers v. Tennessee Bd. of Regents*, 273 F. App'x 458,

-11-

463 (6th Cir. 2008) (noting that the Sixth Circuit has "rejected the notion that substantive due process protects a medical student's interest in continuing education. . . . This court has, albeit in an unpublished opinion, applied the holding of *Bell* in a subsequent decision *denying a substantive due process claim in the context of an academic dismissal*.") (citing *Bell v. Ohio State University*, 351 F.3d 240 (6th Cir. 2003) (emphasis added)). Doe's interest in finishing his degree program and preserving his reputation against the claimed violation of the University's sexual misconduct policy qualifies for procedural due process protection.

### 2. Procedural Due Process Claims

In addition to identifying a protected interest, a plaintiff claiming a violation of the Due Process Clause by a state actor must plead that he was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). Once it is determined that the Due Process Clause applies, as it does in "higher education disciplinary decisions," *Flaim*, 418 F.3d at 633; *Roth*, 408 U.S. 564), "'the question remains what process is due.'" *Id.* at 633-34 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The amount of process due will vary according to the facts of each case and is evaluated largely within the framework laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." The *Mathews* framework requires the Court to assess (1) the nature of the interest the plaintiff asserts; (2) the risk that the procedure employed will lead to an erroneous result, and the value that alternative or additional procedures would bring; and (3) the burden on the government of those additional or different procedures. *Mathews*, 424 U.S. at 335.

As the court of appeals has noted, "'[a] university is not a court of law, and it is neither practical nor desirable it be one. Yet, a public university student who is facing serious charges of

misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing. In weighing this tension, the law seeks the middle ground.'" *Flaim*, 418 F.3d at 635 n.1 (quoting *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005)). Ultimately, the "Court's main concern [must focus on] ensuring the presence of 'fundamentally fair procedures to determine whether the misconduct has occurred.'" *Id.* at 634 (quoting *Goss*, 419 U.S. at 574).

Fundamental fairness requires, at a minimum, notice and an "opportunity for hearing appropriate to the nature of the case." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Roth*, 408 U.S. at 570) (quotations omitted). In disciplinary expulsion cases, "[t]he hearing, whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'" *Flaim*, 418 F.3d at 635-37 (quotations and citations omitted). However, "hearings need not be open to the public, . . . neither rules of evidence nor rules of civil or criminal procedure need be applied, and witnesses need not be placed under oath." *Ibid.* Nor is "a full-dress judicial hearing, with the right to cross-examine witnesses, . . . required." *Id.* at 637 n.2 (quoting *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.1961)). But the accused student must have "the right to respond and defend, which will generally include the opportunity to make a statement and present evidence." *Id.* at 636.

Doe does not criticize the notice given him by the OIE. His procedural due process claim is predicated on the following allegations: (1) the review panel improperly conducted a "de novo review" of the record, rather than applying the "clearly erroneous" standard of review called for under the policy; (2) the definition of "incapacitated" that was applied during investigation and review of his case is "unconstitutionally vague"; (3) Doe was not given an opportunity to appear

personally before the appeal panel or confront or cross-examine the complainant or other witnesses; and (4) at least one member of the appeal panel had a conflict of interest that rendered him biased.

a.  Appeal Panel's Standard of Review

After conducting a thorough — even exhaustive — investigation of the incident, Investigator Kline wrote that "there is insufficient evidence to conclude that the Respondent acted in violation of the Policy on January 16, 2016 when he subjected the Complainant to unwanted sexual activity." On review, the appeal panel concluded that there was "no material deviation from the procedures" applicable to the original investigation.  It also found that there was "not any new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation."  However, the panel found that its "review of all available and relevant information indicates that the evidence clearly does not support the OIE investigator's conclusion and provides firm and definite support for modifying the original finding."  This latter conclusion, so the parties seem to agree, appears to paraphrase accurately the University's policy stating the grounds for reversal of investigative findings by an appeal panel.  However, Doe insists that the appeal panel actually gave fresh review to the evidence and afforded no deference to the investigator, in violation of the University's Policy.

But even if the appeal panel applied a review standard not prescribed by the University's procedures, that alone would not establish a due process violation.  The Sixth Circuit recently rejected a similar argument in a school expulsion case.  *Doe v. Cummins*, 2016 WL 7093996, at *7 n.2.  ("Given that the Constitution — and the case law interpreting it — mandates what procedures are constitutionally required following the deprivation of a property or liberty interest, and not internal school rules or policies, this argument clearly lacks merit.").  That court (and others) has

-14-

held consistently that the violation of school policies or state law does not create a cognizable due-process claim in federal court. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 570 (6th Cir. 2011); *see also Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 309 (6th Cir. 1984) (holding that a school's violation of its own internal rules is of no constitutional moment); *Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985) ("There is not a violation of due process every time a university or other government entity violates its own rules."); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 603 (S.D. Ohio 2016) (holding that "an allegation that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation"). The claimed deviation from the University's appeal procedure here does not state a viable claim for denial of procedural due process.

### b. Vagueness

Doe's vagueness argument attacks the language of the school's "Policy on Sexual Misconduct by Students." The parties have not submitted with their pending motions a verbatim copy of that policy, but they apparently do not dispute that the appeal panel accurately summarized the operative provisions in its decision, as follows:

> Under the [Sexual Misconduct] Policy, "sexual assault" is defined in relevant part as "[u]nwanted or unwelcome touching of a sexual nature, including . . . fondling, oral sex, . . . or vaginal intercourse . . . that occurs without valid consent." "Consent" is defined in relevant part as "[c]lear and unambiguous agreement, expressed in mutually understandable words or actions, to engage in a particular activity. . . . Consent cannot be validly given by a person who is incapacitated. For purposes of this policy, the issue is whether Respondent knew, or should have known, that the activity in question cannot be consensual." "Incapacitated" is defined as "[l]acking the physical and/or mental ability to make informed, rational judgments. This may have a variety of causes, including, but not limited to, being asleep or unconscious, having consumed or taken drugs, or experiencing blackouts or flashbacks."

Plf.'s Renewed Mot. for Prelim, Inj., Ex. D, Appeals Board Report dated May 25, 2016 at 2.  Doe's main criticism is aimed at the term "incapacitated," because, he contends, the term is so loose that it allowed the appeal panel to project its own conception of what the term should mean.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, --- U.S. ---, 132 S. Ct. 2307, 2317 (2012).  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause . . . .  It requires the invalidation of laws that are impermissibly vague." *Ibid.*  "A . . . punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Ibid.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

"As [the Supreme Court] has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Ibid.*  However, "[g]iven [a] school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("The school disciplinary rule proscribing 'obscene' language and the prespeech admonitions of teachers gave adequate warning to Fraser that his lewd speech could subject him to sanctions.").

The language of the Sexual Misconduct Policy is not unconstitutionally vague, because a person of ordinary intelligence certainly can understand what is meant by the term "incapacitated," where it is defined in the policy itself to mean "[l]acking the physical and/or mental ability to make

-16-

informed, rational judgments." Doe contends that this definition offered insufficient guidance to the appeal panel and permitted the members to act with unbridled discretion by inventing their own *ad hoc* application of the policy, when they concluded that the plaintiff "should have known" that the complainant was incapacitated, despite the lack of her display of any specific or enumerated "indicators of incapacitation." But the Supreme Court in *Bethel School District* held that such precision is not required. A regulation "need not define every term to survive a vagueness challenge." *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 716-17 (7th Cir. 2016). Here, regardless of what criteria may be employed in order to prove the fact in question, it is plain what fact must be proved: that the complainant lacked the physical or mental capacity to make informed, rational judgments.

The appeal panel concluded that the complainant lacked the capacity to make informed rational judgments because (1) she had consumed a prodigious amount of alcohol during the approximately one to two hours preceding the sexual encounter; (2) by her own account she was unaware of and unable consciously to perceive, participate in, object to, or give consent to, the sexual activity that ensued; and (3) the apparent signs of intoxication that the complainant described, which were corroborated by at least three other witnesses who observed her for an extended period that night, reasonably should have been perceived by Doe as well. As discussed further below, there was ample testimony in the record to support those conclusions. And the appeal panel placed substantial weight on the fact — which the plaintiff entirely avoids in his pleadings and his briefing — that he admitted to police that the complainant's account of the encounter was essentially entirely correct, but for the fact that he never heard her say "no sex."

Doe has not stated a claim in his amended complaint based on the alleged vagueness of the Policy.

### c. Personal Appearance, Confrontation, and Cross-examination

Doe contends that he was deprived of the privileges of a live hearing, cross-examination of witnesses, and oral argument before the panel. However, he has not pointed to any information favorable to his defense that he was prevented from presenting, and he has not suggested any substantial way in which his defense was prejudiced by the lack of those procedural devices. Doe appears to assert that he was deprived of a fair hearing mainly because the panel ultimately was unpersuaded by his side of the story, despite the exhaustive and uninhibited presentation that he was allowed to make in his defense. Moreover, he has not identified any information in the record that he contends was not submitted to the panel by him, or that he would have submitted if he had received any more process than he actually had.

The University never convened any live hearing with witnesses present, and there apparently was no hearing before the appeal panel. But Doe did have a hearing, with some degree of formality, during the two live interviews that the investigator conducted. During those interviews the investigator gave verbal and written explanations of the charges and the sexual misconduct policy that Doe was accused of violating. She explained the process that would be followed during the investigation. The investigator made a careful and complete written account of those interviews, and of her contact with all of the other witnesses, which was included in her report, along with documentary exhibits and briefing submitted by the parties that were included as attachments. Doe's attorney was present and advised him, at least during the second interview. He was allowed multiple opportunities before, during, and after both appearances to ask questions, make verbal comments

and arguments, and present additional information and clarifications as he saw fit. He was provided copies of the complainant's statement, police reports obtained by the investigator, and the investigator's draft report, and he was allowed to submit additional information and comments in response to all of that evidence. His feedback and clarifications were incorporated by the investigator into her final report.

In response to the appeal, the plaintiff submitted an eight-page, detailed, point-by-point rebuttal of the complainant's grounds for the appeal, which was prepared and submitted by his counsel. The written decision of the appeal panel indicates that it received and considered the written submissions of both parties.

The Sixth Circuit has noted that "'[t]he right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings." *Flaim*, 418 F.3d at 641 (quoting *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)). However, in some instances, such as when a decision may turn on resolution of conflicting versions and witness credibility must be assessed, "cross-examination of witnesses might [be] essential to a fair hearing." *Ibid.* But the alleged procedural infirmities in this disciplinary proceedings are immaterial where, as here, Doe has admitted all of the essential facts that precipitated the adverse decision. *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) ("Mr. Watson admitted to the board that he assaulted his roommate and that he did so because his roommate was Hispanic and Catholic. Because Mr. Watson candidly admitted his guilt, Mr. Watson was not prejudiced by a lack of notice."); *Keough v. Tate County Bd. of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984) ("Clearly there was substantial evidence to support the district court's finding that Keough admitted the charges and therefore his suspension did not result from a procedural due process deprivation. The district court

did not err in finding that a procedural due process violation, if any, did not cause injury to Keough."); *Black Coal. v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973) ("Lockridge admitted all of the essential facts which it is the purpose of a due process hearing to establish. There being no reason to order defendant to reopen Lockridge's case and hold a new hearing, the district court properly declined to do so.").

Doe has not pleaded any facts that establish a risk that the procedure employed led to an erroneous result, or demonstrated the value that alternative or additional procedures would bring. *Mathews*, 424 U.S. at 335.

### d. Bias

Doe also alleges that the relationship of panel member David Baum to the complainant's lawyer's law partner infected the proceedings with illegal bias. It is beyond debate that, "[t]o insure 'fundamentally fair procedures,' school officials responsible for deciding whether to exclude a student from school must be impartial." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 567 (6th Cir. 2011). "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955).

The requirement of a fair and unbiased adjudicator applies with equal force to both administrative and judicial proceedings. *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). However, "[i]n the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias." *McMillan v. Hunt*, 968 F.2d 1215, 1992 WL 168827, at *2 (6th Cir. 1992) (citing *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985) ("With

respect to the claim of bias, we observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven.")); *see also Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 496-97 (1976) ("A showing that the Board was 'involved' in the events preceding this decision, in light of the important interest in leaving with the Board the power given by the state legislature, is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power."). "To survive a motion to dismiss, [the plaintiff] needs to allege specific, non-conclusory facts that if taken as true show actual bias." *Doe v. Ohio State Univ.*, 2016 WL 6581843, at *8.

Doe alleged in his amended complaint that defendant Baum "knew and had worked with both Sarah Prescott and Professor [J.J.] Prescott," and that Baum "was aware that Ms. Prescott had recently started her own law firm and he knew her firm represented the Complainant." Doe contends that this relationship gave rise to an actual conflict of interest, which Baum failed or neglected to disclose, because (1) Baum "depends on Michigan Law School faculty for support in his job performance, which in turn impacts his continued employment with the University of Michigan"; (2) Baum's "performance is evaluated in part through faculty review"; and (3) "it is in Baum's economic and personal interest to satisfy and gain favor of the tenured faculty, including Professor Prescott." Even if true, none of those alleged circumstances would suffice to establish that Baum harbored an "actual bias" against Doe due to any circumstance such as "personal animosity, illegal prejudice, or a personal or financial stake in the outcome."

Those allegations demonstrate, at most, an attenuated interest of mere professional or personal acquaintanceship, which is insufficient to sustain the required showing of "actual bias."

-21-

Sarah Prescott did not represent the complainant; her law partner did. There is no allegation that she participated as an attorney in the case in any way. Doe does not allege that Baum had any direct pecuniary, personal, or professional interest that could be injured by the outcome of the appeal. Nor does he allege any facts to show how any perceived benefit to Ms. Prescott's law firm as a result of the proceeding would produce any tangible, direct benefit to Baum. He does not allege that Mr. Prescott was Baum's direct or indirect supervisor, or that either of the Prescotts had any proximate influence over Baum's working conditions or the terms of his employment. On similar facts, in the course of addressing a claim of judicial bias, the Tenth Circuit held that such allegations, which suggest at most mere kinship or acquaintance, simply are not enough to sustain any plausible inference of actual bias, where it is merely possible that some remote or attenuated financial interest of some acquaintance or relation of the adjudicator could be implicated by the proceedings. *Fero v. Kerby*, 39 F.3d 1462, 1479 (10th Cir. 1994) (finding that the trial judge's "brother-in-law [having] a substantial financial interest in the outcome of the civil action did not give rise to a direct, pecuniary interest on the judge's part sufficient to overcome the presumption of judicial integrity").

### 3. Substantive Due Process Claim

Doe also contends that the appeal panel cherry-picked the evidence that supported a misconduct finding, ignored other evidence that persuaded the OIE investigator that no violation had been established, and issued an arbitrary decision that is not supported by the evidence. In addition, Doe contends that the review panel misconstrued or misstated comments in certain witness statements and relied upon "findings" supported only by speculation about the complainant's level of intoxication at the time of the events, rather than any information in the record or any scientific or medical basis. And he alleges that the panel's choices were infected with gender bias. Although

-22-

not alleged in so many words in the complaint, these arguments imply a violation of Doe's right to substantive due process.

"The touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations and quotations omitted here and throughout the following paragraph). However, "to sustain a substantive due process claim [challenging a state entity's] administrative action, a plaintiff must show that the state administrative agency has been guilty of arbitrary and capricious action in the strict sense, meaning that there is no rational basis for the administrative decision." *Brody v. City of Mason*, 250 F.3d 432, 438 (6th Cir. 2001). "The administrative action will withstand substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992).

"In the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). As the Sixth Circuit has explained, the Court's review of the basis for a state entity's administrative decision and the evidence supporting it is limited, and the decision must be upheld as long as the record shows that "some factual basis" supports the decision, and that the agency considered the evidence and reacted rationally in response to it. *Pearson*, 961 F.2d at 1222.

To assess this claim, the Court must turn to the evidence discussed in the investigator's report.

According to Investigator Kline, the complainant reported to the OIE on January 18, 2016 "that she was sexually assaulted in the early morning hours of January 16, 2016, by an unknown male individual" who "subjected her to unwanted vaginal penetration without her consent." Kline took statements from both parties, gave copies to each of them, and allowed them to comment. She did the same with her draft report.

a. Complainant's Version

The investigator interviewed the complainant on January 18, 2016, who told her that on January 15, 2016, the complainant went to a "mixer" hosted by Doe's fraternity for her sorority. She arrived at the mixer around 10:45 p.m., and she left the mixer with two friends around midnight to go to a party at the fraternity house.

At the fraternity house the complainant met up with other members of her sorority who were talking and dancing. By that time the complainant "had had a lot to drink." The complainant stated that she had half a beer before the mixer, two mixed drinks — with four shots of alcohol — at the mixer, one shot at the beginning of the mixer, and one more shot before leaving the mixer for the party. The complainant estimated that when she got to the party she had consumed approximately six shots of alcohol in the space of an hour and fifteen minutes. While she was at the party, two guys came around with a "wine bag," and the complainant and her friends drank from the bag. The complainant drank twice from the bag for about 8-9 seconds, or "6-7 large gulps," each time. One of the complainant's friends (identified in the report as "Witness 3") then "dragged her from the

-24-

group" to go to the bar at the party for more drinks, but by that time alcohol was no longer being served at the bar.

While the complainant and her friend were at the bar, two males approached them. One was identified by the complainant as the respondent (plaintiff Doe). The respondent told the complainant he could give her and Witness 3 drinks in his room at the fraternity house. After they talked for about five minutes, Witness 3 "accepted the Respondent's offer of alcohol," and the three went to his room. The complainant said she did not recall having any difficulty walking or talking at that point, but she stated she had fallen earlier at the mixer because the floor was slippery, and she had a bruise on her arm and leg. Once they were in the respondent's room, he poured three shots, and the complainant drank one. After they talked for some time, the respondent asked the complainant and Witness 3 to go back downstairs to dance. When the three went back downstairs, Witness 3 "got sidetracked" and started talking to someone else, and the respondent and complaint proceeded to dance and talk. The complainant recalled that she and the respondent were in a part of the downstairs where no one else was around, and that "no one approached them" during this time.

The complainant stated that while they were dancing that the respondent was "holding onto her," that she felt a "big blur of being spun," "didn't recall her surroundings," and "was getting more unaware" during this time "due to her consumption of alcohol," and was "in and out." The complainant said that during this time she felt "'half-blacked' or half-unconscious." She told the interviewer that she "had a low tolerance for alcohol." The complainant stated that when she was dancing with the respondent it "wasn't in a sexual way," by which she meant "no grinding or sexual touching," and no "giving signs that she wanted anything in a sexual way."

The complainant recalled that at some point she walked back upstairs with the respondent, but she only had "a quick flash of a memory," of walking up some stairs, and she did not remember going up the first flight, but did recall going up the second flight of stairs that led to the respondent's room.  The respondent was holding her hand, but she said that it "felt more like being dragged," that she was "just there," that she "wasn't going with him," and that she "felt like a puppet."  The complainant did not remember entering the respondent's bedroom the second time.  However, once they were in the room, the respondent started kissing her.  The complainant told the respondent "no sex," while they were in his room, but he did not respond, and continued kissing her.

The complainant did not remember crossing the room, but she remembers sitting on the respondent's bed, being unable to sit up on her own, and "flopping over" onto her back.  She did not remember how her clothes were removed, and she did not take them off, but the respondent must have.  She remembered seeing the respondent naked, but did not recall seeing him take off his clothes either.  The respondent did not say anything, but then retrieved a condom from a box near the bed.  The respondent then had sex with her, while the complainant "just laid there in a hazy state of black out."  She did not remember how long the sex went on, did not recall most of it, and did not "reciprocate in any way."  She remembered the respondent saying, "Could you get on top?"  The complainant remembered "ending up on top" of the respondent, but she "could not do anything," and felt "paralyzed from the amount of alcohol in her system."  The complainant heard the respondent "making pleasing noises" and "moaning," and then she "blacked out."

The complainant "came to" from her black out period to find the respondent engaging in oral sex with her, which she said involved him "holding her head down" while he laid on his back and "forcing" her to keep his penis in her mouth.  This continued until the respondent ejaculated.  The

respondent had removed the condom before the oral penetration, and the complainant said she felt nauseated after it ended. She sat up and felt a "spinning sensation," and then "fell back down." The respondent then vaginally penetrated her with his fingers. The respondent asked her if she was okay, and the complainant said "no."

The respondent's roommate (Witness 1) and a female (Witness 2) then came into the room. When they walked in, the respondent stopped "fingering" the complainant, said he needed to go to the bathroom, and left. Before he left the room he put a trash can by the bed in case the complainant needed to vomit. The complainant heard the respondent say "sorry dude" to his roommate as the respondent left the room. The complainant did not see the respondent again after he left the room. The complaint vomited into the trash can, and she remembered that it was red from the wine she drank earlier.

Witness 1 and Witness 2 got into the other bed in the room and "started doing things," but they did not notice that the complainant was in the room. After some time, which may have been around 20 minutes, the complainant remembered feeling "desperation and defeat," because she wanted to leave, but she could not find her clothes, and could not stand up or walk on her own to leave the room. Witness 2 then got a phone call, and when she hung up she told Witness 1 that she had to leave. When Witness 2 got down from the roommate's bed, the complainant "made vomit sounds" to get her attention. Witness 2 then turned on the lights and came over to where the complainant was. The complainant told Witness 2 that the respondent "took advantage of her," and Witness 2 then helped her find her clothes and put them on.

As Witness 2 helped the complainant out of the room, Witness 2 berated Witness 1, yelling at him that his roommate was a "pig" and an "asshole." Witness 2 called for an Uber pick up to take

-27-

the complainant home, but it was cold outside, so they went back into the foyer of the fraternity house to wait.  While inside, Witness 2 yelled at Witness 1 again.  During the ride back to the complainant's residence the driver had to pull over so that the complainant could vomit again.  The complainant stated that she would not have been able to leave the room without Witness 2's help, and that she "certainly would not have been able to walk out on her own."  The complainant added that she was "too intoxicated to have any say in what happened," but that she did "not know how to feel" about the incident.

The complainant stated that she "had only been with one other man in her life and waited a year and a half to have sex with him," and "if she had a say, she would not have had sex with a man she knew for only twenty minutes."  She said that she "let her guard down" by drinking too much, but that she was "just trying to have a good time" with her friends.

The complainant stated that she had used an online blood alcohol content (BAC) estimator to determine her level of intoxication after 1/2 beer, 3 glasses of wine, and 7 shots, and the result was 0.234.  According to a guide that the complainant read, a BAC of 0.20 can result in feeling "dazed, confused or otherwise disoriented," that a person may need help to walk, may not feel pain if injured, could feel sick or vomit, that "blackouts are likely," and that a person may not remember things that happen.  At a BAC of 0.25, the guide stated that "all mental, physical, and sensory functions are severely impaired."  The complainant said that the symptoms described in the guide were consistent with how she felt that night.

Later the next morning, the complainant spoke to several friends and her resident adviser (RA) about what happened.  The RA summoned a University of Michigan Police Department officer.  She also went to UM Health Services and underwent a Sexual Assault Nurse Exam.  The

University police officer collected her shorts as evidence, and the case then was turned over to the Ann Arbor Police Department for investigation. The city police interviewed the complainant and respondent, but apparently no charges were pursued.

### b. Doe's Version

On January 29, 2016, after the Ann Arbor police informed University staff that they had concluded their investigation, the OIE investigator met with Doe. The investigator informed him about the University's sexual misconduct policy, the procedure for investigation, and his right to have a "support person" present during the interview, including an attorney. She gave Doe a copy of the misconduct policy, offered him a chance to ask any questions, and told him he was not to have any contact with the complainant.

Investigator Kline then interviewed Doe on February 5, 2016. Doe was offered a chance to ask any questions before the interview, and again at the end. Doe's attorney was present during the second interview. At the end of the interview, the attorney told the investigator that the Washtenaw County Prosecutor declined to pursue a criminal prosecution. He also furnished two separate polygraph examination reports, dated January 21, 2016 and January 29, 2016.

Doe stated that he first met the complainant on January 15, 2016, and that evening also was the last time he had any interaction with her. His fraternity had a party that night. Before the party Doe hung out with some of his friends, played video games, and drank some. At 10:30 p.m., people began to arrive at the fraternity house for the party. Some time between 11:00 and 11:30, the complainant entered, and Doe noticed her because she was dressed differently from other guests at the party. Doe said the complaint was "talking," there was "nothing unusual," and she seemed

"pretty normal."  He did not notice anything that "stood out" to suggest to him that the complainant had been drinking before arriving at the party.

Around 11:45 p.m., Doe approached the complainant and started talking to her and her friend (Witness 3).  The complainant seemed to be "having fun," she was "bubbly" and "nice," and Doe did not notice anything "weird" or "out of the ordinary" about her demeanor.  When asked if the complainant was drinking, Doe said she "might have had a beer in her hand."  Doe asked the complainant if she and her friend wanted to go upstairs to drink some vodka, and he told them that the vodka he had upstairs was better quality than what was being served at the party.  On the way up the stairs, the complainant and Witness 3 walked ahead of Doe, and he stated that none of them had any difficulty walking.

The three were in Doe's room for around five minutes, during which time Doe poured three shots, and each drank one.  Doe did not see the complainant drink any alcohol between that time and when she left the party.  While in the room the three talked about "nothing in particular," and they then went back downstairs.

Once they were back downstairs, Witness 3 "left and did her own thing," and Doe and complainant began dancing together.  While they were dancing, the complainant was facing away from Doe, and he had his hands on her hips.  Doe reached around the complainant's shoulder, turned her head, and started kissing her.  The complainant then turned around to face him, and they "stopped dancing" and "started kissing."  After 10 or 15 minutes of dancing, Doe asked the complainant if she wanted to go back up to his bedroom.  He said that as they headed upstairs they were holding hands, and they were "shoulder to shoulder" because the stairway is very narrow.  Doe

stated that he was "not carrying her," she "wasn't stumbling," and that "nothing unusual" occurred. Doe did not think that there was any conversation as they made their way upstairs.

Once in his bedroom, Doe and complainant began "vigorous kissing," and they were "wrapped in each others' arms." Doe believed the kissing was welcome because the complainant had her arms around him and she was kissing him back. The complainant did not seem drunk, and Doe did not smell any alcohol on her breath. He did not remember the complainant ever saying "no sex."

Doe asked if the complainant wanted to go over to his bed, and she responded "Yeah." They sat down on the bed together, and began kissing again. Then they laid down together, and "both of them" removed some of the complainant's clothes. Doe removed his shirt. The complainant put her hands inside the Doe's pants and stroked his genitals, and he did the same to the complainant. When asked if this included digital penetration of the complainant's vagina, he said it did. Doe believed that the penetration was welcomed by the complainant because "her legs were spread" and "she allowed him," and "if she didn't want to it would be easier to close her legs." Doe stated that "not much was said" as they continued, and he and the complainant were "mostly just kissing and moaning." The complainant did not appear resistant, and she reciprocated the contact.

Doe got up to turn out the lights, and when he came back to bed, the complainant still had on a bra and black spandex shorts. They continued kissing and fondling in a similar fashion, but "more vigorously" for five to seven minutes. Then Doe removed his boxer shorts, and the complainant lifted her hips so that he could remove her shorts. Doe tried to remove her bra, but he was "fumbling with it," so the complainant "did it herself." Doe stated there was no conversation during this interaction. He then asked the complainant if she wanted to have sex, and she said,

-31-

"Yeah." Doe then retrieved a condom from a box that was near the bed, and the complainant then "lifted her hips," while he removed her underwear; "nothing was said" during this interaction. The complainant then "spread her legs," and Doe got on top of her and began vaginal penetration. The penetration continued for a couple of minutes, during which the complainant was "active," and "seemed like she was having fun," and "nothing seemed off."

At that point Doe stated that his roommate and a female companion (Witness 1 and Witness 2) came into the room and turned the light on. Doe and the complainant stopped having sex. The complainant asked "Who is that," and Doe answered that it was his roommate and "it's fine." Witness 1 shortly after said "This is weird," and the two left the room. Doe and the complainant then resumed having sex. He believed that the second penetration was welcome because the complainant "spread her legs wider so they could have sex." When asked where the complainant's hands were during the sex, Doe said "maybe to her sides" or "on the bed." The second time the sex continued for around five minutes.

Doe then asked the complainant if she would perform oral sex on him, and the complainant replied "Yeah" or "Sure." The complainant did so for around five minutes, during which time Doe's hands were "at his sides or stroking the complainant's hair." He did not hold the complainant's head down or "force her" to perform on him. When he ejaculated, the complainant stopped performing oral sex, but "left her mouth around his penis." Doe believed that the complainant welcomed the oral sex because when he asked for it "she obliged," and because he "wasn't forcing her."

After Doe ejaculated, the complainant and respondent laid together in the bed "in a spooning position" for around 10 to 15 minutes. Witness 1 and Witness 2 then returned to the room, got into the roommate's bed, began kissing for some time, and then proceeded to have sex. The complainant

-32-

then said, "I feel sick; I think I'm going to throw up," and Doe retrieved the trash can and brought it to the side of the bed. The complainant vomited, but according to Doe it was "not terribly long" and "not terribly loud." During this time Witness 1 and Witness 2 continued making out and having sex and "were being really loud."

Doe stayed with the complainant for around five minutes, and during that time she was "just doubled over," and he was "rubbing her back." When asked if the complainant was moving at all, Doe said she "wasn't trying to get up," and "just sat on the bed." Doe did not think that the complainant was sick from drinking, because "she only had one drink during the entire time they were together." When asked if he thought she was intoxicated, he reiterated that he only saw the complainant have one drink while they were together, and that he had "no sign that she was intoxicated" throughout their interactions, when he observed her talking, dancing, and walking up and down the stairs.

Doe then left his room to go to the bathroom. While he was out of the room, he was distracted by a friend and wound up sitting in another room with several people talking about various things. Ten or fifteen minutes later, Doe "heard his name being yelled." When he went into the hallway, Witness 1 said to the respondent, "get into the room." Doe then saw the complainant, who had put her shorts and shirt back on. She was crying, and Witness 2 was "consoling her." Doe approached the complainant and asked "What's going on?" Witness 2 asked him where the complainant's bra was, and Doe retrieved it from the room and gave it to her. Witness 2 then said, "Go away, you don't talk to her." The complainant did not say anything at all to Doe during this time. Witness 2 and the complainant then left the house, and, as they left, the complainant was

"crying into Witness 2's shoulder." When asked if either was leaning on the other, Doe stated that each had their hands on the other's hips.

Police came to the house the next day and took some items as evidence, such as Doe's sheets and the used condom. When asked what he told the police that day, Doe declined to answer on the advice of counsel. When asked why he thought that "concerns had been raised," about the events of that night, Doe said because it was "insensitive" for him to leave the complainant alone while she was sick.

### c. Other Witnesses

Twenty-three witnesses were interviewed during the investigation. Eight were identified to the investigator by the complainant. Ten were identified by Doe. The other five were identified by other witnesses.

Twenty of the witnesses were at the party and confirmed that alcohol was served. One witness stated that the overall level of intoxication among party guests as "less than usual," and another said that "no one was too drunk." A third witness stated that there were no incidents of anyone "falling down" or "throwing up." A fourth said that "a fight broke out," "people were falling down," the basement in the house (evidently the main area where the party took place) smelled of alcohol because "alcohol was spilled everywhere," and "the floor was sticky."

### i. Witness 1

Witness 1 was Doe's roommate and stated that Doe had been "one of his best friends" at the University since they met in October 2015. This witness stated that around 250 people were in the fraternity house during the party. Witness 1 saw Doe at the party, but he did not seem too drunk, because the "he was trying to be fresh" for an appointment that he had the next day. Around 12:30

-34-

a.m., Witness 1 saw Doe dancing with a female party guest, and there was, in his view nothing "out of the ordinary" about their interaction. Witness 1 confirmed that he had met Witness 2 at the party and that they went up to his room around 12:50 a.m., but they left when Witness 2 did not feel comfortable "hooking up" while Doe and complainant also were in the room. Around 15 minutes later, Witness 1 and Witness 2 returned to the room, which was dark. They kissed for several minutes, then got into bed and had sex. During both times when they were in the room, Witness 1 could not see who was in the other part of the room, and he did not see the complainant or hear anyone talking. At some point he heard the door to the room open, but he did not see anyone enter or leave, and nobody answered when he asked "Who is there?" During this time Witness 1 stated that he was "focused on Witness 2." The two continued to have sex for 10-15 more minutes.

When they finished, Witness 2 turned on the light and started to look for her clothes. They then saw the complainant sitting on Doe's bed, and Witness 1 stated that they had not known she was in the room before that. The complainant was sitting on the bed "with her head in her hands," and she "seemed sad," but Witness 1 did not see her crying, and she "did not look 'depressed.'" Witness 1 did not speak to the complainant, but Witness 2 did. Witness 1 heard the complainant say that Doe had been "gone for fifteen minutes," that the complainant did not know where he was, that "it was her first time having sex," and that she "wanted to see" Doe. Witness 1 then left the room to look for him.

Witness 1 gave an account of the complainant's and Witness 2's departure from the house similar to that described by Doe, but he added that he saw Witness 2 and the complainant waiting in the foyer for an Uber pick-up. At that time the complainant "had her arms around Witness 2," but she "wasn't stumbling" and "could stand on her own." However, the complainant "was crying

-35-

the entire time." Witness 1 stated his opinion that the situation had started and that the complainant "instigated a lot of the 'bad guy charges'" because Doe left after he and the complainant had sex, and that things "escalated" after the complainant talked to Witness 2.

### ii. Witness 2

Witness 2 stated that she met the complainant on the night of January 15-16, 2016. She did not know her, but the complainant later sent her a couple of text messages to let her know that she might be questioned during the investigation, to inform Witness 2 that she was "okay," and to thank Witness 2 for helping her. Witness 2 gave a similar account of her "hook up" with Witness 1 in Doe's room. She added that both times they entered the room, the door was unlocked, and the second time they did not know anyone else was there. Witness 2 stated that she and Witness 1 had sex in the room for 20 to 25 minutes, and that they talked and made noise throughout. When they finished and Witness 2 turned on the light, she heard a sound, "like a bump." She had not heard any other sounds or noticed anyone enter or leave the room before that, and she did not know anyone else was there. Witness 2 then saw the complainant sitting on Doe's bed. The complainant was "completely naked," except that she had her shoes on. There was a trash can sitting on the floor in front of the complainant, and there was vomit in the trash can, in the complainant's hair and on her thigh. The complainant was crying, but "not very loudly."

The complainant asked Witness 2, "Who are you," and then the complainant started "sobbing" and "crying really loudly." Witness 1 asked the complainant if she was okay, but when he noticed that she was naked he became uncomfortable and quickly left the room. Witness 2 then "went to the complainant," "got her dressed," and found the complainant's phone. She asked the complainant her name, and then asked if she was okay and if she knew anyone at the party. The

complainant responded that she thought her friends had left, and she stated "It's my fault, I got too drunk." The complainant also stated that she was a virgin, and that she "made a mistake."

When Witness 2 first saw the complainant she "got scared" because the complainant was "upset" and "very drunk." Witness 2 noted that the complainant "couldn't stand on her own" and was "swaying a lot." Witness 2 concluded that the complainant was "very drunk" because her "speech was really slurred," "it was hard for her to get a coherent sentence out," her eyes were "red and glassy," her face was "flushed," and she "had thrown up quite a bit," including on herself. Witness 2 also said that she could smell alcohol when she was around a foot away from the complainant.

Witness 2 did not remember the complainant asking to see Doe, and she stated that the complainant said not to let him into the room. When Doe appeared, the complainant was angry and "didn't give him much of a chance to talk." Witness 2 stated that as the two left the fraternity house, the complainant "couldn't really stand," "couldn't keep her balance," was "physically leaning on her," and was "hanging onto" Witness 2 a lot. While they waited in the foyer for the Uber pick up, the complainant was "leaning all her weight" on Witness 2, was crying, and repeated that she was a virgin, and that she "shouldn't drink so much." By the time Witness 2 got the complainant home and into bed, which was around 3:00 a.m., the complainant was "still leaning on her to walk," and was "still intoxicated."

### iii. Witness 3

Witness 3 identified herself as one of the complainant's sorority sisters. She also was at the party for a couple of hours and saw the complainant, but she had a limited memory of the events, either due to the alcohol she consumed, or, she speculated, because she suspected that she "might

have been drugged." At one point Witness 3 saw the complainant near the bathroom in the fraternity house and noted that the complainant's "eyes were iffy" and were "open but unfocused." The complainant stated that her sorority's leadership had "drilled into" members that they should not go upstairs with fraternity members to drink during parties, and she opined that the complainant "had to be pretty drunk to do that."

iv. Various Others

Two witnesses, who identified themselves as the complainant's sorority sisters, stated that they were with the complainant at the "mixer," walked with her to the party, and saw her consume alcohol that night. One saw the complainant drink from the wine bag at the party, and she stated that the complainant was "more than a little buzzed," because the complainant is "very energetic when she's had a lot to drink." That witness also said that the complainant's speech was slurred and that she was "trailing off at the end of sentences." The other witness also saw the complainant drink from the wine bag at the party and observed that she was "pretty tipsy." That witness did not know if the complainant smelled of alcohol because "the whole place" smelled of alcohol.

Another witness identified himself as a member of Doe's fraternity. He saw Doe and a female together "for a brief time" ("less than a minute, or a few minutes") in the basement of the fraternity house. The two were standing facing each other, with their arms around each other, and they were dancing, hugging, and kissing. The witness thought the interaction was "cute" and took a Snapchat video of it, but, because of the nature of the service (which automatically deletes uploaded items after a short time), the video was no longer available. When asked if either of the two appeared intoxicated, the witness replied "not that he could tell," and he stated that they "both were balanced and upright."

Three other witnesses, also members of Doe's fraternity, reported being at the party and saw the complainant and Witness 2 briefly after they left the respondent's bedroom.  One stated that he "didn't get a great view" and "only saw them for five seconds."  During that brief view he did not see anything to indicate that either were intoxicated.  The other witness saw the complainant waiting downstairs with Witness 2.  The complainant was upset, and crying and talking to Witness 2.  The witness stated that "both were standing," but he "had no idea of their level of intoxication."  The third witness stated that he walked past Witness 2 and the complainant while they were waiting in the foyer, and he noticed that one of the two seemed upset, but he could not see either of their faces as he walked by and did not notice anything else about them.

Two witnesses, identified as friends of Witness 2, stated that they got "frantic" or "urgent" calls from Witness 2 around 2:30 a.m. asking them to meet her outside the fraternity house.  Neither witness had met the complainant before the night of the party.  When they arrived, they observed that the complainant was dressed in a shirt and shorts, Witness 2 was holding the complainant's underwear, and the complainant did not have a coat on even though it was cold outside.  The complainant was described as "visibly upset," "hysterically crying," "highly emotional," and "distraught."  The witnesses stated that the complainant was "very" or "extremely" intoxicated.  The complainant "could not stand on her own," and Witness 2 was "holding her up."  When the Uber car arrived, the complainant could not walk to the car on her own, and she needed help from others to walk and get into the car.  The witnesses stated that they did not know how the complainant could have gotten home without help.  Both witnesses stated that the complainant "slurred her words" when talking, but one noted that the complainant had a hard time speaking because she was crying.

One witness smelled alcohol when she was a foot or two away from the complainant, and the other did not notice if she smelled any alcohol or not.

The remaining witnesses who were interviewed by the investigator did not see Doe and complainant together, saw Doe only at times and in places not proximate to the sexual encounter, or attended one or both of the party events, but could not recall whether they saw Doe or the complainant.

v. Police Reports

Kline reviewed statements taken from Doe and the complainant by Ann Arbor Police Department detectives.  She reported that the complainant gave two statements to the police, on January 16 and January 20, 2016.  The investigator briefly recounted those statements and concluded that both were "consistent with the Complainant's statements regarding the incident as reported to OIE."  The investigator also included an excerpt of a police report comprising a statement that Doe gave to police on January 16, 2016.  The excerpt includes a description of the sexual encounter by Doe that mirrors the account he later gave to Investigator Kline.  However, Kline also recounted that:

> Later in the interview, the AAPD detective relayed the Complainant's version of the encounter to the Respondent. . . .  The detective told the Respondent that "the sexual encounter [the Respondent] described is completely different from the sexual encounter that was described by [the Complainant]."  *The Respondent "advised the way that [the Complainant] described it is correct, that he got it all wrong, that she's right and he was wrong.*  [He] stated [he] didn't rape her.  [When] asked [if he heard the Complaint] say no sex . . . [the Respondent stated] no.  [The Respondent] advised [the detective] he believes the sex they had was consensual and he didn't remember her making any statement of no sex; he never remembers hearing that."

Emphasis added.

-40-

d. Investigator's Conclusions

The investigator summarized the operative provisions of the University policy and then found that sexual contact had occurred which, if unwelcome, would constitute a violation of the University policy. She characterized the operative question as "whether the Respondent knew or had reason to know that the conduct was unwelcome." Kline noted that the complainant acknowledged to the police that she assented to performing oral sex on Doe, which "may have lead someone in the Respondent's place to reasonably conclude that she was consenting to the oral penetration." But Kline also posited that "it must still be determined if the Respondent knew or had reason to know that the Complainant was unable to provide valid consent due to being in a state of incapacitation." She then summarized the witness observations about the complainant's state of intoxication from before the sexual encounter and concluded that those witness statements "suggest some level of intoxication but would not necessarily lead a reasonable person to conclude that she was incapacitated." Kline concluded that "there is no evidence of the Complainant's outward signs of incapacitation that the Respondent would have observed prior to initiating the sexual activity." And she determined that "there is insufficient evidence to conclude that the Respondent acted in violation of the [Sexual Misconduct] Policy."

e. Appeal Panel Decision

The appeal panel reported that the members had reviewed Kline's report, the complainant's appeal, and Doe's response. The appeal panel also "was given the case file maintained by the Office of Student Conflict Resolution," but it is unclear what, if any, additional materials were contained in that file.

-41-

The panel's decision overturning the investigator's conclusions recited a lengthy statement of its findings of fact.  However, the decision hinged on several crucial factual findings, which the appeal panel relied upon to support its belief that the complainant's story, and in particular her description of her physical and mental state during the sexual encounter, was more credible than the description of her apparent capacity and behavior given by the respondent.  The panel accepted the complainant's summary of the amount of alcohol she consumed as supporting her assertion that "she was 'too intoxicated to have any say in what happened' during her sexual encounter with Respondent."  The panel referenced her post-encounter conduct (vomiting, stumbling, inability to find her clothes, disorientation), and cited the statements of two witnesses who observed her at the party and thought she was drunk.  It appears that the panel gave considerable weight to the statement of Witness 2, who spent substantial time with the complainant after Doe had left her.  And the panel pointed out that two witnesses corroborated Witness 2's description.  The panel wrote: "Witness 2 believed that Complainant was still intoxicated when they arrived back at [the dormitory], because Complainant was still leaning on her to walk.  It stands to reason that if Complainant was this intoxicated after her sexual encounter with Respondent, then she was significantly intoxicated leading up to and during that encounter."

It also appears that the panel discounted the statements of other witnesses who did not think the complainant was inebriated, because "many of them were fraternity brothers of Respondent, and all of them only observed Complainant briefly and/or at a distance."  The panel concluded: "In light of all this, we find Complainant's description of the events leading up to and during her sexual encounter with Respondent to be more credible than Respondent's description."  In rejecting Doe's version, the panel wrote:

-42-

> In contrast, Respondent's observations, which paint a picture of Complainant as giving consent in a lucid and linear progression with both [words and actions] are not credible. In making this determination, we find it relevant that after making an initial statement to the police about what transpired during the sexual encounter, Respondent changed his story and agreed that Complainant's version was correct, except that he consistently disagreed that she never told him "no sex." In our view this diminishes the credibility of his statement to the OIE investigator, which is similar in many respects to his initial statement to the police.

The panel concluded "by a preponderance of the evidence that Respondent should have known that Complainant was intoxicated to the point of incapacitation and therefore could not validly consent to having sex," and, based on that conclusion, also found that there was "firm and definite support for modification of the OIE investigator's findings."

\* \* \* \* \*

Doe argues that there was "no evidence" that the complainant was intoxicated to the point of being "incapacitated." That position, of course, necessarily disregards the entirety of the complainant's own account, in which she stated that she was unconscious or "blacked out" during almost the entire duration of the sexual encounter due to the amount of alcohol she drank that night. Doe has not pointed to any evidence to suggest that the complainant consumed less alcohol than she said she did. The appeal panel considered the testimony of some witnesses who, based on fleeting observations, did not notice any indications that the complainant was intoxicated. But it ultimately found more persuasive the testimony of five other witnesses who spent considerably more time with the complainant, and who had the chance to observe her behavior directly and closely.

Doe contends that the decision was flawed and tainted to its core by the panel's wholesale rejection of a "plethora of evidence" put forth by the plaintiff and other male witnesses, and the unquestioning acceptance as credible of all testimony offered by the complainant and other female witnesses. However, the only "example" of biased analysis that Doe advances is his claim that

"[t]he Appeals Board intentionally or recklessly misstated crucial witness testimony," where "the Board's report states that '[t]wo witnesses who know Complainant . . . reported that they perceived she was intoxicated for a variety of reasons (very energetic when she's drunk; inhibitions were lowered; and speech that was 'not completely clear,' contained 'occasional slurs,' and occasionally 'trailing off at the end of sentences).'"  Doe, based on a heftily redacted passage from the investigator's report, asserts that "[t]hese witnesses did not state that the Complainant was 'intoxicated,'" and that "even the Appeals Board does not claim that these witnesses described the Complainant was 'incapacitated,' which should have been directly determinative of the outcome of this case."  But it is the plaintiff who "recklessly misstates" the testimony of these two witnesses, by selectively omitting almost the entire relevant substance of their statements.  The unaltered passage of the investigator's report addressing those witnesses reads in full as follows:

> [T]wo witnesses [who self-identified as members of the Complainant's sorority] indicated that they were with the Complainant at the "mixer" and walked with her to the party at the [fraternity house].  Both witnesses reported observing the Complainant consume alcohol.  One stated that she observed the Complainant consume "some wine" at the [fraternity] party, but said she could not be sure how much because the drink was "from the bag."  When asked whether the Complainant "seemed intoxicated," this witness said that she seemed "more than a little buzzed" because the Complainant is "very energetic when she's had a lot to drink."  When asked whether the Complainant's speech suggested that she was intoxicated, this witness said "no" but added that the Complainant's speech was "not completely clear," contained "occasional slurs," and she was "trailing off at the end of sentences."  This witness indicated that she did not notice or remember anything about the Complainant's eyes to suggest she was intoxicated.

> The other witness stated that she saw the Complainant drink from the wine bag.  She explained that she did not recall the number of times the Complainant drank from the bag, but indicated that she thought the Complainant drank multiple times, approximately two to three times.  She described the Complainant taking "long pulls" from the bag, which she clarified to mean "taking long drinks at a time."  When asked if she observed anything that would suggest that the Complainant was intoxicated at this time, the witness said that the Complainant was "pretty tipsy."  She explained that the Complainant's "inhibitions were lowered" and she "seemed

-44-

happier and more free," adding that the Complainant is a "very friendly person" but that "she gets especially friendly when she's drunk" and is "talkative," "smiley," and "very agreeable." When asked if the Complainant smelled of alcohol, this witness said that she could not tell because "the whole place" smelled like alcohol. The witness indicated that she did not recall anything about the Complainant's movements, speech, eyes, or face that suggested she was intoxicated.

The appeal panel's gloss on that testimony, read in its entirety, was reasonable and consistent with the substance and the context of those witness statements. Both witnesses reported seeing the complainant drink alcohol, and the amount of consumption they witnessed was consistent with pertinent portions of the complainant's account. Contrary to the plaintiff's assertion, neither stated that the complainant was "not intoxicated," and neither stated that they observed nothing that suggested to them that the complainant was intoxicated.

Moreover, the appeal panel cited the testimony because it found that the observations of the two witnesses corroborated the complainant's own testimony about the amount of alcohol that she drank at the "mixer" and at the fraternity party before she met Doe. Doe concedes that he never saw the complainant before the fraternity party, and he has not pointed to any statement by any witness that tends in any way to suggest that the complainant consumed less than the amount of alcohol that she recounted in her statement. The testimony of the two "sorority sisters" was accepted by the appeal panel because it was consistent with other testimony and because the observations made by those witnesses were consistent with the complainant's assertions about how much she drank, and her level of intoxication. Nothing in the record supplies any plausible factual basis for a finding that the appeal panel either misread the testimony, or that it accepted the testimony as credible merely because the witnesses were female.

Similarly, nothing in the record suggests that the panel rejected the testimony of the plaintiff's "fraternity brothers" or the respondent himself because those witnesses were male. As

-45-

to Doe's own testimony, as noted previously, the appeal panel found his account of the sexual encounter significantly less credible because of his abrupt reversal during his interview with police wherein he conceded that his account was "wrong" and the complainant's was "right," with the exception that he continued to insist that he never heard the complainant say "no sex." Again, nothing about the panel's rationale for discounting Doe's testimony suggests that it did so because of his sex or gender.

Doe's position that there was no reasoned basis for the panel's decision necessarily depends on the excision of two critical items from the record: (1) the complainant's own account of her conduct and mental state throughout the night; and (2) Doe's admission that her account of the sexual encounter was "right" and his was "wrong." The appeal panel found those items particularly compelling, and its conclusion that the complainant's account was more credible is rationally supported by Doe's own admission that it was. There is simply no plausible basis, on the record presented, for a claim that the panel decision was "arbitrary and capricious." The decision was supported by an ample factual record, developed after an exhaustive investigation. It is evident from the record that there certainly was "some factual basis" for the decision, and Doe has not identified any way in which the panel's elaboration of that basis was arbitrary, irrational, or unreasoned. He has not stated a claim for violation of his rights under the Due Process Clause.

### D. First Amendment Claim

Doe alleges in count III of the amended complaint that the University violated his rights under the First Amendment by denying him the opportunity to set forth his "objections" in his response to the penalty proposal. This claim is based on allegations that Doe had a telephone conference with defendant Nadia Bazzy, the Assistant Director of the University's Office of Student

Conflict Resolution, on June 22, 2016, in which Bazzy told the plaintiff that a "resolution officer" would determine the punishment.  Before that decision would be made, Bazzy told Doe that she would propose a resolution based on her anticipation of the likely punishment, and if Doe and the complainant agreed, there would be no need to involve the resolution officer.  Doe alleges that Bazzy warned him that if he did not accept her recommendation, the resolution officer likely would decide to expel him.

Bazzy recommended the penalty of "voluntary permanent separation," meaning Doe would withdraw his enrollment, he would agree not to enroll or re-enroll in the future, and he would avoid being present on University property or participating in any school events or programs.  However, if he agreed voluntarily to withdraw, then his transcript would not show that he had been expelled or disciplined for misconduct.  After Doe was notified that the complainant accepted Bazzy's proposal, he responded to Bazzy indicating that he accepted the proposal, and included a "statement of rationale" in which he wrote: "The fact that I am being forced to withdraw from the University is shocking and devastating to me.  I am choosing to accept the proposed agreement only because I have been told that if I do not choose to do so, I will likely be expelled."  Bazzy replied to the plaintiff the next day and informed him that the University construed his response as an objection to the proposal rather than an acceptance, and that, if the plaintiff did not respond that he accepted the proposal without objection, then the penalty would be decided by a resolution officer, as previously described.   Doe then capitulated.

First Amendment retaliation claims such as this one generally are analyzed "under a burden-shifting framework."  *Wenk v. O'Reilly*, 783 F.3d 585, 593 (6th Cir. 2015).  The plaintiff must plead a *prima facie* case of retaliation, by alleging facts showing that "(1) he engaged in

-47-

constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by his protected conduct." *Ibid.* (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). If the plaintiff offers facts establishing a *prima facie* case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct.'" *Ibid.* (quoting *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 412 (6th Cir. 2011)).

The plaintiff has failed to state a claim for "retaliation" under the First Amendment, principally because the facts that he has alleged do not support any plausible conclusion that the defendants' "threat" to expel the plaintiff was caused by or made in response to any protected speech.

It is plain from the facts as alleged that the "threat" to expel the plaintiff was advanced well before the plaintiff voiced his "objection." No plausible inference can be drawn that the threat of expulsion was made "because of" or in response to the plaintiff's protected speech, where the speech in question was not voiced until after the threat already had been made.

Moreover, to the extent that Bazzy's advice to the plaintiff was a threat at all, it was merely a communication about what, historically, the penalty had been in every similar case in the past where a student was found liable for similar misconduct. It is undisputed that the substantive decision by the appeal panel that precipitated the certainty of expulsion was made weeks before the penalty phase resolution proposal ever was discussed. There is simply no plausible factual basis to sustain a retaliation claim where all of the relevant allegedly "retaliatory" conduct occurred days and

weeks before the plaintiff ever engaged in any protected speech, because the University could not, by definition, have "retaliated" against the plaintiff for speech that had not been spoken when it made the challenged decisions and communications.

### E.  Title IX Claim

Doe also alleges in his amended complaint that the University's finding that he violated the Sexual Misconduct Policy and its decision to expel him violated Title IX of the Education Amendments of 1972.  "Title IX provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 848 (6th Cir. 2016) (quoting 20 U.S.C. § 1681(a)).  "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

The defendants argue that the allegations in the amended complaint fail to state a claim under Title IX.  The defendants have framed arguments in their briefing addressing a putative "selective enforcement" claim, but Doe does not advance or attempt to support any such claim in his response or motion for injunctive relief.  Moreover, on the facts alleged in the complaint and apparent from the administrative record, Doe could not prevail on any such claim because he has not identified any female respondent who was disciplined for sexual misconduct that he contends was treated more favorably or afforded more lavish procedures than were used in his case.  *Cummins*, 2016 WL 7093996, at *13 n.10 ("Because appellants do not allege that a similarly accused female was treated differently under UC's disciplinary process, the 'selective enforcement' standard is inapplicable.").

Instead, Doe contends that he can prevail under any of three legal theories under Title IX: (1) "erroneous outcome"; (2) "deliberate indifference"; and (3) "archaic assumptions."

### 1. Erroneous Outcome Theory

Doe argues that he adequately has pleaded a claim under the "erroneous outcome" standard, based on the evident unsoundness of the appeal panel's reasoning and its apparent gender bias. In particular, the plaintiff argues that the panel (1) ignored the applicable "standard of review" and conducted a "*de novo*" analysis of the facts, rather than deferring to the investigator's conclusions; (2) selectively ignored the testimony of the male complainant and his favorable witnesses and credited the testimony of the complainant and female witnesses who supported her story, because of gender bias; (3) misstated the testimony of two female witnesses who were the complainant's "sorority sisters"; (4) put undue weight on the testimony of Witness 2 (female), who only observed the complainant from 20 minutes after the sexual encounter occurred, while glossing over the testimony of other witnesses who did not observe significant signs of intoxication in the complainant before the encounter; and (5) allowed a panel member to participate in the appeal despite his undisclosed actual bias in favor of the female complainant. Doe also contends that the appeal panel's gender-based motivation to "make an example" of him can be inferred from the content of published news accounts reporting about public criticism of the University for its handling of sexual assault complaints by female students and other statements by the University directed to countering critics.

"Although [the federal courts of this circuit are] not subject to a binding framework in evaluating a student's Title IX discrimination claim, [the Sixth Circuit has] previously looked to the Second Circuit's decision in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), which identified

two categories of Title IX claims related to student-disciplinary hearings: 'erroneous outcome' claims and 'selective enforcement' claims." *Doe v. Cummins*, 2016 WL 7093996, at *12 (citing *Mallory v. Ohio University*, 76 F. App'x 634, 638-39 (6th Cir. 2003)). "A successful 'erroneous outcome' claim requires the plaintiff to show that the 'outcome of [the] University's disciplinary proceeding was erroneous because of sex bias.'" *Ibid.* (quoting *Mallory*, 76 F. App'x at 639).

As discussed above, there is no substance to the supposed procedural flaws alleged by the plaintiff. Moreover, here, as in *Cummins*, the plaintiff has offered nothing more than an administrative decision by school officials with which he disagreed, and unelaborated allegations that the decision must have been due to "gender bias," essentially because he is male, the complainant is female, and the decision was adverse to him. *Doe v. Cummins*, 2016 WL 7093996, at *13 (rejecting the Title IX claim because the plaintiffs "fail[ed] to show how these alleged procedural deficiencies are connected to gender bias. As noted by the district court, these deficiencies at most show a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct").

Doe's allegations that the appeal panel was pressured into siding with the female complainant likewise are insufficient to state a claim for gender bias that led to an erroneous outcome. The Second Circuit provided a framework for such a claim in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), but that case is readily distinguishable on its facts, as explained in *Doe v. Cummins*. *See* 2016 WL 7093996, at *13.

To support his allegations about the "toxic climate" on campus, Doe points to two news articles published in February 2014, more than two years before the panel issued its decision, and three more that were published in June and September 2016, after the panel decision was issued.

-51-

Plf.'s Mot. [55], Ex. F. (Pg ID 2128-49) ("University of Michigan Probed for Response to Sexual Assault" (Feb. 25, 2014) (Pg ID 2129)); ("Feds Investigating University Of Michigan Over Gibbons Sex Assault Case" (Feb. 25, 2014) (Pg ID 2133)); ("UM pushed for delays in feds' sex assault investigation" (June 4, 2016) (Pg ID 2138)); ("Inquiry deserved a timely response" (June 8, 2016) (Pg ID 2144)); ("Sexual misconduct education is key" (Sept. 18, 2016) (Pg ID 2148)). News accounts more than two years removed from the events and the panel decision do not supply any plausible support for vague allegations that the panel members were goaded by public pressure to "make an example" of the plaintiff merely because he was a male student charged with sexual assault. Doe contends that the June articles were published while the University's Vice President for Student Life, E. Royster Harper, was considering whether to accept the panel's decision. But Doe has not pointed to any facts in the record to suggest that Harper's thinking about the case was tainted by any bias — gender-based or otherwise — or that Harper did anything more, after reading the panel's recommendation, than affixing his ministerial endorsement of it on the signature page. All of Doe's allegations of bias are directed to the panel decision, not to anything Harper did, said, or wrote (which apparently began and ended with checking a box and signing his name).

It appears from the articles that the University has been subject to an ongoing inquiry by the federal government related to its handling of sexual assault complaints. However, unlike in the *Columbia University* case, none of the articles Doe submitted were published proximately to the investigation or the appeal panel's deliberations in his case, and Doe does not allege that the University held any campus-wide ("town hall") meeting or made any other public demonstration of its urgent concern about sexual assaults imminent to any of the proceedings in his case, as occurred in *Columbia University*. None of the articles concerned the events or parties in this case, and there

is no other apparent connection in the record between the criticisms voiced in the news articles and the disposition of Doe's misconduct charge. Moreover, none of the articles indicate that any of the school officials involved in the investigation or appeal were subject to public criticism or pressure directed at them individually, and Doe has not alleged such a connection.

Finally, there are stark distinctions between the underlying facts and process of investigation described in the complaint in *Columbia University*, compared with the pertinent undisputed underlying facts in this case. *See* 831 F.3d at 849-50. In *Columbia University* it was uncontested that the female complainant and male respondent engaged in a consensual dating relationship for at least "weeks" before the alleged sexual encounter. The encounter allegedly took place in May 2013, but the complainant did not contact school officials to make a complaint until the start of the next school year, in September. Moreover, as to the encounter itself, there apparently was no dispute between the parties that it was nominally consensual, and that the complainant appeared fully conscious and willing to participate. The complainant never maintained that she was mentally or physically incapacitated, and the disciplinary sanctions evidently were based solely on the investigator's conclusion that the respondent had "pressured [the complainant] over a period of weeks to have sex with him." *Columbia University*, 831 F.3d at 50. The plaintiff also alleged that the investigator adopted a decidedly hostile and adversarial "cross examination" technique in her interview with him, that she asked only leading questions "calculated to elicit a confession," and that she disregarded witnesses and information that he offered in his defense. The plaintiff asserted that, in contrast with the interactions with him, when speaking to the female complainant the investigator adopted a conciliatory, expansive, and consultative role, offering "thorough advice as to the resources available to her." *Ibid.* Considering the absence of any colorable evidence of "coercion"

-53-

during the sexual encounter, several incongruities between information given by witnesses and the findings reached by school officials, the refusal by officials to consider statements and information at odds with the complainant's accusations, and news articles published just weeks before the disciplinary hearing reporting widespread public and student criticism of the University and the individual officials involved in the inquiry, the Second Circuit concluded that the complaint supplied "the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss." *Columbia University*, 831 F.3d at 56.

The facts here are far removed from those that sufficed to give "minimal support" to the Title IX claim in *Columbia University*. Doe has never pointed to any information or witnesses in his favor that he contends were not developed in the record or presented to the investigator and appeal panel. Statements by the complainant and other witnesses amply supported the complainant's assertions that she consumed a large amount of alcohol before the sexual encounter and was intoxicated to the point of being unconscious and unable to move, think, or object during the sex. The panel's credibility assessments rationally were explained and justified based on the factors elaborated in the decision and discussed above. The complainant never conceded that the encounter was consensual or that she was a willing and aware participant. She reported the incident immediately to police and University officials within hours of the encounter. Doe, both in his complaint and throughout his briefing and written and oral arguments, repeatedly lauds the initial inquiry and the development of the record by the original investigator as exhaustive and exacting. And the tenuous allegations of a "toxic climate" on campus are not plausibly supported by the several temporally remote news accounts on which the plaintiff relies, that were unrelated to the events in his case, and which were published either years before the challenged decision, or after it

-54-

was issued.  Finally, although Doe asserts that the "overwhelming majority" of students accused of sexual misconduct are male, he has not identified any decisions in other cases that would tend to suggest any gender-biased "pattern of decision making" by University officials when adjudicating sexual misconduct charges against male students, nor has he pointed to any information to suggest that the University has handled complaints of sexual misconduct against female students in any way differently than it handles those against male students.

If the facts in *Columbia University* supplied only "minimal" support for a Title IX claim, then the facts here hardly can be regarded as supplying any support at all.

### 2.  Deliberate Indifference Theory

Doe contends that the "deliberate indifference" of defendants Harper and Bazzy is adequately alleged where he asserts that his attorney informed those school officials about defendant Baum's actual bias and the need for re-hearing of the appeal by a different panel, but they refused to grant a re-hearing or to halt the proceedings until an unbiased panel could be secured.  Doe also argues that the officials who gave the final sign-off on the appeal panel decision did so despite the numerous procedural defects in the appeal process and the evident bias and misbegotten reasoning reflected in the panel decision.

It is doubtful that the case law governing claims of "deliberate indifference" under Title IX can be applied in any coherent fashion to the facts of this case.  As the Sixth Circuit observed in *Horner v. Kentucky High School Athletic Association*, 206 F.3d 685 (6th Cir. 2000), "the cases from which [the deliberate indifference test] arose, *Franklin*, *Gebser*, and *Davis*, all address deliberate indifference to sexual harassment, and are not readily analogous to" cases such as *Horner*, in which students allege discriminatory application of a facially gender-neutral policy by school officials.

-55-

*Horner*, 206 F.3d at 693 (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992);
*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998); *Davis v. Monroe Cty. Bd.
of Educ.*, 526 U.S. 629 (1999)).  Each of those cases involved a plaintiff who was a *victim* of sexual
assault or harassment who alleged that school officials did nothing to prevent the abuses from which
he or she suffered.  The plaintiff has not cited any decision in which the *accused* in a sexual
misconduct proceeding sued, or prevailed, on a theory of "deliberate indifference," based on
allegations that school officials meted out unlawfully discriminatory discipline.

Nevertheless, even if the "deliberate indifference" theory could apply here, Doe has failed
to make out any plausible claim on that basis.

*First*, Doe's claim that higher University officials were "indifferent" to defendant Baum's
alleged bias fails because the plaintiff does not allege — nor has he ever argued in any of his
affirmative or responsive briefing — that Baum was biased because of Doe's or the complainant's
respective *genders*.  Instead, he asserts only that Baum had an "actual bias" due to an attenuated
chain of incidental professional acquaintances which he contends caused Baum to push for a
decision in favor of the complainant, in order to please an attorney who was a partner in the same
law firm as the lawyer who represented the complainant in the disciplinary appeal.  None of the facts
Doe alluded to on that score, even viewed in their most generous and expansive light, gives rise to
any plausible inference of gender bias on Baum's part.

*Second*, for all the reasons discussed in detail above, none of the named University officials
who "signed off" on the final appeal decision could plausibly be regarded as "indifferent" to alleged
gender bias.  The record does not support any reasonable inference that the panel made its decision
because of any such bias, rather than for the rationale, based on the record facts, that are evident

-56-

from the written decision. Doe alludes to an allegedly "toxic climate" on campus as further evidence that University officials were disposed to overlook the panel's biased decision in order to curry favor with the public. But, for the same reasons discussed above in the context of the "erroneous outcome" claim, none of the news reports cited supplies any pertinent or material facts plausibly to support that position.

### 3. Archaic Assumption Theory

Doe argues that the appeal panel's gender bias also is evident from numerous "archaic assumptions" embodied in certain statements in the panel decision. The plaintiff contends that statements about the complainant being sexually naive, inexperienced with college parties, and not a heavy drinker in high school all are based on nothing more than stereotypical thinking about young women, fueled by the tendency of University officials to portray female sexual assault complainants as "victims" and male sexual assault respondents as "predators."

These "archaic assumptions" arguments are similarly inapplicable to the circumstances of this case, because that standard of decision is one that has been applied only in cases alleging that a public school entity has denied equal opportunities to participate in athletic programs based on unfounded and antiquated historical notions about the physical capabilities of girls and boys. *Cummins*, 2016 WL 7093996, at *12 n.9 ("The 'archaic assumptions' standard appears [to be] limited [in application] to unequal athletic opportunities.") (citing *Mallory*, 76 F. App'x at 638-39 ("The 'archaic assumptions' standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting from classifications based upon archaic assumptions.")). Doe has not cited any case applying the "archaic assumptions" theory to a case

such as this, where the complaint concerns an allegedly discriminatory policy that has nothing to do with any athletic program.

Moreover, for the same reasons discussed above, the facts disclosed by the pleadings and the record do not support any reasonable inference that the appeal panel reached its decision by relying on any "assumptions" about Doe or the complainant based on their genders. The notations in the decision regarding the complainant's naivete with regard to sex, drinking, and college parties were not based on any assumptions about her gender; they were based on her own statements to the same effect, which were not contradicted or called into doubt by any other information in the record. And Doe has not identified any "archaic assumption" that the panel made about him or his "fraternity brothers" that led the panel to reject their testimony. The panel recited in its decision several reasonable and rational grounds for its credibility findings with respect to the various witnesses including (1) Doe's admissions to police detectives, (2) the absence of any previous relationship between the complainant and Witness 2 or her friends, (3) the prior relationships between Doe and other residents of his fraternity house, and (3) the limited opportunities that several witnesses had to observe the complainant. Those entirely non-gender-based facts caused the panel to give less weight to statements by Doe and his housemates, and more weight to statements by the complainant, Witness 2, and other witnesses. Also, as previously discussed, the panel did not "misread" statements by three female witnesses who saw the complainant at the "mixer" and the fraternity house party, and it merely accepted those statements as confirming the complainant's unrebutted assertions about how much she drank, which they relied upon in finding that she was intoxicated to the point of being incapacitated.

Doe has not pleaded facts that will support a claim based on Title IX.

-58-

F.  State Law Claims

Doe also alleged a claim under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*  That law prohibits discrimination impacting an individual's use of educational institutions on the basis of sex.  Mich. Comp. Laws § 37.2402(a).  Under that law, an educational institution may not "[e]xclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, or privileges of the institution, because of . . . sex."  Mich. Comp. Laws § 37.2402(b).

"Because the educational provisions of the act have received little judicial interpretation and because the statutory language employs terms of art used and judicially interpreted extensively in the specialized but extensive field of employment discrimination, [the Court may look to those] decisions to [] interpret and apply the law to the facts."  *Fonseca v. Michigan State Univ.*, 214 Mich. App. 28, 30, 542 N.W.2d 273, 275 (1995).  Also, "when Title VII and ELCRA have similarly worded provisions, Michigan courts often interpret ELCRA provisions using Title VII case law."  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

Michigan "courts have recognized two broad categories of claims under [the ELCRA anti-discrimination provisions]: 'disparate treatment' and 'disparate impact' claims."  *Wilcoxon v. Minnesota Min. & Mfg. Co.*, 235 Mich. App. 347, 358, 597 N.W.2d 250, 256 (1999).  "A *prima facie* case of discrimination under the [ELCRA] can be made by proving either disparate  treatment or disparate impact."  *Duranceau v. Alpena Power Co.*, 250 Mich. App. 179, 181-82, 646 N.W.2d 872, 874 (2002).  Michigan courts generally apply the burden-shifting analysis "articulated by the United States Supreme Court in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] as a

framework for evaluating [sex]-discrimination claims." *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997).

Doe has not alleged any facts that plausibly could sustain a claim that he was denied any procedural privileges in the course of the sexual misconduct investigation or during the appeal of the investigative findings on the basis of his sex or gender. There is, therefore, no plausible basis to sustain any "gender discrimination" claim under ELCRA on any of the various theories that he advances in his amended complaint and briefing.

Doe alleges that "students accused of non-sexual misconduct violations are entitled to a hearing in front of a panel, the right to pose questions to the complainant and witnesses, an audio recording of the hearing, access in advance to all written and other information that will be used, the names of witnesses in advance of the hearing, access to a recess during the hearing to obtain advice and counsel, and the right to make statements to the hearing panel or present a written report," and that only students accused of sexual misconduct are denied those procedural privileges. Am. Compl. ¶ 302. The plaintiff asserts that students "accused of sexual misconduct at the University are overwhelmingly male," and he postulates, therefore, that the disciplinary policy as it applies to sexual misconduct cases "has a disparate impact on male students." *Id.* ¶ 305. He does not, however, allege either that all students accused of misconduct are male, or that the procedural privileges that he describes are afforded to female students accused of sexual misconduct, but denied to male students facing the same charges.

There is nothing in the Sexual Misconduct Policy, and Doe has offered no information to suggest, that female students accused of sexual misconduct would not be dealt with — or have not been dealt with — in the same fashion as male students. And there is no plausible inference that can

be drawn from the provisions of the Policy that could sustain any claim that male students in general, or Doe in particular, would be or have been treated less favorably than any similarly situated female student because of gender or sex, rather than because of the nature of the charges in question. Doe advances the chimerical premise that disparate treatment is established by the fact that the complainant in this case was treated more favorably than he was, i.e., because the ultimate decision was in her favor and not his. That position, of course, disregards the self-evident and dispositive distinction between the parties: Doe was accused of sexual misconduct; the complainant was not. Moreover, Doe has not alleged that the complainant was afforded any procedural privileges superior to those that were afforded to him throughout the process (e.g., he does not assert that the complainant had access to a live hearing in the presence of the appeal panel or the right to confront and cross-examine witnesses, where he was denied similar privileges).

For the reasons discussed above, there also is no plausible factual basis articulated in the pleadings or evident from the relevant portions of the administrative record to show that the appeal panel was biased in its decision making against Doe because he was male, or in favor of the complainant because she was female.

Where the plaintiff has failed to put forth any plausible allegation that a policy or decision in question caused him to be treated differently because of his sex or gender, there is no need for the Court further to address any alleged specific infirmity in the challenged policy or decision. *See Gordon v. Traverse City Area Public Schools*, No. 15-121, 2016 WL 1566721, at *8 (W.D. Mich. Apr. 19, 2016) ("The Court need not analyze any of these elements [] because Plaintiff's claim fails for the basic reason that Plaintiff does not allege that he was harassed because of his sex.").

### III.  Motion for Preliminary Injunction

Doe has filed a motion and renewed motion for preliminary injunction, together with motions for evidentiary hearings, seeking an immediate order that would compel the University to admit him to the term starting now so that he can complete his degree.

Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions and temporary restraining orders.  When considering whether to issue a preliminary injunction, the court weighs four factors: (1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without the injunction; (3) whether the preliminary injunction would cause substantial harm to others; and (4) the public interest, if any, that would be served if the injunction issues.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  Although these factors are to be balanced, the failure to show a likelihood of success on the merits is generally fatal.  *Ibid.*; *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

As discussed in detail above, the amended complaint does not state any claim for which relief can be granted.  Because the plaintiff's likelihood of success on the merits is nil, his request for temporary injunctive relief must fail.

### IV.  Conclusion

Plaintiff John Doe has not stated claims in his amended complaint for which relief can be granted.  For that reason, he cannot prevail on his temporary injunction motions and his case will be dismissed.

Accordingly, it is **ORDERED** that the plaintiff's motion and renewed motion for a temporary injunction [dkt. #6, 55] and motion and renewed motion for an evidentiary hearing [dkt. #29, 44] are **DENIED**.

It is further **ORDERED** that the defendants' motion to dismiss [dkt. #56] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 5, 2017

<table>
<tr><td>

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 5, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI

</td></tr>
</table>