UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE,

              Plaintiff,                         Case Number 16-13174

v.                                      Honorable David M. Lawson

DAVID H. BAUM, SUSAN PRITZEL,
TABITHA BENTLEY, E. ROYSTER
HARPER, NADIA BAZZY, ERIK
WESSEL, UNIVERSITY OF MICHIGAN,
and BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,

              Defendants.

_____/

### OPINION AND ORDER GRANTING MISCELLANEOUS RELIEF AND DENYING MOTION TO ALTER OR AMEND THE JUDGMENT AND FOR LEAVE TO FILE AMENDED COMPLAINT

While in his junior year at the University of Michigan, plaintiff John Doe had a one-night stand with an intoxicated freshman co-ed in his fraternity house bedroom. After having sex, Doe left the room, never to be seen by her again that night, while the co-ed vomited into a trash can next to the bed. After the co-ed filed a complaint with the University, an appeal board assembled by the University's Office of Student Conflict Resolution (OSCR) determined that Doe had sexual relations with the freshman when Doe should have known that she was too drunk to be able to give consent. For violating the University's sexual misconduct policy, Doe was required to withdraw. He filed a complaint in this Court (later amended), alleging that he was treated unfairly. In a 63-page opinion, the Court dismissed Doe's several claims based on the Due Process Clause, the First Amendment, Title IX of the Education Amendments of 1972, and state law.

Now before the Court is Doe's motion to reopen the case, to alter or amend the judgment, and for leave to file another amended complaint under Federal Rules of Civil Procedure 59(e) and 15, or, in the alternative, for relief from judgment under Rule 60(b)(2). He argues that he is entitled to relief from the Court's judgment dismissing his amended complaint based on "newly discovered evidence" disclosed during the course of discovery in a related state court civil lawsuit where the complainant sued the plaintiff for damages arising from the alleged sexual misconduct that precipitated his expulsion. Doe seeks to revive and amend his due process claims, based on evidence that he asserts now proves the following: (1) the complainant was not "incapacitated" at the time of the alleged sexual assault; (2) proof that the complainant was not incapacitated was withheld from plaintiff Doe during the sexual assault investigation and appeals process; (3) the plaintiff suffered a denial of due process when he was not allowed to discover that information or to cross-examine the complainant at a live hearing before the appeal panel; and (4) additional process in the form of complete discovery and a live hearing would have allowed the plaintiff effectively to foreclose his unlawful expulsion. He also asks the Court to enter judgment as a matter of law in his favor, ordering him to be reinstated to the University, and ordering the University to modify its student discipline policy.

The Court heard oral argument on June 8, 2017. Thereafter, the plaintiff also filed supplements to his motion, additional motions to expand the record, and two notices of supplemental authority.

Because none of the "new evidence" to which the plaintiff alludes has any material impact on, and none of it calls into question, either the Court's conclusion that the University's handling of his disciplinary case was consistent with the Due Process clause, or the conclusion by the appeal

panel that there was sufficient information to suggest that the complainant was "incapacitated" at the time of the sexual encounter, and that the plaintiff should have known so, the Court will deny the motion to alter or amend the judgment and reopen the case. The motions for miscellaneous relief will be granted in part.

I.

The extensive factual record concerning the sexual encounter was recited at length in the Court's opinion on the motion to dismiss. The "newly discovered evidence" consists of the following.

*First*, the plaintiff insists that the complainant admitted at her deposition that she "has never been 'incapacitated' per her definition . . . including during the events at issue here." Citing Complainant's dep. at 101 (Pg ID 3182). The plaintiff asserts that this rebuts all of the plaintiff's prior statements that she was "incapacitated" during the sexual encounter.

*Second*, the plaintiff asserts that during the complainant's deposition she admitted that she was not "incapacitated" (1) when she arrived at the plaintiff's fraternity house around 12:20 a.m.; (2) while she was downstairs talking to the plaintiff and his friend, before the first time she went upstairs to the plaintiff's room; (3) while she was in the plaintiff's room the first time, during the five-minute excursion upstairs when the plaintiff poured "shots" for the complainant and her friend; (4) initially, when she went up to the plaintiff's room the second time, including when she kissed the plaintiff while standing inside the room; (5) after the sexual encounter, when "Witness 1" and "Witness 2" were in the room, and the complainant made "fake vomiting noises" to get their attention; and (6) after leaving the fraternity house and returning to her dormitory with Witness 2. Citing Complainant's dep. at 48, 60, 69, 106, 132, 163-66.

*Third*, the plaintiff contends that the complainant's medical records from the University Health Center indicate that she was "not intoxicated" when she was examined there at 5:00 a.m. The plaintiff asserts that this rebuts the plaintiff's estimate that she had a blood-alcohol content (BAC) of 0.235 during the sexual encounter, which she derived by using an online calculator, because BAC degrades at a rate of 0.015 per hour, and the plaintiff therefore would have had a BAC of around 0.20 three hours later, when examined at the hospital, which would have left her still "intoxicated" at that time.

*Fourth*, the plaintiff contends that documents from the University's Office of Institutional Equity (OIE) file show that the complainant submitted "multiple rounds of edits" of her statement to the OIE investigator, before the investigator completed her report, that the "edits" added "hyperbolic language" that was relied upon by the appeal panel and the Court, and that those "iterations" of the complainant's statement were not provided to the plaintiff during the investigation.

*Fifth*, the plaintiff asserts that an email included in the OIE file reveals that the names of the appeal panel members were provided to the complainant on May 3, 2016, weeks before the appeal panel issued its written decision, but they were not disclosed to the plaintiff.

*Sixth*, the plaintiff contends that the complainant admitted at her deposition that when the plaintiff stated to a police detective, "She's right and I am wrong," he meant merely that he was mistaken as to certain immaterial explicit details of the sexual encounter, such as "whether [they] had vaginal sex before oral sex, whether the complainant said yes to vaginal sex, and whether she got underneath the covers," and that the complainant conceded that the plaintiff "did not admit that his recitation of the entire night was wrong and hers was right."

In a supplement to his motion, the plaintiff also points to a University of Michigan Police Department (UMPD) incident report that was disclosed during discovery in the ensuing civil case, which, he contends, memorializes statements made by the complainant to a UMPD officer that "contradict" her later statements made to the OIE investigator, and that are inconsistent with her description of the encounter as recited by the appeal panel and the Court. In particular, the plaintiff points to the following excerpt of the report:

> Per Sgt Harding, [Complainant] stated that [Complainant] and [Complainant's] friend [REDACTED] went to [REDACTED] for a party. They were drinking and the male suspect invited them up to his room. They then left his room to dance downstairs. He then persuaded [Complainant] to go back up to his room where he forced [Complainant] down, put a condom on, and had sex with [Complainant]. [Complainant] then passed out due to being highly intoxicated. [REDACTED] of the suspect brought a girl up to their room, she saw [Complainant] and said they needed to help [Complainant]. She woke [Complainant] up, got [Complainant] dressed and took [Complainant] downstairs. She then found [REDACTED] and [REDACTED] and [Complainant] took an Uber back to [REDACTED].

The plaintiff asserts that this report was contained in the OIE file but never was disclosed to him during the investigation or appeal.

After the complainant sued plaintiff Doe, she gave a deposition in the civil case. In response to almost all of the questions about how the encounter was initiated, how the plaintiff and complainant got undressed, and how they had sex during the encounter, the complainant responded, "I don't know" or "I don't remember." The complainant testified that plaintiff Doe's statements about when she performed oral sex were "incorrect" because he described it happening before intercourse, but it happened after. The complainant also testified that the plaintiff was mistaken when he stated that she got on top of him right away (she said she was on top "[e]ventually, but not

right away"), and that it was "incorrect" that the plaintiff and complainant got "under the covers" when Witness 2 entered the room the first time.

During a lengthy cross-examination, the complainant repeatedly was pressed by plaintiff's counsel about what she thought the plaintiff had meant when he said he was "wrong" about the sexual encounter and the complainant was "right." In the most pointed exchange, the complainant testified as follows:

> Q. Now let's go back down to what the respondent is saying here. [Detective] Dortch — still on the top paragraph — "Dortch told Respondent it is his belief the way that described the sexual encounter is probably what happened. Respondent advised the way [the complainant] described it is correct; that he got it wrong. "'She's right and I am wrong.'" So, do you see what he's referring to there? What he's wrong about is whether he had vaginal sex with you before he had oral sex with you, and whether you said yes to oral sex or whether you said yes to vaginal sex, whether you got underneath the covers? Do you see that, that that's what he —
>
> A. Yes. And the point is he was wrong about me consenting to vaginal sex.
>
> Q. So, you're saying he was wrong — got it all wrong when he said you consented to vaginal sex? Instead, he should have said you consented to oral sex? That would have been correct?
>
> A. He — just like you said. He said he was wrong about the entire sexual encounter.

When pressed further on the topic, the complainant again insisted that the principal fact plaintiff Doe was "wrong" about in his initial statement was his assertion that she had consented to have sex with him:

> A. When we were going over what was incorrect, there was a part that he said he asked me if I wanted to have sex, and my response was "yeah."
>
> . . .
>
> A. And I said that was incorrect. And so then — and I said that was also part of the area that he said was wrong.
>
> . . .
>
> A. And then later on you said that he's been — he claimed that he asked for my consent and I said "yes," but that was part of the area he said he was wrong.

The complainant also testified that the plaintiff should have known that she was incapacitated when she was on his bed because "if I wasn't moving on my own and he was moving me, then he did know I was feeling paralyzed." Again, when pressed several times on this point, the complainant reiterated that she was "incapacitated" when she was on the plaintiff's bed, during the sexual encounter:

> Q. So, you're telling us both that you were incapacitated at a particular point in time, which we've now narrowed down to some point laying on the bed. But you're saying that you were incapacitated and you had some blackout, but you're also telling us you have a very clear memory on some very specific things, such as you said "No sex." Do I have that right?
> A. Yes.

Based on this information, the plaintiff filed his motion for reconsideration and for relief from judgment under Rules 59(e) and 60(b)(2), and his motion to file a second amended complaint under Rule 15(a)(2).

## II.

"A court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)). "To prevail on a motion brought pursuant to Rule 59(e), newly discovered evidence 'must have been previously unavailable.'" *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 615 (6th Cir. 2012) (quoting *GenCorp*, 178 F.3d at 834). "[T]he newly discovered evidence also 'must be of such a nature as would probably produce a different result,' and it is well-settled that the requirements for newly discovered evidence are essentially the same under Rule 59(e) and 60(b)(2)." *F.D.I.C. v. Arciero*, 741 F.3d 1111, 1117 (10th

Cir. 2013) (quoting *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1213 (10th Cir. 2012); 11 Charles A. Wright, Federal Practice and Procedure § 2859 (2012) ("The same standard applies to motions on the ground of newly discovered evidence whether they are made under Rule 59 or Rule 60(b)(2)."). However, "parties cannot use a motion for reconsideration [under Rule 59(e)] to raise new legal arguments that could have been raised before a judgment was issued." *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 395 (6th Cir. 2007) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (stating that "[a] motion under Rule 59(e) is not an opportunity to re-argue a case").

Ordinarily, requests to file amended pleadings are governed by Federal Rule of Civil Procedure 15. However, "'[w]hen a party seeks to amend a complaint after an adverse judgment, it [] must shoulder a heavier burden [than if the party sought to amend a complaint beforehand]. Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60.'" *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014) (quoting *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010)).

Federal Rule of Civil Procedure 60(b) allows the Court to relieve a party from a final judgment or order based on "newly discovered evidence." Fed. R. Civ. P. 60(b)(2). "To prevail on a Rule 60(b)(2) motion, [the] movant must demonstrate (1) that [he] exercised due diligence in obtaining the information and (2) [that] the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment." *JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 750 F.3d 573, 584-85 (6th Cir. 2014) (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d at 615 (quotation marks and alterations omitted)).

In his present motion, the plaintiff is somewhat vague on exactly which claims he seeks to revive, but his principal challenges in the motion are to (1) the adequacy of the disclosure and hearing procedures afforded him during the disciplinary investigation; and (2) the factual correctness of the appeal panel's conclusion that the complainant was "incapacitated" during the sexual encounter. Those arguments implicate both the procedural and substantive due process claims, since they challenge both the factual basis of the administrative decision and the means by which it was reached.

A.

In its original opinion, the Court recited at length the law governing procedural due process claims in school discipline cases. The main points are these: "A public university student who is facing serious charges of misconduct that expose him to substantial sanctions should receive a fundamentally fair hearing." *Flaim v. Med. College of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005) (quoting *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005)). But that hearing need not "take on . . . [the] formalities "of a criminal trial. *Id.* at 635. The student "must be afforded a meaningful opportunity to present his side," but "a full-scale adversarial proceeding is not required." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). The student's "right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings." *Flaim*, 418 F.3d at 641 (quoting *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)). In some cases, however, "cross-examination of witnesses might [be] essential to a fair hearing." *Ibid.*

The Sixth Circuit recently has addressed circumstances when cross-examination — or at least some semblance of it — may be called for in student discipline hearings. In *Doe v. Univ. of*

*Cincinnati*, --- F.3d ---, No. 16-4693, 2017 WL 4228791 (6th Cir. Sept. 25, 2017), the court posited that "[a]ccused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'" 2017 WL 4228791, at *5 (quoting *Flaim*, 418 F.3d at 636). A case that might fall in that category would be one that "'resolve[s] itself into a problem of credibility, [so that] cross-examination of witnesses might . . . be[ ] essential to a fair hearing.'" *Ibid.* (quoting *Flaim*, 418 F.3d at 641).

The court in the *Cincinnati* case examined a university discipline procedure that did not allow face-to-face cross-examination, but instead included a procedure in which the accused student could submit written questions to a hearing panel that would screen them and decide whether to pose them to the accuser. In addition, each side is allowed to present their side of the story in their own words, and the accused student can offer favorable evidence. The court found no fault with that process, which it had approved in an earlier case. *See Cummins*, 662 F. App'x at 448. But in *Cincinnati*, the accusing student never appeared at the hearing, and her version of the events was presented in an unchallenged and un-notarized written statement. The court found that procedure inadequate and affirmed the district court's injunction preventing suspension of the accused student. 2017 WL 4228791, at *6. Notably, however, the court suggested that cross-examination would not be necessary at all in cases where the accused student admitted the misconduct. *Id.* at *5.

None of the information plaintiff Doe has presented in his motion and the supplements establishes that the procedures afforded by the defendants here were inadequate. As an initial matter, the plaintiff does not contend that any of the "new evidence" to which he points was relied upon by either the OIE investigator or the appeal panel in their written decisions. The plaintiff also does not assert that he attempted to present any of the "new evidence" to the relevant decision makers during

-10-

the disciplinary investigation, or that they refused to consider it. The plaintiff therefore has not raised any cognizable claim of error in the Court's assessment of the record, as it was recited by the appeal panel, or the propriety of the conclusions based on that record. Instead, the plaintiff contends that, if he had been able to obtain the information that he now has, and if he had presented that information to the appeal panel, then they would have been compelled to reject the complainant's story and accept his own, and they therefore could not prudently have decided to punish him.

As the Court noted in its previous opinion, the plaintiff did not criticize the notice of the disciplinary complaint given him by the OIE. His procedural due process claim was predicated on the following allegations: (1) the review panel improperly conducted a "de novo review" of the record, rather than applying the "clearly erroneous" standard of review called for under the policy; (2) the definition of "incapacitated" that was applied during investigation and review of his case was "unconstitutionally vague"; (3) he was not given an opportunity to appear personally before the appeal panel or confront or cross-examine the complainant or other witnesses; and (4) at least one member of the appeal panel had a conflict of interest that rendered him biased. He now asserts, in addition, that he was denied due process because the plaintiff's medical records, the "edits" of the plaintiff's statements as drafted by the OIE investigator, and the UMPD police report were not disclosed to him. He also argues that the substance of the plaintiff's deposition testimony establishes that if he had been allowed to cross-examine her at a live hearing he would have been able to expose defects in her story that should have caused the appeal panel to reject her testimony.

In its previous opinion, the Court determined that cross-examination was not essential to a fair process in this case because Doe essentially admitted that the complainant's version of the events was true. Op. & Order of Dismissal [dkt. #74] at 19-20. That finding accords with the Sixth

Circuit's most recent decision in *Doe v. University of Cincinnati*. *See* 2017 WL 4228791, at *5. In his present motion, Doe argues that the new evidence undercuts that conclusion. The Court disagrees.

The plaintiff insists that the complainant admitted at her deposition that when he stated to a police detective, "She's right and I am wrong," he meant merely that he was mistaken as to certain immaterial explicit details of the sexual encounter, such as "whether [they] had vaginal sex before oral sex, whether Complainant said yes to vaginal sex, and whether she got underneath the covers." Doe contends that the complainant conceded that the plaintiff "did not admit that his recitation of the entire night was wrong and his was right." Citing Complainant's dep. at 192-205, 210-11 (Pg ID 3267-80, 3285-86); *see also* Defs.' Exhibit B (Pg ID 3492-94). The crucial point on which the complainant stood firm at her deposition, and which was the focus of Detective Dortch's inquisition, was that the plaintiff was "wrong" when he initially stated to the police that the complainant consented to intercourse and was an active and willing participant in the sex. The complainant — consistently with all of her previous statements disclosed by the record — insistently and repeatedly testified that she did not consent to the sex, that due to her condition she could not consent, and that on that central point, as well as in several other prominent details of the encounter, the plaintiff's initial statement to the police was categorically incorrect.

The plaintiff also puts forth additional facts about the University's process, which, he says, denied him fundamental fairness. For one, he contends that documents from the OIE file show that the complainant submitted "multiple rounds of edits" to her statement to the OIE investigator, before the investigator completed her report, that the "edits" added "hyperbolic language" that was relied upon by the appeal panel and the Court, and that those "iterations" of the complainant's statement

were not provided to the plaintiff during the investigation. But the plaintiff does not dispute that the final version of the complainant's statement was presented to him before the investigator issued her report or that he was allowed fully to present his rebuttal to the complainant's "hyperbolic" commentary. He has not pointed to any plausible factual basis or legal authority to suggest that the failure to disclose intermediate "edits" of the statement prevented him from mounting an effective rebuttal to the completed statement, after it fully was disclosed to him.

For another, Doe asserts that an email included in the OIE file reveals that the names of the appeal panel members were provided to the complainant on May 3, 2016, several weeks before the appeal panel issued its written decision, but they were not disclosed to the plaintiff. But the plaintiff does not point to any evidence to suggest that the complainant did anything with that information, or that she had any contact with the appeal panel members that the plaintiff was denied. *See* Complainant's dep. at 220 (Pg ID 3295) ("Q. Did you do anything with the information of who was on the panel? A. No."). The plaintiff never asserted previously, and he does not assert now, that the complainant had a hearing before the panel members, or any opportunity to present her case to them, that was not afforded to him. And he has not cited any authority or offered any factual basis for the proposition that the complainant's knowledge of the names of the appeal panel members resulted in any injury to his rights.

Finally, the plaintiff complains about a certain police report that, he says, was not disclosed to him at any time during the discipline process. There are two police reports that were submitted as exhibits pertinent to the motion. The first report was excerpted in an email message that (it seems undisputed) was included in the OIE file, but was not disclosed to the plaintiff during the investigation. Defense counsel asserted at oral argument that this report never was considered by

the appeal panel, and contended that it was not disclosed to either the plaintiff or the complainant. The defendants now concede, however, that the statement at oral argument was not true. The email with the report excerpt was submitted as plaintiff's supplemental Exhibit H to his motion for reconsideration [ECF Doc. No. 80-2] (Pg ID 3358). This is the report that memorialized the complainant's statement to a UMPD officer that the plaintiff "forced her down" on the bed and had sex with her. This report evidently was made during an initial contact between complainant and University police, which happened before she was transported to the hospital. This report is the one that plaintiff contends improperly was withheld from him, and that constitutes part of the "new evidence" on which he relies to support his motion. This also is the report that the plaintiff relies on (in part) for his assertion that the complainant's story "completely changed" from the investigation to when she recently was deposed, because the complainant never maintained during the investigation, and does not contend now, that she was "forcibly raped" or that plaintiff "forced" her to do anything. However, the impact of this non-disclosure on the plaintiff's procedural rights is minimal at most; there is no indication that the investigator or the appeal panel relied on that report in their respective decisions, and the version of the events is much more incriminating to the plaintiff.

The second report was of a witness interview of the plaintiff Doe by Ann Arbor Police detectives. That report was made during follow-up interviews of the complainant and the plaintiff by Ann Arbor City police, which happened sometime after the complainant went to the hospital (the morning or the day after the encounter). It was excerpted by the OIE investigator in her narrative, but it never was submitted *in toto* as an exhibit to any papers that were filed before the Court entered judgment in this case. It also was not submitted by the plaintiff as an exhibit to his motion for

reconsideration. A lightly redacted copy of this report was submitted by the defendants as Exhibit B to their response to the plaintiff's supplemental brief [dkt. #83]. Pages 3-4 of that report (Pg ID 3493-94) memorialize Detective Dortch's discussion with the plaintiff about how the plaintiff's story did not line up with the complainant's. That report also contains the evidence that the plaintiff conceded the complainant's story was "right" and his was "wrong." *Id.* at 4 ("[Plaintiff] advised that the way that [Complainant] described it is correct, that he got it all wrong, that she's right and I'm wrong.") (Pg ID 3494). The appeal panel relied on the OIE investigator's excerpt of this report when it found that this admission by the plaintiff made his account less credible than the complainant's. The commentary by Detective Dortch in the report indicates that he was not just asking about intimate details of the encounter, but also was asking about whether the complainant consented to the sex, or was aware enough to give consent. *Ibid.* ("[Plaintiff] advised Detective Dortch he believes the sex they had was consensual . . . . Detective Dortch stated according to [Complainant], she had consumed enough alcoholic beverages that she had reached her limit [and Complainant] further advised Detective Dortch, she was not in the right state of mind to consent to vaginal sex even if she wanted to."). The plaintiff does not assert that this report was withheld from him or that anything in it constitutes "new evidence" supporting his motion to reopen the case. Certainly, there is no due process violation that could be predicated on the manner in which that report was handled.

## B.

Doe's argument that the newly discovered evidence undermines the appeal panel's finding of misconduct invokes substantive due process. As discussed in the earlier opinion, "[i]n the context of school discipline, a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal v. Morgan*, 229 F.3d 567,

575 (6th Cir. 2000). He has offered evidence that, he says, will prove that the appeal panel (and the Court) got the facts wrong. But once again, as he has tended to throughout this litigation, the plaintiff relies entirely on a distorted and selective reading of the record to sustain his position.

Initially, the plaintiff argues that in the civil litigation, the complainant has backed away from her position that she was incapacitated during the sexual encounter with Doe. But she never "admitted" at her deposition, and never conceded or stated, that she was not at any time "incapacitated." Nothing in the plaintiff's deposition testimony plausibly supports that assertion. In the principal portion of the deposition on which the plaintiff relies, the complainant testified as follows:

> Q.     You discussed with me earlier a friend who was incapacitated who literally
>          could not get up and walk; right?
> A.     Yes.
> Q.     And she had to have people physically carry her; correct?
> A.     Correct.
> Q.     You were never in that condition, were you?
> A.     No.

But the complainant also insisted, when directly questioned on the point, that she was "unable to move" and "blacked out" while she was on the plaintiff's bed, during the sexual encounter. That testimony was consistent with the plaintiff's statements to the OIE investigator, which were relied upon by the appeal panel, that she had some awareness of what was going on, but was only partly conscious or unconscious, could not move, and could not sit up on her own or either resist or participate in the sexual acts. The complainant also testified that the plaintiff should have known that she was incapacitated when she was on his bed because "if I wasn't moving on my own and he was moving me, then he did know I was feeling paralyzed." When pressed on this point, the

complainant reiterated that she was "incapacitated" when she was on the plaintiff's bed, during the sexual encounter:

> Q. So, you're telling us both that you were incapacitated at a particular point in time, which we've now narrowed down to some point laying on the bed. But you're saying that you were incapacitated and you had some blackout, but you're also telling us you have a very clear memory on some very specific things, such as you said "No sex." Do I have that right?
>
> A. Yes.

*See also* Complainant's dep. at 13 (Pg ID 3094) ("Q. You ended up having sex with the respondent where you would not have had you not been intoxicated. Am I correct on that — A. I was not intoxicated. I was incapacitated."); *id.* at 94 (Pg ID 3175) ("Q. We've talked about you — him taking your clothes off. We've talked about you two discussing you getting on top. Were you incapacitated at that time? A. Yes. I don't know how I did that."); *id.* at 98 (Pg ID 3179) ("A. He never asked me to go upstairs. He just grabbed my hand and dragged — or not dragged me, but — Q. Right. You followed him up, you said? A. I felt like a puppet. . . . I felt like I had no control already right then."); *id.* at 106 (Pg ID 3187) ("Q. So, you're saying you were incapacitated once you were laying down on the bed? A. Yes."); *ibid.* ("And you said — you said later to the OIE — I think you said you laid there in a hazy state of blackout? A. Yes."). All of her testimony on this point hews to the substance of the complainant's earlier statements to the OIE, and nothing in it renders fatally implausible the information that the appeal panel relied on.

Next, the plaintiff points to numerous moments in the evening when the complainant conceded that she was not "incapacitated." But that testimony also was consistent with the substance of the complainant's account of the evening, and it is immaterial to the question whether or not she was incapacitated at the time of the encounter. The complainant conceded that she was not

incapacitated at various other points during the evening, and that the effect of the alcohol only "hit her" when she was upstairs in the plaintiff's room the second time. The plaintiff contends that it is "highly unlikely" based on the complainant's testimony that she was "incapacitated" at the time of the encounter. But he has not pointed to any of her testimony that is materially inconsistent with her account of the evening as given to the OIE investigator, and as relied upon by the appeal panel. Nothing in that testimony rebuts the Court's conclusion that there was "some factual basis" in the record for the conclusions that were reached by the appeal panel. The plaintiff also recites numerous inconsequential factual details covered during the deposition, all of which are substantially consistent with the complainant's narrative set forth in the Court's previous opinion. He does not explain how any of those details call into question the Court's or the panel's conclusions.

The plaintiff also contends that the complainant's medical records from the University Health Center indicate that she was "not intoxicated" when she was examined there at 5:00 a.m. *See* Plf.'s Mot., Ex. B (Pg ID 3025). The plaintiff asserts that this rebuts the plaintiff's estimate that she had a BAC of 0.235 during the sexual encounter, which she derived by using an online calculator. The reasoning goes that because BAC degrades at a rate of 0.015 per hour, the plaintiff therefore would have had a BAC of around 0.20 three hours later, when examined at the hospital, which would have made her still "intoxicated" at that time. The Court noted the portion of the plaintiff's statement in which she discussed the BAC estimate. But that estimate is immaterial to the evaluation of whether there was a plausible basis for the panel's decision, because the panel did not rely on any BAC calculation to substantiate its conclusion that the complainant was incapacitated. Moreover, in its opinion, the Court noted that "[a]t a BAC of 0.25, the guide stated that 'all mental, physical, and sensory functions are severely impaired,'" and the "*complainant said that the symptoms described*

*in the guide were consistent with how she felt that night*." Op. at 28 (Pg ID 2880) (emphasis added). The pertinent import of the complainant's statement about her estimated BAC, as construed by the appeal panel and the Court, was that she stated that the symptoms described were consistent with *how she actually felt*. The conclusions based on those statements were not premised on any numerical assessment of the complainant's BAC at any particular point in time. The complainant stated that she felt "severely impaired," and that she was "unable to move" or to participate in the sexual encounter, due to the large amount of alcohol she had consumed. The appeal panel accepted her account and found that it was consistent with statements by other witnesses. The panel did not rely on any assessment of the complainant's BAC or any other medical evidence or calculations in doing so. And the complainant's medical records indicating that she was "not intoxicated" three hours after the encounter do not fatally impeach the information on which the panel actually relied.

None of the newly discovered evidence is "of such a nature as would . . . produce a different result." *Devon Energy Prod.*, 693 F.3d at 1213. Nor has the plaintiff shown that the additional process that he says he should have had — full disclosure of the OIE file materials and cross-examination of the complainant at a live hearing — would have helped to avoid an erroneous outcome in his disciplinary proceedings. The plaintiff, therefore, is not entitled to relief under either Rule 59(e) or 60(b)(2).

III.

The plaintiff also has filed a motion a motion for leave to file excerpts of the depositions of two witnesses who were deposed in the complainant's the state court civil lawsuit, and a motion to "correct statements made at oral argument" relating to the first police report discussed above. The first motion deals with filing excerpts from the depositions of Olivia Priedeman and Emily Latham,

-19-

who were identified in the OIE report as unnamed friends of the complainant. It is appropriate to file discovery materials when "the court orders filing." Fed. R. Civ. P. 5(d)(1). Generally, filing discovery materials will be authorized when they provide factual support for a motion or response, or to complete the record for appeal. The Court will grant that motion.

The plaintiff's motion to correct the record is a slightly different matter. The plaintiff asks the Court to accept as a supplemental exhibit a document with the words "Hearing Packet" in large bold face type, which was Bates stamped with a serial number immediately preceding the Bates ID of the email discussing the UMPD police report that was referred to above. The plaintiff contends that this document establishes beyond doubt that the email in question "was indeed a part of the OSCR file that the Appeals Board might have relied upon in making their decision." As noted earlier, the defendants' attorney represented otherwise during oral argument on the motion to alter judgment, but since has conceded his misrepresentation. The plaintiff insists that the "record" of the argument be "corrected."

For the same reason the deposition excerpts will be filed, it is appropriate to accept the proposed exhibit as part of the record. However, the record does not need "correcting." The record of the hearing speaks for itself, and the plaintiff has not pointed to any statements by counsel that he contends were incorrectly transcribed. And, as discussed earlier, even when taken in the light most favorable to the plaintiff, the statements attributed to the complainant in the email do not fatally undermine the reasonableness of the appeal panel's decision based on the record presented to it.

IV.

The plaintiff has not established a basis for relief under either Rule 59(e) or 60(b)(2). The plaintiff's proposed additions to the record are appropriate, as stated above.

Accordingly, it is **ORDERED** that the motion to re-open the case or alter or amend the judgment and for leave to file an amended complaint [dkt. #76] is **DENIED**.

It is further **ORDERED** that the motion for leave to file to discovery materials [dkt. #88] is **GRANTED.**

It is further **ORDERED** that the motion to correct statements at oral argument [dkt. #89] is **GRANTED IN PART**.  The exhibit labeled "Hearing Packet" is made part of the record.  The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 29, 2017

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2017.

s/Deborah Tofil
DEBORAH TOFIL

---