## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**JOHN DOE**, *an individual*,

      Plaintiff,

vs.

**DAVID H. BAUM, SUSAN PRITZEL, TABITHA BENTLEY, NADIA BAZZY, E. ROYSTER HARPER, ERIK WESSEL, ANTHONY WALESBY, and JEFFERY FRUMKIN, ROBERT SELLERS,** *employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally*, **and UNIVERSITY OF MICHIGAN, BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,** *a constitutional corporate body*,

      Defendants.

Case No.  16-cv-13174
Hon.  David  A. Lawson

---

SECOND AMENDED
COMPLAINT AND
DEMAND
FOR JURY TRIAL

---

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Andrea M. Van Hoven (P78856)
Alana A. Karbal (P82908)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
avanhoven@deborahgordonlaw.com
akarbal@deborahgordonlaw.com

**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**
Megan P. Norris (P39318)
Brian M. Schwartz (P69018)
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com
schwartz@millercanfield.com

**JENNER & BLOCK LLP**
David W. DeBruin (337626)
Attorneys for Defendants
1099 New York Ave., N.W., Suite 900

Washington, DC 20001
(202) 639-6015
ddebruin@jenner.com
_____

Plaintiff John Doe, by his attorneys Deborah Gordon Law, complains against Defendants as follows:

## CLAIMS AND JURISDICTION

1.      This is an action for due process violations under the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C § 1983; and for violations of Title IX, 20 U.S.C. § 1681–1688.

2.      This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

## BACKGROUND

3.      Plaintiff John Doe (Plaintiff) is a former student at the University of Michigan (University).  Plaintiff's claims arise out of actions taken against him by Defendants for an alleged violation of the University of Michigan "Policy on Sexual Misconduct by Students" (Sexual Misconduct Policy), dated August 19, 2013.

4.      Plaintiff was 13.5 credit hours short of his degree and carried a 3.95 GPA when he was forced to withdraw from the University on June 27, 2016, based on an erroneous and fundamentally unfair determination by a University Appeals Board (Appeals Board or the Board) that he had violated the Sexual Misconduct Policy.

5.      After the University's Office for Institutional Equality (OIE)

1

completed a three-month investigation, including interviewing 23 witnesses, it concluded that, based on a preponderance of the evidence, Plaintiff did <u>not</u> violate the Sexual Misconduct Policy.  Plaintiff had been denied notice of the allegations against him, a hearing, cross-examination of the Complainant and witnesses and access to all relevant evidence.  In spite of the denial of due process, Plaintiff was not deprived of his property right to his education.

6.     Subsequently, without having seen or heard from either party or any witness, with no hearing having been held and without providing any cross-examination of any kind, the University Appeals Board reversed the Investigator's findings and conclusions, depriving Plaintiff of his property interest in his education without due process.

7.     On September 1, 2016, Plaintiff filed his Complaint with this Court [dkt. #1].

8.     On October 3, 2016, Plaintiff filed his First Amended Complaint [dkt. #36].

9.     On September 1, 2016, Plaintiff filed a Motion for Temporary Restraining Order and/or Preliminary Injunction [dkt. #6], and on October 21, 2016, Plaintiff filed a Revised Supplemental Motion for Evidentiary Hearing and Temporary Restraining Order and/or Preliminary Injunction Based on Amended Complaint [dkt. #55].

10.     On September 19, 2016, Plaintiff filed an Emergency Motion for Evidentiary Hearing [dkt. #29], and on October 11, 2016, Plaintiff filed a Renewed Motion for Evidentiary Hearing and Temporary Restraining Order and/or Preliminary Injunction [dkt. #44].

11.     On December 2, 2016, Plaintiff issued a subpoena commanding the appearance of Defendant Baum at the December 8, 2016 hearing.

12.     On November 16, 2016, this Court entered an order staying discovery [dkt. #64].

13.     On December 6, 2016, this Court entered an order quashing the subpoena by which Plaintiff sought testimony from Defendant Baum [dkt. #71].

14.     On January 5, 2017, this Court entered an order [dkt. #74] denying Plaintiff's Motion and Renewed Motion for Preliminary Injunction and Motions for Evidentiary Hearing, and Granting Defendants' Motion to Dismiss [dkt. #56]. On that date, judgment was entered dismissing Plaintiff's case with prejudice [dkt. #75].

15.     On February 2, 2017, Plaintiff filed a Motion to Re-Open Case and/or for Reconsideration, to Amend Complaint, and to Vacate Order as to Due Process Claim based on New Evidence [dkt. #76].

16.     On September 29, 2017, this court entered an order [dkt. #95], denying Plaintiff's Motion to Alter or Amend the Judgment and for Leave to File

3

Amended Complaint.

17.    On October 10, 2017, Plaintiff filed an Appeal with the Sixth Circuit Court of Appeals.

18.    On December 6, 2018, the Sixth Circuit Court of Appeals entered its Opinion and Order reversing this Court and remanding for further proceedings as to the 42 U.S.C. § 1983 and Title IX claims.

## **PARTIES**

19.    Defendant David H. Baum (Defendant Baum or Baum) was at pertinent times a member of the University's Appeals Board, which found that Plaintiff had engaged in the alleged sexual misconduct.  At that time he was Assistant Dean at the University of Michigan Law School.  Baum is now Associate Director, Office for Institution and Equity at the University and is an attorney licensed in the State of Michigan, P43178.  He resides in the Eastern District of Michigan.

20.    Defendant Susan Pritzel (Defendant Pritzel) was at pertinent times a member of the University's Appeals Board, which found that Plaintiff had engaged in the alleged sexual misconduct.  At that time she was a retired Assistant Professor at the University of Michigan Dental School.  She resides in the Eastern District of Michigan.

21.    Defendant Tabitha Bentley (Defendant Bentley) was a member of the

4

University's Appeals Board, which found that Plaintiff had engaged in the alleged sexual misconduct. At that time she was a student at the University. She resides in the Eastern District of Michigan.

22. Defendant Nadia Bazzy (Defendant Bazzy) was the Assistant Director for the Office of Student Conflict Resolution (OSCR) at the University. In this role she oversaw the procedures and processes discussed herein, including the Appeals Board process and the sanctioning process. Defendant Bazzy previously served as the Interim Director of the Sexual Assault Prevention and Awareness Center (SAPAC) and currently serves as Director of Multi-Ethnic Student Affairs at the University. She resides in the Eastern District of Michigan.

23. Defendant E. Royster Harper (Defendant Harper or Harper) was at pertinent times the Vice President for Student Affairs at the University and is now the Vice President for Student Life. She oversaw the OIE and OSCR process and signed pertinent documents. She resides in the Eastern District of Michigan.

24. Defendant Erik Wessel (Defendant Wessel) at pertinent times was the Director of OSCR at the University. He resides in the Eastern District of Michigan.

25. Defendant Anthony Walesby (Defendant Walesby) was at pertinent times the Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the Office for Institutional Equity, and served as the University's ADA

5

and Title IX Coordinator.  He is no longer employed at the University.

26.    Defendant Jeffery Frumkin (Defendant Frumkin) is currently the University's Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the OIE and serves as the University's Title IX Coordinator.  He resides in the Eastern District of Michigan.

27.    Defendant Robert Sellers (Defendant Sellers) is currently the University's Vice Provost for Equity and Inclusion and Chief Diversity Officer, the office of which is responsible for oversight of the Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the OIE, and the Title IX Coordinator.  He resides in the Eastern District of Michigan.

28.    The above-named individuals are sued both in their individual and official capacities.

29.    Defendant University of Michigan (Defendant University or University) is a public university, with its main campus located in Ann Arbor, MI in the Eastern District of Michigan.  Through the OIE and the OSCR, Defendant University has a stated goal of promoting federal and state laws regarding nondiscrimination, such as Title IX, and receives federal funding.

30.    Defendant Board of Regents of the University of Michigan (hereinafter "Defendant Board of Regents") is a constitutional corporate body operating and governing the University of Michigan, within the Eastern District of

Michigan.

31.     The events underlying this Complaint occurred in Ann Arbor, Michigan, within the Eastern District of Michigan.

## FACTS

**A.     A Title IX Complaint is Brought Against Plaintiff in January 2016.**

32.     In September 2013, Plaintiff was admitted to and began attending the University as an undergraduate student.

33.     From September 2013 through April 2016, Plaintiff successfully completed six semesters at the University with a cumulative 3.95 GPA.  He began his senior and final year at the University in the fall of 2016 with 13.5 credit hours remaining to receive his Bachelor of Business Administration degree.

34.     Prior to the events described herein, Plaintiff had an excellent reputation, was not involved with law enforcement and was never disciplined by a school or employer.

35.     On January 18, 2016, a University student (Complainant) filed a complaint with the OIE alleging that Plaintiff violated the Sexual Misconduct Policy dated August 19, 2013.

36.     The OIE was in charge with investigating such complaints under the auspices of the Title IX coordinator.

37.     On January 18, 2016, the OIE commenced an investigation to

7

determine if Plaintiff violated the Sexual Misconduct Policy. The Investigator was to write a report at the conclusion of the investigation and include a summary of the investigation, the Investigator's findings and a summary of the investigation rationale in support of the findings.

38.    In her Report, the Investigator stated the issue to be determined as follows:

> Both parties agree that, on the night of the incident, the parties engaged in sexual activity. While the Complainant asserts that the sexual activity was unwelcome and without her consent, the Respondent maintains that the entire encounter was consensual. The question then is whether the Respondent knew or had reason to know that the conduct was unwelcome.

39.    The Investigator stated that her findings turned on a credibility contest.

**B.    Defendants' Sexual Misconduct Policy Was Unconstitutional and the Opposite of the Policy Applied to All Other Forms of Student Misconduct.**

40.    The University was well aware in January 2016 that notice, a hearing and cross-examination were required and essential elements of fairness and due process, which the University guaranteed to its students.

41.    In fact, the University has historically provided, and today provides, such a due process procedure to <u>all</u> students other than those accused of sexual misconduct, as set forth in the University of Michigan Statement of Student Rights and Responsibilities (Statement) as follows:

8

(a)     Written notice of any allegation against the student;

(b)     The standard of review that the respondent is presumed not responsible **unless clear and convincing evidence** is presented that a violation of the Statement has occurred;

(c)     A live hearing;

(d)     Access to all written or other information that will be considered prior to the hearing including the names of witnesses providing information;

(e)     Knowledge of the names of witnesses;

(f)     The right to directly question the complainant, the investigator and witnesses;

(g)     The opportunity to present written reports to the hearing board and to make statements at the beginning and end of the hearing;

(h)     An audio recording of the hearing; and

(i)     An appeal process that does not allow the Appeals Board to make an independent finding against the respondent; it may only reverse a finding against him or remand the matter to the original fact finder(s).

42.     Plaintiff was deprived of every one of the due process protections described above.

43.     As of 2011, Defendants removed students accused of sexual misconduct from the due process protections guaranteed in the Statement, carving out a subset of students, essentially all male, who are not entitled to due process.

44.     The University made the choice to provide a separate, constitutionally

deficient process to students accused of sexual misconduct because of pressures from within and outside of the University to adopt false narratives that sexual assault on campus was an epidemic, that female students were "victims" and/or "survivors" even prior to any adjudication, and that these students must be supported and encouraged to report to the OIE at all costs, including the elimination of the due process protections provided to all other students, and the lowering of the standard of proof to "preponderance of the evidence."

45.     Per the policy, Plaintiff was provided with no notice of the allegations against him, no hearing and no ability to put questions to his accuser or witnesses. He was never given the names of witnesses.  He was provided with only one private meeting with the Investigator on January 29, 2016.

46.    The  standard  of  proof  used  to  determine  a  violation  was "preponderance of the evidence," not "clear and convincing," the standard used in all other student misconduct cases.

47.     The process offered to Plaintiff, as set forth in the Sexual Misconduct Policy,  has  been  found  by  the  Sixth  Circuit  Court  of  Appeals  to  be unconstitutional. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).

**C.    Plaintiff was Exonerated by the OIE Investigation.**

48.    On April 15, 2016, the Investigator issued a 43-page Report of her findings and decision.

49.     In spite of the fact that there had been no notice, due process hearing, cross-examination or opportunity to test Complainant's credibility, on April 15, 2016, the Investigator made the correct finding that there was "insufficient evidence" to conclude that Plaintiff acted in violation of the Sexual Misconduct Policy.

50.     The University's then Title IX Coordinator, Defendant Anthony Walesby, reviewed and approved the Report.

**D.     Plaintiff Did Not Violate the Sexual Misconduct Policy.**

51.     The OIE Report includes the following findings.

52.     The Complainant and Plaintiff met for the first time in the late hours of January 15, 2016 or the early hours of January 16, 2016.

53.     Between 11:30 p.m. and midnight, the Complainant and her friends arrived to Plaintiff's house to attend a party that was in progress.

54.     Shortly after the Complainant and Plaintiff met, they went upstairs to his bedroom to have a drink.  The Complainant told the OIE Investigator that when they walked upstairs, she did not have any difficulty walking or talking.

55.     They engaged in conversation and the Complainant consumed one shot of vodka, which Plaintiff had offered her.

56.     Other than the single shot of vodka, Plaintiff did not serve the Complainant any additional alcohol.  Plaintiff also did not see her consume any

11

other alcohol at the party.

57.     Although the Complainant had consumed alcohol before arriving to Plaintiff's house, Plaintiff had no knowledge of that.

58.     The Complainant told the OIE Investigator that after she finished her drink, Plaintiff suggested that they go back downstairs "to dance," and they did so.

59.     The Complainant told the OIE Investigator that she had no trouble dancing with or talking to Plaintiff.

60.     Several witnesses then saw the Complainant and Plaintiff dancing and kissing.  At least two witnesses stated that they did not observe the Complainant displaying any outward signs of intoxication.

61.     One of the Complainant's sorority sisters who was at the party stated that the Complainant's speech did not suggest that she was intoxicated.

62.     Another one of the Complainant's sorority sisters, who was also at the party, stated that she could not recall anything about the Complainant's movements, speech, eyes, or face to suggest that the Complainant was intoxicated.

63.     At or before 1:00 a.m., Plaintiff and the Complainant walked upstairs to Plaintiff's bedroom, continued kissing, and engaged in sexual activity in Plaintiff's bed.

64.     The Complainant told the OIE Investigator that Plaintiff then "got a condom."

65. She recalled that the condoms were within reach and had a blue wrapper.

66. Before and while they engaged in sexual activity, the Complainant did not tell Plaintiff that she was intoxicated, incapacitated, felt sick, was in a "black out" state, or felt "paralyzed."

67. The Complainant admitted that she told Plaintiff "sure" when he asked whether she wanted to continue the sexual activity.

68. At or around 1:00 a.m. or 1:30 a.m., Plaintiff's roommate ("Witness 1") entered Plaintiff's bedroom with another female student ("Witness 2").

69. After realizing that Plaintiff was in the room, Witness 1 and Witness 2 left the room. However, they returned to the room about twenty minutes later and engaged in sexual activity in Witness 1's bed, which was located in a different part of the room than Plaintiff's bed.

70. Because the room was dark, Witness 1 and Witness 2 did not see the Complainant or Plaintiff.

71. The Complainant reported to the OIE Investigator that she was aware Witnesses 1 and 2 were in the room and could hear them "doing things in . . . bed" for about twenty minutes.

72. The Complainant told the OIE Investigator that while she was lying in bed, she recalled Witness 2 had received a phone call from a friend and she heard

Witness 2 telling Witness 1 about the phone conversation.

73.     After the Complainant's and Plaintiff's sexual encounter, Plaintiff left his bedroom to use the bathroom and did not return for some time.

74.     While Plaintiff was out of the room, Witness 1 and/or Witness 2 turned on the bedroom light at approximately 2:00 a.m.

75.     The Complainant told the OIE Investigator that she then intentionally made vomiting sounds to get the attention of Witnesses 1 and 2.  She had not sought the assistance of Witnesses 1 and 2 at any time previously.

76.     Witness 1 and Witness 2 then saw the Complainant.

77.     The Complainant and Witness 2 then had a lucid conversation, left the bedroom together, and left Plaintiff's house in an Uber car between 2:30 and 2:45 a.m.  The car drove them to the Complainant's dormitory.

78.     The Complainant sent a very coherent and well-spelled text message to a friend at 2:53 a.m., stating that she had returned to her dormitory.

79.     The Complainant continued sending coherent text messages throughout the early morning.

80.     The Report concludes that "[b]ased on a thorough review and analysis of the evidence obtained during this investigation, it is determined that the preponderance of the evidence does not support the conclusion that the Respondent engaged in unwanted touching of a sexual nature in violation of the Policy . . .

14

Respondent is determined not to have violated the University of Michigan Policy on Sexual Misconduct by Students."

81.    The factfinder also noted that "it is determined that there is insufficient evidence to suggest [the Complainant] was incapacitated and unable to provide valid consent at the time of the incident.   In other words, there is no evidence of the Complainant's outward signs of incapacitation that Respondent would have observed prior to initiating sexual activity."

**E.    The Appeals Board Reversed the OIE, Reaching an Erroneous Conclusion, Depriving Plaintiff of his Property Interest in his Education With no Due Process.**

82.    On April 28, 2016, Defendant Bazzy notified Plaintiff by email that the Complainant had appealed the OIE decision and that a formal notification would follow.

83.    The appeal process was administered principally by the OSCR Assistant Director, Defendant Bazzy.

84.    Plaintiff was not allowed to appear in front of the Appeals Board, nor was he provided with the names of the three Appeals Board members: Defendants Baum, Pritzel, and Bentley.   The Appeals Board Report revealed that the Board met twice, on May 20 and May 25, 2016.

85.    The Appeals Board never met with, talked to or questioned the parties or the witnesses.   Plaintiff was not allowed to appear in front of the Board.

15

Nonetheless, per the Sexual Misconduct Policy, the Appeals Board was imbued with the authority to unilaterally reverse the findings in favor of Plaintiff, subjecting him to immediate, permanent removal from the University with no further appeal.

86.   The Appeals Board had little or no relevant training.

87.   On May 25, 2016, the Appeals Board issued its decision.

88.   The Appeals Board determined that "[t]he OIE investigator [had] conducted a fair and thorough investigation and analyzed the evidence in good faith." It also determined that "there was not any new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation that could reasonably [have] affect[ed] the investigation findings."

89.   The Appeals Board rejected all evidence favorable to Plaintiff and embraced all evidence favorable to Complainant. It rejected or ignored all of Complainant's inconsistencies.

90.   The Appeals Board found Complainant's description of the events to be more credible than Plaintiff's.

91.   In violation of the standard to reverse the OIE findings, the Appeals Board issued a decision, finding that Plaintiff had violated the Sexual Misconduct Policy.

92.   Defendant Harper accepted the Board's recommendations on June 13,

2016.

93.     On September 7, 2018, the Sixth Circuit Court of Appeals found this appellate process to be unconstitutional. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).

**F.     The Appeals Board's Erroneous Outcome Was Made With No Due Process And Was Based in Pertinent Part on Plaintiff's Gender.**

94.     The Appeals Board reached an erroneous result, with no due process allowed, based in pertinent part on the basis of Plaintiff's gender. The standard used was "preponderance of the evidence."

95.     The Appeals Board raised concerns about Complainant's "experience[] with college parties," and that "she was not very sexually experienced," none of which had relevance to the findings but which placed her in the stereotypical role of an innocent female who was a victim of a male predator. Yet, the Board was unconcerned with Plaintiff's past experience with parties, drinking or sex.

96.     The Board went so far as to argue that Complainant's inconsistent statements as to whether she was a virgin were not material, clearly concerned that it was offensive for Plaintiff to raise this issue. The Board excused her apparently false, gratuitous statement that she was a virgin on the basis that she was intoxicated at the time. But her intoxication did not stop the Board from accepting

17

all of her other statements as true when they were suited to a finding against Plaintiff.

97. Inconsistent statements made by Complainant went ignored and the Board insisted that Plaintiff was not credible.

98. The Appeals Board adopted statements of female witnesses, while rejecting the statements of every male witness, in pertinent part, on the basis of gender.

99. The Appeals Board credited Complainant's account of being very drunk, "dizzy," "unaware of her surroundings," "half-blacked out or unconscious," "remembering only flashes . . . and bits and pieces," in spite of significant evidence to the contrary and then went on to find that in spite of her alleged utter lack of recollection and even consciousness, her descriptions of what happened were "credible." This was based on her gender.

100. The Appeals Board literally ignored all evidence that Complainant was <u>not</u> incapacitated, including that she had sent perfect, coherent text messages shortly after the sexual encounter, based in pertinent part on the desire to find in Complainant's favor on the basis of her gender.

## G. Important Evidence From the OIE File Was Not Provided to Plaintiff.

101. During the investigation, Complainant sought to convince the Investigator that she was so intoxicated (the OIE standard is "incapacitation") that

18

her verbal answer of "yes" to sex was meaningless.  She went to the internet and came up with an analysis that at the time of these events she had a blood alcohol concentration (BAC) calculation of 0.23.

102.   University of Michigan Hospital records in the OIE file, which were not shared with Plaintiff, showed that at approximately 5:00 a.m., when Complainant arrived there, she had <u>no</u> signs of even being "intoxicated."  She was found to be not "intoxicated;" "alert;" "oriented;" her speech was "clear, spontaneous, [and] logical;" her eye response was "spontaneous," which is the highest level of responsiveness; and her motor response ranked at the highest level- "normal".

103.   This report showed that Plaintiff had significantly exaggerated her level of intoxication to the OIE.

104.   In addition, the OIE did not provide Plaintiff with the complete statements of witnesses taken by the Investigator and contained in the OIE file; nor were they attached to the "Report."  This was exculpatory evidence that Plaintiff never saw.

105.   For example, the complete statements of "Witness 14," a "close friend" of Complainant, was that when he was with Complainant immediately upon her returning to her residence hall, he "did not" notice any signs to suggest that she was "intoxicated."  This witness accompanied Complainant to the hospital

for an exam at approximately 5:00am, and stated that she was walking "on her own," "normal" and "nothing stood out."

106.   This statement negated Complainant's assertion that she was incapacitated or intoxicated.

107.   Also in the OIE file, but not provided to Plaintiff, was a second police report by Complainant to the University Police Department, in which Complainant gave an entirely different account of the sexual encounter, significantly undermining her credibility.

### H.   Plaintiff is Forced to Withdraw or be Expelled.

108.   After the Appeals Board found against Plaintiff, Defendants took immediate action to remove Plaintiff from the University as quickly as possible.

109.   At 9:00 a.m. on June 22, 2016, Defendant Bazzy conducted a telephone meeting with Plaintiff to discuss the penalty phase, also known to the University as the "resolution process."

110.   Plaintiff was told that a resolution officer (the RO) would decide Plaintiff's punishment.  But before that occurred, Defendant Bazzy would propose a "resolution agreement" or a penalty for Plaintiff.  The "resolution agreement" would be based on the penalty that the RO would likely impose.

111.   If the Complainant and Plaintiff agreed on the penalty, there would be no need for a decision by the RO.

20

112.   Defendant Bazzy made clear that if Plaintiff did not accept her penalty recommendation, the RO would likely decide to permanently expel Plaintiff from the University.  She said that any other result would be "highly unlikely" since students had been expelled in every other case where they were found to have violated the sexual misconduct Policy under similar circumstances.

113.   In fact, since the OIE and the OSCR began publishing statistics, every male found to have engaged in sexual misconduct "with penetration" has been permanently removed from the University.

114.   Immediately after the meeting, via an emailed letter to Plaintiff, Defendant Bazzy recommended "voluntary permanent separation."  This required Plaintiff to be immediately and permanently separated from the University; permanently prohibited from reenrolling; prohibited from attending University sponsored events or "accessing" University property; prohibited from returning to volunteer or act as a consultant or mentor; and given a permanent disciplinary record that would state that he violated the sexual misconduct Policy.

115.   Plaintiff was given only until June 27, 2016—three business days—to accept the proposed agreement or have the R.O. decide his penalty, which would be an expulsion.

116.   On June 22, 2016, Defendant Bazzy wrote to Plaintiff to explain that Plaintiff could prepare a "Statement of Rationale" for his student file if he chose to

accept the proposed agreement, explaining for the record why he had done so.

117.   In the afternoon on June 27, 2016, before Plaintiff had indicated whether he intended to accept the proposed agreement, Defendant Bazzy informed Plaintiff via email that the Complainant had accepted it.

118.   The Complainant's acceptance was not premised on Plaintiff's acceptance of the agreement.

119.   Plaintiff accepted Defendant Bazzy's proposal later in the day on June 27, 2016.

120.   When Plaintiff accepted the proposed agreement he submitted an accompanying "Statement of Rationale."   He wrote: "The fact that I am being forced to withdraw from the University is shocking and devastating to me.  I am choosing to accept the proposed agreement only because I have been told that if I do not choose to do so, I will likely be expelled."

121.   After consulting with University counsel, Defendants Bazzy and Harper determined that Plaintiff would not be allowed to freely express his reason for accepting the resolution because it might disadvantage Defendants legally. Accordingly, on June 29, 2016, Defendant Bazzy emailed Plaintiff forcing him to withdraw his statement.

122.   The entire resolution process was approved and overseen by Defendants Harper, Bazzy, and Wessel.

## I.    Plaintiff's Current Status With the University.

123.    On June 22, 2016, Defendants issued the following sanctions against

Plaintiff, which remain in full force today:

**"No Contact**

You are prohibited from having any contact, on or off campus, with ████████████████ or her family. This includes, but is not limited to, contact occurring via any of the following methods: in person (e.g., at activities, events, or classes); third party (e.g., friends, acquaintances, or family members); telephone, including text messaging; e-mail; instant messenger (such as Gmail chat); Facebook, Twitter or any other social networking site; skype; mail, including delivery services; gifts or other materials.  Failure to honor this no contact restriction by doing everything reasonably possible to avoid contact with ████████████████ could result in additional complaints with the University of Michigan.

**Permanent Voluntary Separation Effective Immediately:**

If the terms of this agreement are accepted, you will be separated from the University of Michigan effective immediately.  As part of this separation, you will be permanently prohibited from registering or enrolling in any University of Michigan course or program.  For the duration of the Complainant's affiliation with the University of Michigan you will be prohibited from attending University of Michigan sponsored events, from accessing University of Michigan property or facilities, unless reasonably needed for a health or safety emergency.  Thereafter, should you require re-evaluation of this prohibition for any reason you may provide a written request to the Office of Student Conflict Resolution (OSCR) for review.  If you are found in violation of the terms of this permanent separation, further action may be taken through the University of Michigan Police Department (UMPD).

Additionally, your University network access and email will be disabled as well as any other privileges you were granted as a University of Michigan Student.  You will not be permitted to return

as a volunteer, consultant, mentor, or fellow at the University of Michigan in any capacity. A disciplinary record can be maintained by the Office of Student Conflict Resolution indefinitely in cases resulting in permanent separation from the University.

**Notification to Future Schools or Employers (Advised):**

Many graduate schools and employers require that applicants disclose information regarding their prior disciplinary history to the school, employer, or entity upon application or as soon as the information becomes known to the applicant. You may have an obligation to disclose this matter in order to remain in compliance with applicable law or policy, and is advised to make this disclosure in the future as appropriate and in a manner that authentically represents the behavior for which he has been found responsible. If the University of Michigan is contacted with questions about a student's disciplinary history, the University may need to provide appropriate information in response, as permitted by the Family Educational Rights and Privacy Act (FERPA)."

124.    Plaintiff did not receive a BBA degree from the University.

**J.    Subsequent Discovery Proves That Defendants Were Wrong to Find Against Plaintiff.**

125.    In a case subsequent to the OIE/OSCR proceeding, Plaintiff was able to obtain discovery, including Complainant's deposition.

126.    Her deposition proved what cross-examination would have uncovered and how wrong the Appeals Board was.

127.    Complainant admitted that she was never blacked-out or unconscious in the literal sense.

128.    Complainant admitted that Plaintiff had no idea how she felt with regard to being intoxicated, stating "he's not a mind-reader."

24

129.   Plaintiff was experienced with drinking and parties, contrary to the conclusions of the Appeals Board.

130.   Plaintiff had no idea how much Complainant had to drink before he saw Complainant that night.  She never told him.

131.   Complainant herself cannot say that she was "incapacitated."  If she was, it was only for a few minutes.

132.   Plaintiff could not have known that Complainant had too much to drink – it didn't "hit her" until she was lying on Plaintiff's bed.  She never told Plaintiff the alcohol had "hit her."

133.   While she was on the bed in Plaintiff's room, she was fully aware of what was happening.

134.   By the time she got back to her dormitory – approximately 15 minutes after leaving Plaintiff's room – she was thinking "clearly and lucidly" and was not "incapacitated."

### K.   The Appeals Board Was Pre-Disposed to Discriminate Against Plaintiff in Favor of His Female Accuser.

135.   As set forth above, the Appeals Board applied gender stereotypes to their findings, taking into account the female's experience with parties, sex and drinking, while not taking that into account for Plaintiff.

136.   The Appeals Board acted in the role of protector of Complainant, expressed concern about her being accused of not being honest when she said she

25

was a virgin, and making excuses for her inconsistencies.  They made no such allowances for Plaintiff.

137.  Having never questioned or met Complainant, they found her to be more "credible" in spite of evidence that she was not credible, based on her gender.

138.  The Appeals Board ignored all evidence showing that Complainant was not telling the truth or was exaggerating, while doing the opposite as to Plaintiff.

139.  The Appeals Board bought Complaint's hyperbolic statements that she was in "black-out" and "unconscious" even though they had no idea what her definition of those terms meant, based on her gender.

140.  The Appeals Board used as support that "at the very least, [Plaintiff] should have been able to smell alcohol on Complainant…" even though smelling alcohol is not indicative of a person being incapacitated, and "smelling" is not required by the Sexual Misconduct Policy.

141.  The Board further found that Plaintiff "should have asked Complainant how much alcohol she had to drink" that evening. That is not required by the Policy and no such burden was placed on Complainant to have asked Plaintiff how much he had to drink.

142.  Similarly, the Board found that Plaintiff should have "observed" that Complainant was "having trouble walking" when Complainant never told the OIE

Investigator she was having trouble walking prior to the sexual encounter.

**L.    Defendants Discriminate Against Accused Males, including Plaintiff, in Favor of Female Accusers in Violation of Title IX.**

143.   Defendants intentionally created a policy only for students – virtually all of whom are male – who are accused of sexual misconduct.

144.    The Policy intentionally tilts the playing field in favor of the female accuser.

145.   Defendants have never offered a public explanation as to why students accused of sexual misconduct are not provided the same due process protections as all other students and why the Statement does not apply.

146.   Defendants have a lower standard of proof – preponderance of the evidence – for students accused of sexual misconduct.   All other types of misconduct, including murder, have a clear and convincing standard of proof.

147.   The lower standard of proof discriminates against accused males on the basis of gender.

148.   Defendants' practice and policy in handling sexual misconduct allegations is to "start by believing" the female accuser, as announced by President Mark Schlissel in 2016 when he signed a Proclamation endorsing the "Start by Believing" campaign designed to "End Violence Against Women International."

149.   On its SAPAC website, under the heading of "Our Vision and Philosophy", Defendants state "SAPAC uses a feminist approach to services," an

27

admission that Defendants are engaged in sexual discrimination in favor of females and against males. SAPAC was overseen by Defendants Harper and Bazzy – decision makers with regard to Plaintiff.

150.  The SAPAC site directs that others should "*[b]elieve* what the survivor is telling you" at all times, including before any investigation or findings.

151.  Defendants withheld an earned diploma from a male student solely on the basis of a mere allegation of sexual misconduct of a female student, before an investigation or any findings, evidence that Defendants are pre-disposed to believe and find in favor of female accusers.

152.  Defendants have taken the position that they do not believe female accusers should have to be directly questioned by the accused male and vice versa because they believe it will be too difficult or uncomfortable for the female.

153.  On April 13, 2017, Plaintiff made a complaint to the Defendants that Complainant had made false, material statements to the OIE, which included but were not limited to, that Complainant "woke up with his penis in her mouth," and that she had told Plaintiff how much she had to drink that night.  Complainant had admitted elsewhere under oath that those statements were false.

154.  In addition, Complainant had made a false police report to the University Police Department.

155.  Plaintiff complained that these false statements were not oversights –

28

they were total fabrications.

156.   These false statements had been relied upon by the OIE, OSCR and the Appeals Board.

157.   Plaintiff's complaint was made pursuant to the sexual harassment policy, which stated that:

> "'There is an assumption of Good Faith Reporting…, the University presumes that reports of Prohibited Conduct are made in good faith…and the [parties] and other sharing information with the investigator are expected to provide truthful information in any proceeding under the Policy.' 'Students who violate this policy may face disciplinary action up to and including expulsion.'
>
> 'Sexual harassment can be a very serious matter having far-reaching effects on the lives and careers of individuals.  Intentional false accusations can have similar impact.  A person who knowingly and intentionally files a false complaint under this policy is subject to University discipline.'"

158.   Defendants never investigated Plaintiff's complaint or took action of any kind to deal with Complainant's admitted false, material statements.

159.   This was clear difference in treatment based on gender for having violated the policy.

160.   In addition, Defendants place full responsibility for a female accuser's intoxication on the accused.  He is solely responsible for assessing her state of inebriation.  The accuser has no such responsibility and is given immunity by the University for having violated their policies on use of alcohol, including underage drinking.

**M.    Defendants Intentionally Continue to Deny Due Process to Students Accused of Sexual Misconduct.**

161.   As described above, the Sexual Misconduct Policy applied to Plaintiff was dated August 19, 2013.

162.   On July 1, 2016, Defendants issued a new Sexual Misconduct Policy entitled The University of Michigan Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence.

163.   This policy did not provide for verbal or written notice or hearing of any kind, cross-examination of parties or witnesses, or names of witnesses.

164.    On February 7, 2018, Defendants issued another policy entitled The University of Michigan Policy and Procedures on Students Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence. Again, the policy provided for no notice, no live hearing, no cross-examination of parties or witnesses. The Investigator performed the investigation via private interviews often via phone or email and made findings.  The appeal process allowed for an "external reviewer," who never met with a single party or witness and could reverse findings in favor of the accused.

165.   On January 9, 2019, in light of *Doe v. Baum*, Defendants issued yet another new policy.  The new policy purports to, but via careful omissions and vague wording does not, guarantee the due process required by *Doe v. Baum*. It says that a hearing "may" occur and that questions will be asked by the hearing

30

office with "follow up questions by one party to the other" and any witnesses.

166.   After the ruling in *Doe v. Baum*, the University President, Mark Schlissel, publicly stated that he disagreed with the holding and mischaracterized the "dissent."

167.   On January 29, 2018, President Schlissel issued a public statement declaring his disagreement with *Doe v. Baum*, and that he continues to disagree with cross-examination as set forth in the opinion:

> "Last semester, U-M revised its student sexual misconduct policy and procedures based on a court ruling by the U.S. Sixth Circuit Court of Appeals. The court ruled that a public university must give an accused student an in-person hearing when credibility is at issue in sexual misconduct cases and provide the opportunity for the accused student or their adviser to cross-examine the accuser and witnesses.
>
> The change was necessary to follow the law, but U-M respectfully submits that the Sixth Circuit got it wrong. In fact, even one of the three judges on the panel dissented.
> It is our hope that any rule changes will not nationalize the challenges presented by this case by taking a one-size-fits-all approach.
>
> Even as we comply with the current law, we continue to believe that having experienced, fair hearing officers posing questions to all parties and witnesses based on input from both sides is the best way to determine the truth and minimize harm to all students involved."

168.   President Schlissel added that he does not want the University to provide cross-examination or be required to use the same standard of proof for all students:

> "Specifically, the University of Michigan endorses the AAU's three recommendations for improving regulations:

31

1.  Remove requirements that institutions permit cross-examination
    and appoint aligned advisors.

2.  Remove the requirement that universities apply the same
    standard of evidence and process across all disciplinary
    processes.

\*      \*      \*

169.  The language of the new policy coupled with the statement by
President Schlissel make clear that Defendants have no intent on complying with
*Doe v. Baum*. They believe it is more important to protect the female accuser –
who they believe needs protection – than to comply with the law.

**N.    Defendants Were Under Pressure to Obtain More Findings
Against Men Accused of Sexual Assault.**

170.  The erroneous Appeals Board Report and subsequent approval of it by
Defendant Harper arose in the context of negative publicity about how the
University of Michigan has handled "sexual assault" claims.

171.  In February 2014, the U.S. Department of Education's Office of Civil
Rights (OCR) began investigating the University for failing to adequately and
promptly respond to complaints of sexual misconduct. *See* Letter to University of
Michigan from U.S. Department of Education, Feb. 21, 2014, http://publicaffairs.
vpcomm.umich.edu/wpcontent/uploads/sites/19/2015/01/OCRNOTIFICATIONLE
TTER.pdf.

172.  As a result of the OCR Investigation, the University received

substantial negative publicity.  *See, e.g.*, John Lauerman, "University of Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (Feb. 25, 2014), http://www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-probed-for-handling-of-sexual-assaults. For instance, one local news station reported that a former University employee believed that the University had a policy of deterring students from filing sexual misconduct complaints. *See* Ashley Dunkak, *Feds Investigating University of Michigan Over Gibbons Sex Assault Case* (Feb. 25, 2014), http://detroit.cbslocal.com/2014/02/25/feds-investigating-university-of-michigan-over-gibbons-sex-assault-case/.

173.  The University was also subject to sharp criticism from students on campus.  One student group issued a public statement saying, "[w]e are fed up with university administration's handling of sexual violence . . . We are fed up with the university hierarchy hampering transparency and safety to protect their own profit-making abilities and reputations."  *See* Lauerman, "University of Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (Feb. 25, 2014), http://www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-probed-for-handling-of-sexual-assaults.

174.  Mark Schlissel took his post of University President on July 1, 2014, in the midst of the public backlash against the University with regard to sexual assault.  *See* "Mark Schlissel Named 14th President of the University of

Michigan," *The        University        Record*        (Jan.        24,

2014),        https://record.umich.edu/articles/mark-s-schlissel-named-14th-president-

university-michigan.

175.   President Schlissel has penned several statements regarding sexual

misconduct on the University's campus, highlighting it as an area of special

importance, and noting the need to "improve support for survivors," "focus[]

greater attention on groups that appear to be at greater risk," "improve [the

University's] investigation procedures," and "enhance [its] processes for

adjudicating incidents."

176.   Throughout 2014, 2015, and 2016 the University made multiple

efforts to avoid sanctions from the federal government and to convince the public

that it was working hard to protect women on campus.  *See, e.g.*, Michigan Daily

Editorial Board, *Sexual Misconduct Education is Key*, Michigan Daily (Sept. 16,

2016),        https://www.michigandaily.com/section/editorials/daily-mandatory-

reporting-sexual-misconduct-education-online-tool-faculty.

177.   In fact, while Defendant Harper was determining whether to accept or

reject the Appeals Board's Report, the Detroit Free Press ran a story stating that the

University was under pressure from the OCR for not timely responding to requests

for information and repeatedly requesting delays.  *See* David Jesse, "U-M Pushed

For Delays in Feds' Sex Assault Investigation," *Detroit Free Press* (June 4, 2016),

http://www.freep.com/story/news/local/michigan/2016/06/04/university-michigan-sex-assault-investigation/85340204/.

178.   In addition, while Defendant Harper was reviewing the Appeals Board's Report, the Michigan Daily published an article by its Editorial Board, calling for the University to better protect victims of sexual assault. *See* Michigan Daily Editorial Board, "Inquiry Deserved a Timely Response," *Michigan Daily* (June 8, 2016), https://www.michigandaily.com/section/editorials/daily-inquiry-deserved-timely-response.   The Editorial Board reported that the steps the University had taken "to show [] support for survivors of sexual assault . . . might be forgotten . . . as the student body is once again reminded of how the University has repeatedly failed individuals who reported claims of sexual assault."   The Editorial Board further noted the University was "failing to protect its student body" by not cooperating fully with the OCR Investigation.

179.   All of the aforementioned facts have created an environment in which decision-makers at the University of Michigan are explicitly and implicitly biased against males accused of sexual misconduct.

**COUNT I**
*42 U.S.C. § 1983 - Fourteenth Amendment*
*Procedural Due Process*
*Property and Liberty Interests*
*(as to Defendants Baum, Pritzel, Bentley, Bazzy, Harper, Wessel*
*Walesby, Frumkin and Sellers)*

35

180.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

181.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

182.   Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions where, as here, students have a property interest in their education.

183.   Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

184.   Plaintiff was entitled to process commensurate with the seriousness of the allegations against him and the potential discipline, sanctions, and repercussions he was facing. Here the allegations were of the utmost seriousness, have lifelong ramifications, and were quasi-criminal in nature.

185.   There would have been no undue burden placed on Defendants to provide due process, including a hearing and cross-examination, in that the University already provides these due process protections to all students accused of any kind of misconduct other than sexual misconduct.

36

186.   Plaintiff had a significant interest in avoiding expulsion or forced withdrawal and a lifetime record of sexual assault.

187.   Defendants intentionally withheld from Plaintiff all due process protections.

188.   Because the University provided an appeals process, it had the obligation to ensure that the process was completed in accordance with due process protections as proscribed by the United States courts and its own Statement.

189.   Defendants' denial of due process to Plaintiff was arbitrary and capricious, deliberately indifferent and fundamentally unfair.

190.   A reasonable person would have known that failing to apply the due process protections described above would violate Plaintiff's constitutional rights.

191.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or ever attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his

37

standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; loss of personal and professional reputation; and expenditures of money to obtain a degree elsewhere.

## COUNT II
### *Title IX, 20 U.S.C. § 1681–88 – Discrimination Based on Sex – Erroneous Outcome*
*(as to Defendants University of Michigan and Board of Regents of the University of Michigan)*

192.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

193.   Title IX prohibits discrimination on the basis of sex in educational institutions, including the University, which receives federal funds.

194.   Defendants have violated Plaintiff's rights under Title IX by treating him differently because of his sex.

195.   Plaintiff was treated differently with regard to the procedures he was offered and the analysis of all evidence, which was viewed in light most favorable to the Complainant, based on his gender.

196.   Defendants were predisposed to view any female student who made a report to OIE (or anywhere else in the University), including Complainant as a

"victim" and/or a "survivor" prior to any findings being made.  The goal is to provide additional procedural advantages to accusers not provided to Plaintiff.

197.  The Board's findings, as described above and approved by Defendant Harper, are riddled with a difference in treatment as to how the statements of each party were viewed.

198.  Defendants continually sought by way of their policy, to tilt the adjudicatory playing field in favor of Complainant on the basis of gender, including a denial of due process and a lower standard of proof.

199.  An erroneous outcome was reached based on Plaintiff's gender.

200.  Here, the Appeals Board made findings favorable to Complainant based on her gender and held Plaintiff to a higher standard based on his gender.

201.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of  his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a

stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

A.   Equitable Relief:

    1.   An Order putting Plaintiff into the position he would have been absent a violation of his rights and a finding against him;

    2.   A ruling that, as a matter of law, Plaintiff's due process rights were violated;

    3.   An award of interest, costs and reasonable attorney fees; and,

    4.   Whatever other equitable relief appears appropriate at the time of final judgment.

B.   Legal Relief:

    1.   Compensatory damages in whatever amount he is found to be entitled;

    2.   Exemplary damages in whatever amount he is found to be entitled;

    3.   Punitive damages in whatever amount he is found to be entitled; and,

    4.   An award of interest, costs, reasonable attorney fees, and expert witness fees.

Dated: March 1, 2019                    Respectfully submitted,

**DEBORAH GORDON LAW**
**/s/Deborah L. Gordon (P27058)**
**Elizabeth A. Marzotto Taylor (P82061)**
**Andrea M. Van Hoven (P78856)**
**Alana A. Karbal (P82908)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
avanhoven@deborahgordonlaw.com
akarbal@deborahgordonlaw.com


## JURY DEMAND

Plaintiff **John Doe** by his attorneys **Deborah Gordon Law** demands a trial by jury of all the issues in this cause.

Dated:  March 1, 2019                     **DEBORAH GORDON LAW**
**/s/Deborah L. Gordon (P27058)**
**Elizabeth A. Marzotto Taylor (P82061)**
**Andrea M. Van Hoven (P78856)**
**Alana A. Karbal (P82908)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
avanhoven@deborahgordonlaw.com
akarbal@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

**_____/s/Deborah L. Gordon_____**
Deborah L. Gordon