# Exhibit A

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     JOHN DOE,

 4                     Plaintiff,
                                          Case No. 16-13174
 5        -v-

 6     DAVID H. BAUM, et al.,

 7                     Defendants.
       _____/
 8
                     MOTION AS TO IMPOSITION OF A REMEDY
 9
                 BEFORE THE HONORABLE DAVID M. LAWSON
10                    United States District Judge
               Theodore Levin United States Courthouse
11                  231 West Lafayette Boulevard
                          Detroit, Michigan
12                        February 14, 2019

13     APPEARANCES:

14     FOR THE PLAINTIFF:    Deborah L. Gordon
                             Deborah L. Gordon PLC
15                           33 Bloomfield Hills Parkway, Suite 220
                             Bloomfield Hills, Michigan  48304
16

17     FOR THE DEFENDANT:    Brian M. Schwartz
                             Miller, Canfield, Paddock & Stone, PLC
18                           150 West Jefferson Avenue, Suite 2500
                             Detroit, Michigan  48226
19                              and
                             David W. DeBruin
20                           Jenner & Block LLP
                             1099 New York Avenue, N.W., Suite 900
21                           Washington, DC  20001

22

23

24            To Obtain a Certified Transcript Contact:
               Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                     www.transcriptorders.com
```

1                         TABLE OF CONTENTS

2    MATTER_____ PAGE

3    MOTION AS TO IMPOSITION OF A REMEDY
     Argument by Ms. Gordon....................................  5
4    Argument by Mr. DeBruin.................................. 24
     Further Argument by Ms. Gordon.......................... 50
5    Further Argument by Mr. DeBruin ........................ 60
     Motion Taken Under Advisement by the Court.............. 62
6

7    CERTIFICATE OF COURT REPORTER.......................... 63

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Detroit, Michigan

 2    February 14, 2019

 3    2:10 p.m.

 4                            *      *      *

 5           THE CLERK:  All rise.  The United States District

 6    Court for the Eastern District of Michigan is now in session,

 7    the Honorable David M. Lawson presiding.

 8           THE COURT:  You may be seated.

 9           THE CLERK:  Now calling the case of Doe versus Baum,

10    Case Number 16-13174.

11           THE COURT:  Good afternoon, Counsel.  Would you put

12    your appearances on the record, please.

13           MS. GORDON:  Deborah Gordon on behalf of the

14    plaintiff, your Honor.

15           MR. DeBRUIN:  Good afternoon, your Honor.  David

16    DeBruin for the defendants.

17           MR. SCHWARTZ:  Brian Schwartz for the defendants.

18           THE COURT:  The case is before the Court on the

19    plaintiff's motion and brief with respect to the imposition of

20    a remedy.

21           When this case was remanded by the Sixth Circuit, we

22    had a conference and I was puzzling, I believe, with counsel

23    over the vehicle, the proper vehicle to bring the matter back

24    before the Court to discuss, I guess, where we go from here.

25           And I have a motion in which the plaintiff has
```

1    indicated that the Court should proceed with issuing certain

2    injunctive relief consisting of vacating and expunging the

3    finding of responsibility and the sanctions and other actions

4    taken by the university, and also vacating and expunging the

5    no-contact and permanent suspension order that was issued back

6    in June of 2016, expunging all the documents involving the

7    investigation and findings, enjoining the university and the

8    defendants from disclosing any information to third parties,

9    enjoining the university and the defendants from disclosing

10   the plaintiff's identity to third parties, although I'm not

11   sure that that's particularly contentious here, and also

12   awarding the defendant a degree from the Ross School of

13   Business, and damages in excess of approximately $30,000 in

14   tuition, which I suppose I could characterize as cover,

15   because he obtained a degree elsewhere.

16          Some of that strikes me as sensible, other parts of

17   that are somewhat remarkable given the fact that when you look

18   at the case, we're really not even beyond the pleading stage,

19   but nonetheless, that was the request.

20          The defendants have filed a response to that motion,

21   and I think I'm pretty clear about the parties' respective

22   positions, but Ms. Gordon, why don't you start and go ahead

23   and hit your highlights, if you please.

24          You can do that from this lectern here or your seat,

25   wherever you --

```
 1              MS. GORDON:  Ill go here, Judge.

 2              THE COURT:  That's fine.  That's fine.

 3              MS. GORDON:  Okay.  The university has contested

 4    every single thing I have asked for, which was a surprise,

 5    because when we met in your office I thought, based on what

 6    the Court had done in Doe versus Alger and Doe versus GMU,

 7    with the orders that had been issued with regard to, you

 8    know, immediate equitable relief, some of the things seemed

 9    mandatory.

10              THE COURT:  Well, you know, I think the way I'm

11    looking at this case, the posture of it now is that the motion

12    to dismiss is a dead letter, because it's essentially denied

13    by the Sixth Circuit, and what's been revived is your motion

14    for preliminary injunction.  So here we are with that.

15              MS. GORDON:  Well, I don't agree with that, Judge.

16    I think the Sixth Circuit has already ruled that my client's

17    constitutional rights were flatly violated.

18              THE COURT:  That can't be, because the case was

19    only -- it wasn't at a summary judgment stage.

20              MS. GORDON:  Okay.

21              THE COURT:  And you never filed a motion for judgment

22    on the pleadings.

23              MS. GORDON:  Well, I will do so now, then.  But the

24    Sixth Circuit has made a decision with regard to a due process

25    violation as a matter of substantive law; not on the TRO,
```

1    on -- you dismissed my case on the merits --

2         THE COURT:  I did.

3         MS. GORDON:  -- on a 12(b)(6).  So this didn't go up

4    on a TRO.  This went up on a final order of the Court, that

5    you had granted the 12(b)(6) and denied my motion for

6    reconsideration.

7         THE COURT:  Sure.  And when that decision is reversed

8    that means we're back to where we started.  The 12(b)(6)

9    motion is denied.

10        MS. GORDON:  Excuse me, Judge.  I just want to grab

11   the opinion.

12        THE COURT:  And the case moves forward.

13        MS. GORDON:  Okay.  I don't believe -- I believe the

14   posture that we're in here is just like the Doe versus Alger

15   case where the judge granted summary judgment for the

16   plaintiff.  And with granting the summary judgment for the

17   plaintiff, the plaintiff was then entitled to immediate

18   relief.

19        Let me go to Goss versus Lopez, Judge, which is, as

20   we know, a U.S. Supreme Court case.  And what the U.S. Supreme

21   Court case said there was, "The three-judge court declared

22   that plaintiffs were denied due process of law because they

23   were," quote, "suspended without hearing prior to suspension

24   or within a reasonable time thereafter.  It is ordered that

25   all references" -- excuse me -- "thereafter and that

1    regulations pursuant thereto were unconstitutional in

2    permitting such suspensions.  It was ordered that all

3    references to plaintiffs' suspensions be removed from school

4    files.  Because the order below granted plaintiffs' requests

5    for an injunction ordering defendants to expunge their record,

6    this court has jurisdiction of the appeal."

7           The court went on to rule that the judgment

8    against -- or excuse me -- the finding against the plaintiffs

9    in that case was invalid and that, therefore, the findings

10   would be vacated, period, full stop.

11          Let me move on to Carey versus Piphus, where the

12   court, the U.S. Supreme Court found --

13          THE COURT:  What were you reading?  What did you just

14   read from, Goss versus Lopez?

15          MS. GORDON:  Yes.

16          THE COURT:  Okay.

17          MS. GORDON:  I sure did.

18          Now I'm moving on to Carey versus Piphus where,

19   again, the court says, "The right to procedural due process is

20   absolute.  It does not depend on the merits of a claimant's

21   substantive assertions because of the importance to organized

22   society that procedural due process be observed.  We believe

23   that the denial of due process should be actionable for

24   nominal damages without proof of actual injury."

25          So to the extent the Court is now entertaining the

1   idea that somehow the case is just getting off the ground and

2   you will now make a ruling, I guess it will have to be in

3   comportment with the Sixth Circuit.  I'm unclear, then, about

4   the directive to come to you with a remedy, because you

5   directed us to approach the Court with remedies.

6         I don't think anybody can doubt that the Sixth

7   Circuit has thrown out the University of Michigan's policy,

8   period, full stop, exclamation point.  That case is the law

9   of the Circuit.  And throughout the Circuit, people are --

10  some are, some aren't -- following with the law that says you

11  must have cross examination in a hearing.  I see no way, your

12  Honor, that this Court is going to rule otherwise.

13        So if I need to present an order to this Court

14  codifying for the District Court level the fact that the

15  University of Michigan's policy -- which, by the way they

16  have now agreed in their legal papers to the Sixth Circuit

17  was unconstitutional, they literally say that -- I fail to

18  see, your Honor, how we are going to start from square one.

19        I will move on to say that because I have obtained

20  this relief on behalf of my client and had the policy thrown

21  out, my client is automatically entitled to vacation of the

22  unconstitutional findings made against him.  That must happen

23  now.  I don't think this Court has any alternative.

24        THE COURT:  Are you suggesting that the university is

25  contesting that aspect of your request?

```
 1            MS. GORDON:  Yes.  They literally said -- this is why

 2   I started out by saying how surprised I was.

 3            THE COURT:  Yeah.

 4            MS. GORDON:  Because we sat in your office and I

 5   thought we were all -- I realize they didn't like everything

 6   I said, but I felt that they were -- you know, got the basics,

 7   which are, interim attorney fees are allowed because there has

 8   been a substantial change between the parties, and we have

 9   won substantial relief which will not be changed.  The Sixth

10   Circuit -- they have dropped their appeal to the U.S. Supreme

11   Court, or never made one, and the en banc was denied.

12            So I have now a situation where we have the law of

13   the Circuit that is not going to be undone by this Court, no

14   matter what you rule with regard to John Doe here.  That law

15   will remain.  So with that, I get my interim fees.  They

16   cite -- excuse me -- they cite --

17            THE COURT:  Tell me again about the authority for

18   interim fees.

19            MS. GORDON:  The authority for interim fees is

20   extremely clearcut.  Doe versus Alger, which is the case in

21   the Second Circuit --

22            THE COURT:  That was a summary judgment case; right?

23            MS. GORDON:  Yes, it was.  And the judge granted

24   summary judgment for the plaintiff, and with that the judge

25   awarded significant relief, including vacation of his record,
```

1   all the things you just read for -- read from with regard to

2   the no-contact order being dissolved, him being able to be in

3   good standing at the school, and so on.  That's what -- there

4   is an order that I attached to my reply, which is the Alger

5   judge's ruling, your Honor, which is quite extensive and

6   detailed.

7           Now, let me tell you that she issued that order as

8   interim relief.  Okay?  So if you look at her order, she says

9   there, okay, this stuff is a basic.  This is going to happen

10  for sure.  Now, once we get the for-sure stuff down, what's

11  going to happen to John Doe?  Okay?

12          John Doe starts with a clean slate.  Now what happens

13  to him?  Does he want to be reinstated?  The judge in Doe

14  versus Alger said, if he wants to be reinstated -- he was new

15  in his career at the school, I think he was like a freshman,

16  and he was only suspended, he was not expelled or forced to

17  withdraw like my client.  The judge said, okay, if you are

18  going to be -- you get all this interim relief and you are

19  going to be reinstated, John Doe, and if you want to then turn

20  around and withdraw, we say good-bye to you, and that's the

21  end of the case.  But if you want to be reinstated and

22  continue to take classes, now you are going to have to go back

23  to their panel and their process and let the university

24  adjudicate misconduct.

25          Okay.  In Doe versus George Mason University, it was

Motion as to Imposition of a Remedy - February 14, 2019

```
 1   very similar facts to Doe versus Alger.  And in George Mason
 2   University, the judge took a little different position.  He
 3   ordered all the same relief that the judge in Doe versus Alger
 4   did, strictly on a summary judgment decision.  That was it.
 5   And he said, but I'm not going to make John Doe, in my case,
 6   go back to the appeals board, because just like here the
 7   plaintiff had won below in, let's call it, the OIE
 8   investigation at George Mason University, but it was on --
 9   then there was an appeal.  And the judge in George Mason said,
10   okay, there is no appeal required here under their own policy.
11        THE COURT:  Well, actually, there was no appeal
12   allowed under their policy.
13        MS. GORDON:  Fair.  But they took one.
14        THE COURT:  Right.  And that was really the
15   distinguishing factor.
16        MS. GORDON:  Well, yes.  But I have a similar
17   situation.  I have a situation where the court -- excuse me --
18   the university took on an appeal, but threw aside the criteria
19   for the appeal.  So the OIE finding, in my opinion, needs to
20   be reinstated depending on what we're doing with this case.
21   But this is a very complicated situation.
22        But as to vacating my client's record -- and by the
23   way, defendant is wrong when they state in their papers that
24   the record has been vacated.  That's flatly a false statement.
25        THE COURT:  Tell me the situation there.
```

Motion as to Imposition of a Remedy - February 14, 2019

1        MS. GORDON:  Okay.  My client was forced to withdraw.

2   When he withdrew, he was told point blank -- if you look at

3   Exhibit 2 to my original papers, my original brief, I have

4   attached the letter he received from the University of

5   Michigan.  And in that letter he is told that he will have

6   a permanent record.

7        Now, it's not going to be on his transcript, but it

8   resides in their files.  And he is also told that he better be

9   careful about how he answers questions with future employers

10  or other educational institutions, because he must be honest

11  and say there was a finding against him, and we all know and

12  understand that.

13       THE COURT:  So it's your understanding that when the

14  defendant says that the record expungement has been taken care

15  of, it hasn't, with respect to the lingering vestige of

16  whatever that is in the university's file?

17       MS. GORDON:  It's nothing lingering, Judge.  It's a

18  flat-out finding that my client engaged in sexual misconduct.

19  That is nothing lingering.  That is --

20       THE COURT:  Well, of course it's lingering, because

21  it's still there.

22       MS. GORDON:  Well, fair enough.  But I don't mean

23  it's something minor.  I mean it's like it's not something

24  that's on the side bubbling around, that is a fact of life,

25  and that needs to be vacated, because that was reached with an

1    un -- with a process we all know now to be unconstitutional.

2         So there's no way that the University of Michigan can

3    continue to have a finding in its files and records against my

4    client that he violated their policy.  And there is no case

5    that says otherwise.

6         They have cited to a couple of cases for things like

7    condemnation or, I'll call them, food stamps.  I mean, I may

8    be wrong, but it's a government administrative agency.  There

9    is not a single case where a student is involved and the

10   student was found to have been removed from the school without

11   due process, a procedural due process, a court has not

12   said, of course, he immediately gets his record corrected.

13        And the materials I put in front of your Honor which

14   you read earlier all came from the Doe versus Alger judge in

15   her order, which is quite thorough.

16        What she didn't get into, as I said, is what are we

17   going to do if he decides to take classes?  But there was no

18   question in her mind or the George Mason University judge's

19   mind or the Goss court's mind that these records are vacated.

20   And this has now got to be number one for my client, to remove

21   this cloud where he continues to have to say he has been found

22   guilty of sexual misconduct.

23        THE COURT:  Okay.  Move on to whatever else other

24   forms of relief you would like to talk about.

25        MS. GORDON:  Okay.  So interim fees are the same

Motion as to Imposition of a Remedy - February 14, 2019

```
1    thing.  I have covered them thoroughly in my -- in my -- not
2    thoroughly; I had limited pages, rightly so.
3            But interim fees, I'll read you from Woods versus
4    Willis, Sixth Circuit 2015, "To be a prevailing party
5    plaintiff must have done more than bring a lawsuit that
6    achieved the desired result of catalyzing a voluntary change.
7    Plaintiff must have been awarded summary relief by the courts
8    resulting in plaintiff receiving a judicially-sanctioned
9    change in the legal relationship of the parties.  The
10   touchstone of the prevailing party inquiry must be the
11   material alteration of the legal relationship."
12           That has occurred here under all case law, Judge.
13   There is absolutely no question about it.  And I'm entitled to
14   my fees and costs now.
15           THE COURT:  Aren't you required to have a judgment?
16           MS. GORDON:  Yeah, well, I can submit a judgment,
17   yes.  I think that's a possibility.  These other cases, they
18   are in summary judgment.  I can certainly submit an order to
19   this Court with regard --
20           THE COURT:  What do you mean, you can submit an order
21   to this Court?
22           MS. GORDON:  I can request an order from this Court,
23   Judge Lawson, that's what I meant.
24           THE COURT:  By filing a motion of some sort?
25           MS. GORDON:  Of course.  Or perhaps today we can
```

```
 1    resolve that.  I mean, I don't think it's going to be
 2    difficult to decide what the order is going to say.  It's
 3    going to say that the University of Michigan's policy as
 4    applied to the plaintiff was unconstitutional.
 5           I mean, I can file a summary judgment, if you want
 6    to go down that road.  I need some guidance from the Court.
 7           THE COURT:  Well, the guidance would be that we
 8    would enter a scheduling order, the parties would take their
 9    discovery, which you want to do on your Title IX case.
10           MS. GORDON:  Right.  Right.
11           THE COURT:  And then we would follow the conventional
12    process that's laid out by the Federal Rules of Civil
13    Procedure.
14           MS. GORDON:  Okay.  I don't -- I don't agree that
15    that's the process.  I agree that right now I'm entitled to
16    interim relief.  I don't think there is any question legally
17    about it, and the defendant does not say there is anything
18    either.  They don't cite a single case where I have to --
19    before I get my interim relief of vacating my client's record.
20    What law would not allow me to have my client's record
21    vacated?
22           THE COURT:  Well, we have moved on from that,
23    Ms. Gordon.
24           MS. GORDON:  Okay.  Well, Judge, you seem very -- I
25    just want to be sure that we're -- everybody is on the same
```

 1   page here with regard to what the law is, because I know of

 2   no law where my client cannot have his record vacated.

 3              THE COURT:  Ms. Gordon, I hear you about that.

 4              MS. GORDON:  Okay.  All right.

 5              THE COURT:  I thought you were talking about interim

 6   attorney's fees as opposed to other kinds of relief.  But be

 7   that as it may, do you have anything else you want to say?

 8              MS. GORDON:  Yes, I do.  I have quite a few other

 9   points to mention, Judge.

10         I do want to -- what I am recommending is, because

11   the Court is going to hear from the university in a moment,

12   that what they want is more process from my client.  So I have

13   a couple of things that I must make the Court aware of in that

14   regard.

15         The university issued what they called an interim

16   procedure on January 9, 2019.

17              THE COURT:  Oh, this year?

18              MS. GORDON:  Yes.

19              THE COURT:  Tell me about that.

20              MS. GORDON:  Post -- okay.  So post Doe versus Baum.

21              THE COURT:  Mm-hmm.

22              MS. GORDON:  So University -- Doe versus Cincinnati,

23   Judge, came down in the fall of 2016 -- '17.  That was right

24   around the time we were in front of your Honor, and that was

25   brand new law.  So on the heels of Doe versus Cincinnati,

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    where the Cincinnati court said very specifically that you

 2    must have a hearing and both sides must be able to question

 3    one another at the hearing, but in Cincinnati, Judge, there

 4    was only one policy.  It wasn't like U of M, where there's

 5    these dual policies, one for everybody else and one for sexual

 6    misconduct, and over here they have a complete hearing and

 7    over here you have no hearing.

 8            So the University of Michigan continues to want to

 9    not provide a hearing.  So even after --

10            THE COURT:  You mean still a bifurcated system?

11            MS. GORDON:  Yes.  Absolutely.

12            THE COURT:  All right.

13            MS. GORDON:  Absolutely.  And I have got a case in

14    front of Judge Tarnow which is now in the Sixth Circuit where

15    he has ruled that the statement of student rights and

16    responsibilities, which is the longstanding policy that

17    applies to everybody else, should apply to sexual misconduct

18    cases.

19            THE COURT:  Was Judge Tarnow's case a sexual

20    misconduct case?

21            MS. GORDON:  Yes, it is, Judge.

22            THE COURT:  All right.

23            MS. GORDON:  It's virtually the same thing as what's

24    in front of your Honor, an OI investigation and the like.

25            Okay.  So --
```

Motion as to Imposition of a Remedy - February 14, 2019

```
 1          THE COURT:  Sorry to dwell on this.  Did it go
 2   through an investigator's summary and then an appeal to a
 3   three-member board?
 4          MS. GORDON:  Yes.  So let me explain that.  So if I
 5   can just back up for a second.
 6          So after Doe versus Cincinnati came down the
 7   University of Michigan scrambled, and in the following
 8   February of '18 now, a year ago, they created a new policy.
 9   And there is no doubt about it, they tried to work -- do a
10   workaround around Doe versus Cincinnati.  And when I was at
11   the Sixth Circuit arguing this case, Judge Gibbons said, "I
12   fail to see why the University of Michigan continues to
13   deny" -- "defy the Sixth Circuit."  She said that at oral
14   argument and I have included it in my papers.
15          And what she meant by that was, after Doe versus
16   Cincinnati, the University of Michigan continued to deny a
17   hearing to students accused of sexual misconduct.  The
18   university continued to not allow students to question one
19   another in any format.  They continued to have what they
20   called a private investigator model where there was
21   interviews.
22          THE COURT:  And you're still speaking about sexual
23   misconduct cases?
24          MS. GORDON:  Yes.  This now, the policy I'm in front
25   of Judge Tarnow with.  So we have moved on from the policy
```

1     that was in front of your Honor, and I have now moved to

2     their January -- their February 2018 policy in front of

3     Judge Tarnow, post Cincinnati.  This is their plan that they

4     have come up with.

5            And Judge Tarnow grants my TRO and he says, "No,

6     under Doe versus Cincinnati, you have to have a hearing and

7     you have to have some form of questioning."  And Judge Tarnow

8     said, "I am ruling that the statement of student's rights and

9     responsibilities which allows for a full hearing applies, but

10    I will do a carve-out and I will say that as the court said in

11    Doe versus Cincinnati, you can question each other via written

12    questions."  Okay?

13           Off we went to the Sixth Circuit, because this was a

14    TRO, and they had a right, of course, to an appeal on a TRO.

15    Now there's cross appeals.  So they have argued that they

16    don't want to go to the statement of student's rights and

17    responsibilities as ordered by Judge Tarnow.  They don't want

18    to give that kind of a hearing to students accused of sexual

19    misconduct.  They want to create their own policy, they say.

20    And now they have done that as of a few weeks ago.

21           THE COURT:  And tell me about it.

22           MS. GORDON:  That's the January 9 policy.  I have

23    taken the position in the Sixth Circuit --

24           THE COURT:  No, just tell me what the policy is.

25           MS. GORDON:  It's unconstitutional with regard to

```
 1   hearings.
 2            THE COURT:  No, tell me what they are doing.
 3            MS. GORDON:  Okay.
 4            THE COURT:  What is the practice?
 5            MS. GORDON:  Okay.  So what the practice is, and it's
 6   attached to defendants' papers as an exhibit, is that they are
 7   going to allow a hearing where they say -- I'm sorry -- they
 8   say in their policy, you may get a hearing.  The word "cross
 9   examination" does not appear anywhere in the document which is
10   about 40 or 50 pages.  And what they say is that there will be
11   a hearing officer assigned by the Office of General Counsel
12   and the Dean of Student Affairs and that that hearing officer
13   will be allowed to ask questions of the parties after
14   investigation.
15            THE COURT:  Oh, is that like the level one procedure
16   here?
17            MS. GORDON:  No.  There was no --
18            THE COURT:  Is that what we're talking about?
19            MS. GORDON:  There was never a time here where people
20   gathered in one room and, for example, the hearing officer
21   could --
22            THE COURT:  Oh, the hearing officer is not like the
23   investigator?
24            MS. GORDON:  Exactly.  Exactly.  There would be some
25   investigation here, but then it would go to a hearing, which
```

```
 1    we never had here --
 2              THE COURT:  Yeah.
 3              MS. GORDON:  -- in our policy, Judge.  They didn't
 4    even offer that much.
 5              So now they go to a hearing and the hearing officer
 6    asks the questions.  And then the policy says that the parties
 7    may do, quote/unquote, follow-up after the investigation,
 8    after the hearing officer's questions.
 9              I brought with me a statement from President Mark
10    Schlissel that he issued on January 29, 14, 15 days ago, where
11    he said in a community letter that he does not agree with
12    Doe versus Baum and that he believes that there should be the
13    single hearing officer model with only follow-up questions
14    allowed.  So the university is continuing to dig in their
15    heels.  They have made it extremely clear that this new policy
16    will not track Doe versus Baum.
17              You'll hear from Mr. DeBruin that it does.  I'm here
18    to tell you, I'm challenging it, and I have already filed a
19    challenge in the Sixth Circuit in the Judge Tarnow case.
20              THE COURT:  So is all of this sort of leading to your
21    request that they not be able to do that while this case is
22    pending here in your -- with Mr. --
23              MS. GORDON:  Well, here's my point:  I don't think
24    they can do it.  I mean, there's -- it's so impractical.  Our
25    case is unique, Judge, because don't forget, the complainant
```

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    sued my client in Washtenaw County, okay?  I have nine
 2    depositions.
 3              THE COURT:  Is that case still going, by the way?
 4              MS. GORDON:  Oh, no.  That's long over.  Long over.
 5    But in the meantime --
 6              THE COURT:  Did it go to a verdict?
 7              MS. GORDON:  Oh, no, no, no, no, no.  Uh-uh.
 8              In any event, there's nine depositions.  We have
 9    already gone so far in this case that have bubbled up from
10    this complaint and was in front of your Honor and was in front
11    of Washtenaw County, we have gone so far past what the OIE
12    ever would do or could do.  We have -- I have an incredible
13    record of half-day-long or day-long depositions under oath.
14              THE COURT:  I don't think you mean to say an
15    incredible record, do you?
16              MS. GORDON:  Incredibly large record compared to an
17    OIE investigation.  I mean, an OIE, there is no oath, there
18    is no half-day interview, it's -- I mean, I have a very
19    extensive -- I'll change "incredible" to "extensive."  I have
20    gone way beyond what would ever happen.
21              So what I am recommending to the Court today is, I'll
22    pick up where you left off, let's set a schedule.  I think the
23    findings should be vacated against my client immediately and I
24    will take whatever steps are necessary to file the appropriate
25    motion to do that.  I take your point about there is no
```

1    judgment, but there should be.  And I think there can be and

2    will be.  I will do that.

3            I want the findings vacated.  I want my interim fees.

4    And then I think we should do discovery on Title IX and due

5    process and we should have a trial.  And the trial should be

6    on this:  Not going back to the university.  Just like in

7    Carey versus Piphus, in Goss versus Lopez, they didn't send

8    those students back to more process at the schools.  They said

9    the factfinder at the court will make these decisions.

10           I know your Honor had the Pucci case against, I

11   think, the 37th District Court.

12           THE COURT:  Whatever -- it was Dearborn, wherever

13   that is.

14           MS. GORDON:  Wherever it was.  But the point there

15   was, it was similar.  It was an employment case with a denial

16   of procedural due process.  You put the case to a jury to

17   decide whether or not the plaintiff -- whether there was just

18   cause for her termination.  It was a jury decision.  You

19   didn't send it back to the court.

20           At the same time that was going on, I had a similar

21   case in front of Judge Borman which also went to a jury trial

22   called Barachkov versus the 41st District Court.  I have had

23   multiple trials in this building in employment cases where my

24   client was denied procedural due process and it goes to the

25   jury to make the finding as to whether or not the person would

1    have been fired anyway.

2            And I must say, in that situation, the burden is

3    on the defendant to prove that but for their denial of due

4    process the person would have been terminated anyway.

5            So what I'm saying to you here is, sending us back

6    to U of M for more process is a non-starter.  I am going to

7    contest their policy.  I'm going to say it's unconstitutional.

8    I'm going to say it's too late.  Many witnesses are gone.

9            They have -- the whole process is run by the named

10   defendants, literally.  It's not as if to say one investigator

11   might have a bias, literally the entire -- every decision

12   that will be made about the process will be made by named

13   defendants.

14           So I am requesting the remedial relief that I have

15   already asked you for.  And then I'm asking for discovery and

16   a jury trial, a joint jury trial on the Title IX and the

17   procedural due process.

18           THE COURT:  All right.  Thank you.

19           Mr. DeBruin?

20           MR. DeBRUIN:  Thank you, your Honor.  Let me state at

21   the outset that I want to make it clear that the university

22   does not seek to be unduly contentious in this matter.  We are

23   not trying to be.  We have already cleared his record from the

24   university.

25           THE COURT:  What does that mean?

Motion as to Imposition of a Remedy - February 14, 2019                    25

```
 1          MR. DeBRUIN:  Well, the -- so, again, student records
 2    consist essentially of two different types.  You have got
 3    academic records like transcripts.  Those records were always
 4    clean in this case.  As part of the original agreement with
 5    the plaintiff, he left the university with a clean transcript.
 6    He was able to seek a copy of that transcript to give to other
 7    schools.  There was nothing on it referencing any allegation
 8    of sexual assault, any misconduct finding.
 9          Students also have student conduct files.  Those
10    files are confidential.  You can't walk into the university
11    or anybody else and say, "I would like to know what's in John
12    Doe's student conduct file."  Those records are all governed
13    by a federal statute that preclude exclusion of any
14    information in those files, the Federal Educational Records
15    Privacy Act or FERPA.
16          THE COURT:  Did you say exclusion or disclosure?
17          MR. DeBRUIN:  Any disclosure of the information in
18    those records.
19          THE COURT:  You said exclusion, though.  I'm trying
20    to -- did you misspeak or are you referring to something else?
21          MR. DeBRUIN:  I may have misspoke.
22          THE COURT:  Okay.
23          MR. DeBRUIN:  I apologize.
24          THE COURT:  No, I'm just trying to be clear.
25          MR. DeBRUIN:  So there was a reference when he
```

```
 1    withdrew from the university -- his transcript was clean, but
 2    there was a reference in his student conduct file to the
 3    finding of misconduct.
 4          Now, even there that reference could never be
 5    disclosed to anybody without the plaintiff's consent, and so
 6    when he did seek enrollment at another university, he came to
 7    the university to discuss with us what he could say about
 8    that, what we would say.  We worked that out with plaintiff's
 9    counsel.  But those records are protected even when there was
10    a finding.
11          After the Sixth Circuit --
12          THE COURT:  But they are not expunged?
13          MR. DeBRUIN:  After the Sixth Circuit --
14          THE COURT:  They are not expunged; correct?
15          MR. DeBRUIN:  Well, I'm about to address that.
16          THE COURT:  I'm sorry.  Go ahead.
17          MR. DeBRUIN:  After the Sixth Circuit ruled, and
18    without any order from this Court, an entry was made in that
19    file that that finding was vacated, could not be relied upon
20    for any reason, was essentially wiped clean.  And so in terms
21    of a practical expungement, it has occurred, and there is
22    really nothing to fight for that.  We're not trying to fight
23    for that.  We would not disclose any information in that file
24    at any time without express consent from the student, in any
25    event.  So I feel like we're fighting over something that I
```

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    don't understand what we're fighting about.

 2              THE COURT:  Okay.  Let's move on, then.

 3              MR. DeBRUIN:  So I think as I approach this, and the

 4    papers before the Court, I think it is important to just think

 5    clearly, because we have got lots of different requests for

 6    relief going in many different directions.  And I believe it

 7    is significant, as the Court stated when you came out, that

 8    the plaintiff has not yet prevailed on any claim.

 9              The Circuit stated that the plaintiff has adequately

10    pleaded two different claims for relief.  There has been no

11    motion for summary judgment, no motion for partial summary

12    judgment, no motion for judgment under 54(b) on a portion of

13    the claim.

14              And why does that matter?  That matters because

15    normally proof of injury and entitlement to relief and what to

16    relieve, those are all some components of a claim.  Those are

17    all components of a judgment.  They are all components of an

18    order of this Court.  And so here we've to some extent jumped

19    to issues of relief without addressing issues of injury,

20    without addressing issues of relief based on what?

21              Now, the Court, when you called us together --

22              THE COURT:  Well, I don't know if Ms. Gordon agrees,

23    and I take it from her comments that she doesn't, but I am

24    approaching this move towards some interim relief as

25    adjudicating her motion for preliminary injunction, and that,
```

1    in my view, properly places before the Court the opportunity

2    to address some of the things that she is asking for.  So

3    that's the procedural context, if you will.

4            Now, I agree with you that it's inappropriate to

5    enter judgments unless everybody has due process, including

6    the defendant in this case.

7            By the way, have you filed an answer to the

8    complaint?  I don't remember if there was an amended complaint

9    or not, but have you filed an answer to the complaint?

10           MR. DeBRUIN:  Your Honor, I --

11           THE COURT:  My law clerk suggests to me that you have

12   not answered the complaint.

13           MR. DeBRUIN:  Well, again, we moved to dismiss the

14   case, as you know, early on.

15           THE COURT:  Right.

16           MR. DeBRUIN:  It was more or less contemporaneously

17   with the motion for the injunction.  Those were briefed

18   together.

19           THE COURT:  Well, I'm not suggesting that you should

20   have, necessarily, but if you haven't, you need to do that.

21           MR. DeBRUIN:  Well, we will do that.  I mean, the

22   Court called us together shortly after the Sixth Circuit

23   decided the appeal.  We had a meeting in chambers to address

24   somewhat informally, if you will, what does it make sense

25   in terms of where the case should go.  And we were more than

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    willing to embark upon that conversation and that's, I think,
 2    in some ways what these pleadings were designed to address.
 3          And the Court also raised the issue of, is there
 4    any prospect that we could try to resolve this through a
 5    settlement conference, which we would be open to, as well.
 6          But laying all of that aside, what the -- what has
 7    been decided in this case, laying aside the formalities that
 8    we don't yet have any judgment on any claim is, there has been
 9    a decision that there was a deprivation of the plaintiff's due
10    process rights.  And we concede that that element of the case,
11    in essence, was resolved by the Circuit.  We're not trying to
12    suggest otherwise.
13          There are two clear remedies for a due process
14    violation standing alone.  The normal remedy, case after case,
15    is that the normal remedy for a violation of due process is
16    process, is to provide the process that was denied.  And
17    in this case, there has been a review of the university's
18    procedures, and we will talk about those in a minute.  Those
19    procedures were found to be inadequate.
20          And so the normal remedy for a due process violation
21    is to provide the procedures in the context at issue, in this
22    case, a resolution of a sexual assault complaint that was
23    brought by another student, not brought by the university,
24    that under Title IX we have an obligation to adjudicate.
25    There was a finding that we didn't adjudicate that properly
```

1    under the due process clause.  There is an allegation that we

2    didn't adjudicate it properly under the -- under Title IX.

3            Either way, it doesn't really matter, because the

4    holding of the Sixth Circuit is, we didn't adjudicate it

5    properly, so the remedy is, and we concede, that we should be

6    required to adjudicate it in an appropriate way.  We're

7    prepared to do that.

8            THE COURT:  Well that is a remedy.

9            MR. DeBRUIN:  All I'm saying is, that is the typical

10   remedy for what's been established so far.

11           THE COURT:  Well, maybe yes, maybe no.  I'm not sure

12   I agree.  But it's a typical remedy.  Damages certainly are --

13   is a remedy as well.

14           MR. DeBRUIN:  Yes.  And that was the second component

15   I was going to say.  So just focusing on, you have established

16   a violation of due process, what normally flows from that

17   standing alone, normally what flows is more process and the

18   potential for damages.  But both the Supreme Court in Carey

19   versus Piphus and the Sixth Circuit in Newsome, I'll address

20   both of those, made clear that you're not entitled to proof of

21   damages absent proof of actual injury, which courts recognize

22   you have to separate.

23           THE COURT:  Right.  And I don't think Ms. Gordon is

24   asking for anything else.  She said she wants --

25           MR. DeBRUIN:  I don't think she is.

Motion as to Imposition of a Remedy - February 14, 2019

```
1          THE COURT:  She said she wants a trial.
2          MR. DeBRUIN:  Well, but that's not what she sought in
3   these papers that are before the Court.  In these papers she
4   was not asking for more process, she was not asking for a
5   hearing, and she is not asking for an award of damages,
6   although I guess maybe this request for cover.
7          But normally the damage -- what the courts have made
8   clear in Carey versus Piphus is that you have to separate the
9   damages from a procedural due process violation from the
10  damages of whether or not the person was wrongfully found to
11  be responsible for something that he should haven't been found
12  responsible for.  So those are two separate components.
13         There has been a holding of a due process violation.
14  There has not been a finding that he was wrongly found
15  involved.  That will require either a further adjudication
16  by the university, which is the typical outcome, that's the
17  outcome in Alger, that's the outcome in the GM -- the George
18  Mason case, or at a minimum, if for some reason that was not
19  possible, it could be that there would be a hearing before the
20  Court.  But that's going as to whether there was a wrongful
21  finding of -- whether a termination or an expulsion from the
22  school on the merits of the decision.
23         There still can be, the courts have said, damages for
24  the denial of due process alone, the fact that "I felt like my
25  rights were violated."  You have to separate those.  You're
```

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    not entitled to damages absent proof of a separate injury.
 2    You can get nominal damages.  But, again, those are not the
 3    things that I submit are before the Court.
 4         So in terms of what is before the Court, I think it's
 5    helpful to walk through them, because, again, there is a
 6    request for a degree, for the costs of his obtaining a degree
 7    somewhere else.  And as to those things, I think the Circuit
 8    decision in Newsome is particularly clear and is directly on
 9    point.  And again, we highlighted this in our response papers.
10         But the court, the Newsome case in the Sixth Circuit
11    is a similar case involving student misconduct findings,
12    review by the court as to whether process was adequate or not,
13    rejection of several claims that the process was inadequate,
14    including a claim there should have been cross examination.
15    The court said, no, there was no need to cross examination in
16    that case, but there was another due process violation the
17    court sustained.
18         And then it turned to the issue of remedy.  And the
19    court said, "To the extent that Newsome seeks money damages
20    to compensate him for the violation of his 14th Amendment
21    right, he must demonstrate on remand that he suffered actual
22    injuries such as mental and emotional distress caused by the
23    violation -- the violation of due process."
24         But then the court goes further and says, "To the
25    extent that Newsome seeks reparative relief aimed at restoring
```

1   him to the position he would have occupied but for the due

2   process violation, he is entitled to such relief unless the

3   school district can prove by a preponderance of the evidence

4   that even had it not deprived Newsome of his right to

5   procedural due process, he would still rightfully have been

6   expelled."

7        So clearly as to the substantive relief, a degree,

8   cover, anything going to a wrongful finding of student

9   misconduct, all of that is premature for the reasons that we

10  said.

11       THE COURT:  You're not suggesting it's unavailable,

12  you're just suggesting we're not at that point yet?

13       MR. DeBRUIN:  Exactly.  We're clearly not at that

14  point yet.

15       So today counsel for plaintiff, I submit, has shifted

16  a little bit and now says, well, there should be a hearing

17  before this Court, not a remand to the university.  Multiple

18  courts have addressed that question of whether -- if there has

19  been a procedural violation at the university, so therefore,

20  the findings should be vacated, as it should be here and has

21  been here, then where should the -- but that doesn't mean that

22  the person was wrongfully found involved, it just means the

23  procedures were inadequate.  It wasn't a proper determination

24  of that.

25       Where should that proper determination occur?  In

```
 1    Alger, in GMU, in all the cases that we cite to you, that

 2    determination should be made in the first instance, if it's

 3    available, at the university level under appropriate

 4    procedures.

 5            THE COURT:  Right.  But that makes no sense here,

 6    because you have a student who is no longer at the university,

 7    who has already obtained a degree elsewhere, and has really

 8    no interest in going back to the university and matriculating.

 9    All of that is gone.  It's -- the passage of time has

10    eliminated any meaning from that sort of a procedure.

11            MR. DeBRUIN:  Well --

12            THE COURT:  So why should we engage in that?

13            MR. DeBRUIN:  Well, first of all, that's not what

14    he is asking for.  He is still asking for his university of

15    Michigan degree.  He can't get that under Alger, under

16    George Mason, without going -- having his university record

17    established.  There is a pending charge against him.  It

18    remains pending.  It's -- the finding has been vacated, but

19    the charge hasn't been removed.  So he is still seeking

20    relief from the university, and clearly, that's just like

21    reenrollment and finish my degree.

22            And whether he finishes it by going back to class or

23    he finishes it by getting transfer credits, he is saying, "I

24    want back in the university, I want reenrollment, and I'm

25    going to march toward my degree."  And under the cases, Alger
```

1    and the other cases that we cite, he is not entitled to that

2    without an appropriate new hearing.

3         And we're prepared to provide that hearing under

4    procedures that are consistent with due process.  And I can

5    address that briefly, because we're being attacked even

6    though, again, no motion has been filed before the Court,

7    nothing has been set forth on those grounds.

8         But to just at least go to the core points that were

9    made today, there is a claim that the new procedures don't

10   provide for cross examination, that the university continues

11   to defy University of Cincinnati, continues to defy the

12   decision in this very case.

13        First of all, Cincinnati was decided after the

14   university's resolution of the student misconduct complaint

15   in this case.  The Court may recall Cincinnati came down after

16   we had actually argued the motions and shortly before the

17   Court issued its decision.  I believe you even issued a

18   decision before we could file something to the Court

19   addressing this new decision from the Sixth Circuit.  But

20   that came down after the proceedings in our case.

21        Cincinnati was also, on its face, a very -- at least

22   it appeared to be a facially-limited decision.  It was a

23   situation where the Circuit emphasized, went out of their way

24   to emphasize, this was a two-witness case.  There was nobody

25   else who really had any relevant information as to any part of

Motion as to Imposition of a Remedy - February 14, 2019

```
 1    the incident except the complainant and the respondent.  It
 2    was a classic, quote, he said/she said case.  Those are the
 3    words the courts used in Cincinnati.  And in that context, the
 4    court said the university could not make a decision without
 5    the factfinder evaluating the complainant who was making the
 6    allegation when the respondent was denying the charge.
 7           Our case has always been very different.  The
 8    university and the appeals board decision relies most heavily
 9    on the testimony of third-party witnesses, witness two.  You
10    will remember all of that.
11           So in terms of whether Cincinnati dictated a
12    different result here, that was far from clear.  It was
13    briefed and --
14           THE COURT:  But it is now.
15           MR. DeBRUIN:  It is now.  Well, what's more
16    significant is not Cincinnati, but it's the decision in this
17    case.
18           THE COURT:  Right.
19           MR. DeBRUIN:  So we don't -- we don't dispute that
20    any hearing conducted by the university must be conducted in a
21    manner consistent with the Circuit's decision in Doe versus
22    Baum, this very case.  And so the university's new procedures,
23    which we have provided to the Court, they were attached to
24    our opposition, are very clear.  And at page 31 of those
25    procedures, which again are attached, and I don't know that we
```

1     need to spend a tremendous amount of time on this, but just

2     to make clear, there is a section called "The Hearing" and

3     it begins as follows, and I quote:  "The hearing is an

4     opportunity for the parties to address the hearing officer in

5     person and to question the other party and/or witnesses and

6     for the hearing officer to obtain information following the

7     investigation that is necessary to make a determination of

8     whether a policy violation occurred."

9            So the currently-in-place policies are very clear

10    that the hearing is an opportunity for the parties to address

11    the hearing officer in person and, quote, "to question the

12    other party and/or witnesses."  And that, in fact, is what the

13    new procedures provide.

14           Just briefly to address comments that were made about

15    this other case before Judge Tarnow, first of all, that case

16    was not, Judge, just to clarify the record, a matter that

17    was analogous to this case, in that there had been an OIE

18    investigation, followed by an OIE decision, and then followed

19    by Federal Court litigation.

20           What happened in that case is, during the pendency

21    of the OIE investigation and before there was ever an OIE

22    decision, the plaintiff, represented by plaintiff's counsel

23    here, filed suit and sought to enjoin the university

24    proceedings from continuing.  So those proceedings were

25    stopped midstream and Judge Tarnow did issue an injunction

Motion as to Imposition of a Remedy - February 14, 2019

1    that was basically directed to the old procedures indicating

2    that the old procedures, in his view, did not comport with

3    due process, which is consistent with the Circuit's ruling

4    here.

5            So we now have new procedures.  The new procedures

6    clearly provide for a hearing, a live hearing before a hearing

7    officer with cross examination.  And, again, just to contrast

8    the way it was and the way it is now, as the Court knows,

9    under the previous model there was a very thorough

10   investigation by a university investigator, the OIE

11   investigator.

12           That, Ms. Gordon often lambasts the university for

13   having these two different procedures, one for sexual assault

14   and one for everything else; everything else being the

15   student's rights and responsibilities.  Realize that under

16   everything else, student rights and responsibilities, there

17   was no university investigation.  There was no university

18   involvement.

19           So that if a student brought a complaint against

20   another student for theft or whatever it might be, basically,

21   the student had to marshal and bring his or her case.  There

22   was no independent investigation by the university.  There was

23   a hearing, one student against the accused student, but it

24   was an entirely different process.

25           And when the university addressed allegations of

Motion as to Imposition of a Remedy - February 14, 2019          39

```
 1    sexual assault, which by nature are very different kinds of
 2    investigations, they involve trauma between the complainant
 3    and the respondent, the university admittedly went to an
 4    entirely different model for those cases and those cases
 5    alone.  There is no dispute about it.
 6            And instead of a process that was solely run by the
 7    students, there was this OIE investigation, followed by an OIE
 8    decision, followed by an appeal of the OIE decision, all based
 9    essentially on the OIE investigatory record, which in this
10    case was some 40 pages long.
11            That model, in light of the decision by the Sixth
12    Circuit here, has been replaced.  The current model is
13    different, so you can't overlay one directly on the other.
14    The current model has an OIE investigation, so there still is
15    an attempt to gather evidence, interview witnesses, bring that
16    together, but there is no OIE decision, and instead it goes to
17    a hearing before a hearing officer for a live hearing where
18    both the complainant, the respondent, other witnesses testify
19    in person before the hearing officer and there is cross
20    examination, as I said.  And then from that, there is a
21    relatively limited appeal.
22            So all I'm saying is, vis-à-vis the relief that the
23    plaintiff is seeking in the papers they filed before the
24    Court, if the plaintiff seeks to go forward to get a
25    university degree and the other things that he is requesting,
```

Motion as to Imposition of a Remedy - February 14, 2019                    40

1    the appropriate outcome is for the matter to be resolved for

2    a hearing.

3            We have spoken to the complainant.  She is willing and

4    able to be a participant in a hearing with cross examination,

5    all in accordance with the Circuit's requirements.  And we

6    have maintained all along that that should happen before any

7    more time has passed.

8            We recognize that, as in Alger, if the Court recalls

9    from reading Alger, frequently in these cases where there is

10   litigation, there is a complaint, you know, the passage of

11   time impairs the ability to have a fair hearing.  Courts have

12   denied that in the abstract and said, absent a showing that

13   you couldn't get a fair hearing, there are ways to address it.

14   Even witnesses who may have left the school could perhaps

15   testify by Skype, you know, current methods of communication,

16   and so those issues will be left on remand to the university.

17           THE COURT:  All right.

18           MR. DeBRUIN:  Now, if the plaintiff withdrew all

19   of those requests, then I think we could be in a different

20   position.  If the plaintiff was only seeking damages for the

21   violation of the due process right, then we might be in a

22   situation where it would be appropriate to have a hearing

23   before this Court, separate the harm from due process from the

24   potential harm from the fact that he was found involved for

25   sexual misconduct, which obviously was an upsetting incident

 1   in and of itself.  But that's not the way I read where the

 2   plaintiff is today.

 3          Before I lose the Court's patience, I want to briefly

 4   address at least two other issues, which is the interim fees

 5   in Title IX.  Again, on expungement, I think I have already

 6   talked about that.  We took steps immediately after the

 7   Circuit decision to clear his student misconduct file.  It's

 8   not public in any event and available.  The transcript was

 9   always clear.

10          THE COURT:  Regardless of whether it was public or

11   not, though, you're telling me that it's clear?

12          MR. DeBRUIN:  Yes.

13          THE COURT:  Okay.  Thank you.

14          MR. DeBRUIN:  Yes.  And he is not a student.  I mean,

15   there is no -- there is no one using his student conduct files

16   to make any determinations.  He -- he is no longer a student.

17          THE COURT:  What's the point of a student conduct

18   file?  How is it used?

19          MR. DeBRUIN:  Well, it is used if --

20          THE COURT:  Well, let me just add to my question.  As

21   I understand what you're saying, a student conduct file is

22   very relevant with respect to current students, but what's the

23   point of a student conduct file after the student leaves the

24   university?

25          MR. DeBRUIN:  So there may be instances where an

```
 1    employer or another university, a graduate program may ask

 2    the student whether or not he or she was adjudicated of any

 3    student misconduct.  And in those instances, the university

 4    cannot say anything unless the student goes to the university,

 5    his or her university and says, "I would like you to make a

 6    statement as to whether or not my conduct file was clean or

 7    not clean."

 8            THE COURT:  All right.  Now, if John Doe comes to me

 9    for a job and I ask him to consent to disclosure, and I have

10    that consent and I go to the University of Michigan and ask,

11    "What's in John Doe's student conduct file," what am I going

12    to learn?

13            MR. DeBRUIN:  So in this particular case or --

14            THE COURT:  Yes.

15            MR. DeBRUIN:  So what John Doe's status is today,

16    there is no misconduct file in his record.  There is a pending

17    charge that has not yet been resolved one way or the other.

18            THE COURT:  Okay.

19            MR. DeBRUIN:  And that is no different than any other

20    student who had a charge placed against him or her and that

21    hasn't been resolved yet.

22            THE COURT:  And is that charge a matter of

23    disclosure, or if it's pending it's simply not disclosed at

24    all, even with consent?

25            MR. DeBRUIN:  It's never disclosed without consent.
```

```
 1    If --
 2              THE COURT:  No, no.  If there is --
 3              MR. DeBRUIN:  If the student were to consent and say,
 4    "My potential employer, a federal judge, has asked what the
 5    current status of my file is," the university would make a
 6    truthful, accurate statement:  "The current status is, you
 7    have not been adjudicated of any misconduct.  There is a
 8    current charge, or there is a pending charge, or there is an
 9    unadjudicated charge."
10              THE COURT:  Okay.  That answers my question.  Thank
11    you.
12              MR. DeBRUIN:  But that would only be, again, pursuant
13    to his express authorization.
14              THE COURT:  All right.  Did you want to say something
15    about Title IX?
16              MR. DeBRUIN:  I wanted to say about interim fees and
17    about Title IX --
18              THE COURT:  Oh, yes.  Okay.
19              MR. DeBRUIN:  So first I submit, as we do in our
20    papers, an award of interim fees is not appropriate at that
21    time because, again, I submit the plaintiff has not yet
22    prevailed on any claim.  We're not to the point of having
23    judgment entered on a partial claim.
24              And again, in terms of any award of fees, one of the
25    things the Sixth Circuit, the Supreme Court have both said is,
```

Motion as to Imposition of a Remedy - February 14, 2019

1    you can't award fees without evaluating.

2           So, for instance, the Supreme Court said in Phelan

3    versus -- or I'm sorry -- the Sixth Circuit in Phelan versus

4    Bell, 8 F.3d 369, page 373, quoted at length in the Grandzeire

5    case which is in our papers that, "A party who partially

6    prevails is entitled to an award of fees commensurate to the

7    party's success."

8           And similarly, the Supreme Court, in Hensley versus

9    Eckerhart, 461 U.S. 424, 435, says the District Court should

10   focus on the significance of the overall relief obtained by

11   the plaintiff.

12          So even in the context of assessing interim fees

13   where there has been partial relief on a claim, what is

14   a critical element is, what is the success that has been

15   obtained?  What is the relief that has been obtained?

16          What we know now is, there is a determination that

17   the plaintiff was entitled -- his due process rights were

18   violated, he is entitled to additional process.  But in terms

19   of the other components of the relief being claimed, and in

20   particular any claim that he actually was wrongfully found to

21   be responsible for the misconduct, that has not yet occurred

22   and may never occur.

23          And so I submit not only are interim fees

24   inappropriate at this point because there is no judgment on

25   any claim, complete or partial, but the Court is not in a

Motion as to Imposition of a Remedy - February 14, 2019                45

```
 1    position to be able to evaluate to what extent has the
 2    plaintiff succeeded.
 3           Is this -- I mean, if -- if there was a violation
 4    of due process, but ultimately no injury because even with
 5    process he would have been found responsible, it's a very
 6    different case, and I submit a very different success that's
 7    been obtained, and that would have a direct impact on what
 8    fees are awarded.
 9           There is also, as you know, many claims in this case
10    that have been abandoned.  The whole focus of the initial
11    complaint was all about the supposed conflict of interest
12    between Mr. Baum and someone who was in the office of the
13    complainant's lawyer, and that whole part of the case has been
14    abandoned, and you would have to obviously look at all of that
15    before you could even begin to make any judgment on fees.
16    There has been no basis provided to the Court to even begin
17    that exercise, and I just submit, again, it's premature.
18    We're not to the point.
19           THE COURT:  I understand your point.  Move on to
20    Title IX.
21           MR. DeBRUIN:  So the last thing I want to say is
22    Title IX, and the plaintiff is aggressively pressing to
23    press forward on Title IX discovery.  And I submit it's
24    inappropriate because I think it's basically wasteful or at
25    least premature, and I'll explain why.
```

1          So in some Title VII, even potential Title IX claims,

2     the defendant itself has instigated an action, terminated a

3     state employee on grounds that were alleged to be on the basis

4     of race impermissibly or on the basis of sex impermissibly in

5     Title IX.

6          Here the university did not instigate any charge

7     against the respondent.  A complaint was filed by a student.

8     And under Title IX, we actually -- the university has a

9     responsibility to adjudicate that complaint.  It's not free to

10    say, "You know, this is a messy area, we don't want to have

11    anything to do with it, take your complaint to the prosecutor,

12    take your complaint elsewhere."  We have an obligation under

13    Title IX to adjudicate that complaint.

14         Now, obviously we have a parallel duty to the

15    respondent to adjudicate that complaint in a way that comports

16    with his Title IX rights, meaning that we can't adjudicate

17    in a way that involves bias against the male respondent any

18    more than we can ignore a complaint brought by a female

19    complainant, or if the sexes could be reversed, whatever it

20    may be.  So we have an obligation under Title IX to the

21    respondent to adjudicate that complaint in a manner that is

22    appropriate.

23         It essentially has already been determined under the

24    due process clause that our adjudication was not adequate and

25    that adjudication essentially must be redone, particularly if

1    he is seeking relief, as he is under due process, and he is

2    still seeking relief under Title IX.

3          But the outcome is, if our adjudication was

4    inappropriate, whether because of procedures or because of

5    bias, that procedure has to be redone.  The finding has to be

6    rejected, has to be vacated, as it was, and the procedure has

7    to be done in a way that does not involve bias, that does not

8    involve inadequate process.  But we have already, I think,

9    all agreed that the procedure does need to be redone.  The

10   adjudication has to be repeated.  It was -- you cannot rest on

11   what has already occurred.

12         So to have extensive discovery going to the previous

13   decision of the appeals board and whether that was motivated

14   by some bias of David Baum or any other member of the board

15   is, in large measure, irrelevant, because no one is resting on

16   that decision.

17         THE COURT:  Yes, but if -- but you're ignoring what's

18   happened to Plaintiff Doe over the past three years or however

19   long it's been since he left the university.  All of that

20   can't be undone.  The fact that he suffered this adjudication

21   if, in fact, it was done in a way that evidenced bias under

22   Title IX, he is entitled to damages for that.

23         MR. DeBRUIN:  Yes.  I don't mean to suggest that the

24   only relief would be a new hearing.  But, again, what the

25   damages --

Motion as to Imposition of a Remedy - February 14, 2019

```
 1          THE COURT:  So it's not -- it's not wasteful to move
 2    the case forward and proceed to the -- to take the necessary
 3    steps to adjudicate that claim, is it?
 4          MR. DeBRUIN:  I think it is, for this reason.  Yes,
 5    there may be a damages component.  We don't dispute that.
 6    There may be damages under the due process clause as well.
 7    But what those damages may be may very heavily depend on the
 8    outcome of a new procedure consistent with due process,
 9    assuming that he is seeking relief that requires that to
10    happen.  Because, again, if -- if the outcome of that is,
11    you may have been denied a fair procedure for one reason or
12    another, inadequate procedures, bias, whatever it may be, but
13    the outcome would have been, in fact, the same with adequate
14    procedures, without bias, that is what the purpose of a new
15    hearing is.
16          I'm not saying there wouldn't be a possibility for
17    any damages, but it will greatly affect the damages that he
18    may seek depending on what the outcome is of a procedure
19    that is consistent with the due process clause and certainly
20    consistent with Title IX.
21          We don't dispute that our prior procedure was not
22    consistent with Title IX.  We don't concede that there was any
23    bias.  We vigorously contend that there was not.  But there
24    will be a new process if he is seeking relief, as he appears
25    to be, and we're committed to conduct that process in a manner
```

```
 1    consistent with due process, consistent with the Circuit
 2    decision, and consistent with Title IX, with no bias.
 3             THE COURT:  Well, you do recall that the Circuit
 4    decision said that there is a viable Title IX claim that
 5    should go forward.
 6             MR. DeBRUIN:  Of course.  And I don't dispute that.
 7    But the relief --
 8             THE COURT:  I understand your point on that.
 9             MR. DeBRUIN:  It goes to the relief that you're
10    ultimately going to get.
11             THE COURT:  Mr. DeBruin, I understand your point on
12    that.
13             Now, let me ask you a question:  If, in fact, you
14    would have to proceed with litigating the Title IX claim, tell
15    me what it is that you would need as far as discovery is
16    concerned.
17             MR. DeBRUIN:  You know, again, you can see the
18    Circuit decision in terms of how these cases normally proceed
19    under Title IX.  The only claim that the Circuit upheld was
20    the so-called erroneous outcome claim.  And one of the things
21    the Circuit said was --
22             THE COURT:  Mr. DeBruin, I have a pretty clear
23    question, and I don't --
24             MR. DeBRUIN:  I don't believe there is a lot of
25    discovery that is needed, because again --
```

1          THE COURT:  You would want to take the plaintiff's

2    deposition, presumably --

3          MR. DeBRUIN:  Well, yes.

4          THE COURT:  -- or not?  Or anyone else?

5          MR. DeBRUIN:  If -- it may well be in response to

6    what the -- typically it is the plaintiff who is seeking to

7    attempt to establish bias in the university's procedures.

8          THE COURT:  No question, plaintiff has the burden of

9    proof on that, and the plaintiff, I imagine, will have an

10   entirely different answer when I ask her in a minute what

11   discovery she thinks she will need, but I'm asking you what

12   you think you will need to defend your case.

13         MR. DeBRUIN:  I don't believe we will need extensive

14   discovery and, again, we feel that spending a lot of time on

15   the prior decision which we have already vacated is not a

16   productive use of anybody's time.

17         THE COURT:  All right.  I thank you.

18         THE COURT:  Ms. Gordon, do you have some brief

19   rebuttal?

20         MS. GORDON:  I do, Judge.  Thank you very much.

21         THE COURT:  All right.  First of all, answer the

22   question, please, that I just asked Mr. DeBruin.

23         MS. GORDON:  Yes.  Yes.  I would want to take the

24   depositions of the individuals who have created these

25   policies.  One of our --

```
 1              THE COURT:  How many do you think there are?

 2              MS. GORDON:  I would say probably five.  There is

 3       an org chart that I did not bring with me that there is a

 4       Title IX office, and then the Title IX office reports, as I

 5       understand it, up to the Dean of Students, who eventually

 6       reports up to the President of the university.  So I would

 7       work that out with the other side, but I am going to need to

 8       take roughly five to six depositions of decision makers with

 9       regard to what they have been doing at the university, with

10       regard to their policies, why they have not adopted the

11       statement of student rights and responsibilities and the like.

12              THE COURT:  And for an erroneous outcome Title IX

13       claim, do you or do you not have to establish a pattern?

14              MS. GORDON:  No.

15              THE COURT:  Okay.

16              MS. GORDON:  I have to show the outcome with regard

17       to my client was erroneous based on his gender being a factor.

18       I would also undoubtedly have to depose whoever's left at the

19       university from that three-person decision-making appeals

20       panel.  I know Mr. Baum --

21              THE COURT:  Those are defendants; right?

22              MS. GORDON:  Yes, they are, Judge.

23              THE COURT:  Okay.  Okay.  Any further rebuttal?

24              MS. GORDON:  Yes.  I do want to clarify a couple of

25       things.
```

```
 1              With all due respect to Mr. DeBruin, he is just
 2    flatly wrong on what he has been telling you about what is on
 3    my client's record.  It's just not so.  I'm going to read to
 4    you from ECF Number 107-2 filed 12/10/18.  It's Exhibit 2
 5    to my papers.  This is what my client received from the
 6    university.  He is under a permanent voluntary separation
 7    effective immediately.  He is prohibited from attending
 8    university-sponsored events.
 9              THE COURT:  This is June 16; right?  June 2016.
10              MS. GORDON:  Yes, it is, Judge.
11              Accessing their property, their facilities.
12              THE COURT:  Is this still in his record?
13              MS. GORDON:  Yes, it is.  It's not only in his
14    record, it's literally in effect as I speak to you.  He cannot
15    go to a University of Michigan football game or go to the
16    University of Michigan Hospital unless it's an emergency.  So
17    that is literally in effect today.  It's never been lifted.
18    And I am going to need a court order --
19              THE COURT:  Yeah.  Okay.
20              MS. GORDON:  -- to lift it.
21              Similarly, if you go down to the next paragraph
22    there --
23              THE COURT:  No, I have got it.
24              MS. GORDON:  -- they say he has an obligation to tell
25    other schools that he has a misconduct record.  They say that
```

Motion as to Imposition of a Remedy - February 14, 2019              53

```
 1    and they direct him to do that.  Okay.  So that's on that.

 2              In addition, with regard -- I'm sorry, Judge.  I have

 3    got to grab my legal pad.

 4              With regard to the Court's point about the TRO, I

 5    appreciate the context you're putting it in, but honestly,

 6    I think we're past the TRO stage, because the TRO --

 7              THE COURT:  I agree.

 8              MS. GORDON:  Okay.

 9              THE COURT:  We're at the preliminary injunction

10    stage, is where we're at.

11              MS. GORDON:  Right.  But even there the finding has

12    already been made that the process was unconstitutional.  So

13    I think summary judgment on the constitutionality of the

14    process is more appropriate.

15              THE COURT:  Well, you can file that motion if you

16    want --

17              MS. GORDON:  Okay.

18              THE COURT:  -- but I will tell you this:  First of

19    all, I think it would be unwise before I make a ruling on your

20    present motion; and secondly, you should be mindful of the

21    provisions in the local rule that you only get one summary

22    judgment motion without leave of court.  So I would be

23    judicious, pardon the phrase --

24              MS. GORDON:  Okay.

25              THE COURT:  -- in your decision on what to file and
```

1    when.

2              MS. GORDON:  Okay.  So I was picking up on the point

3    that your Honor made earlier about, if I'm seeking interim

4    fees I undoubtedly need some kind of a judgment.

5              THE COURT:  Well, you're not going to get a final

6    judgment until the case is finalized.

7              MS. GORDON:  Well, interim fees are often awarded

8    just on a summary judgment basis if you have achieved

9    substantial relief, as all the cases I have cited to the Court

10   are.  There are interim fees when the case is not yet over.

11   That is why they are called interim fees.  The plaintiff has

12   obtained substantial relief that is not transient.  That is

13   the wording of the court.

14              For example, some plaintiffs go to the court and say,

15   "I got a TRO.  I want interim fees."  But then it turns out

16   the TRO is overturned, and the court, the Sixth Circuit says,

17   "That was transient relief.  You may have had relief for a

18   moment there.  That was transient, and you're -- so, no, you

19   don't get your interim fees."  But in cases, Judge, where the

20   rights of the parties have been changed permanently, the legal

21   position between the parties, yes, interim fees are awardable.

22              This is a little unusual situation because I don't

23   have a summary disposition from the court that I'm working

24   from, but I think the Sixth Circuit decision is the same --

25   puts the same place marker down with regard to interim fees.

 1          THE COURT:  So I take it you are stating, then, that

 2   it's a functional equivalent of some sort of a pronouncement

 3   of interim relief?

 4          MS. GORDON:  Pronouncement of what?  I'm sorry.

 5          THE COURT:  Interim relief.

 6          MS. GORDON:  Yes.

 7          THE COURT:  All right.  Okay.

 8          MS. GORDON:  It's not a close call on these interim

 9   fees.  It's been litigated quite often.

10          Okay.  So I need to figure out how to get an order so

11   that I can trigger the Court's entertainment of a motion, but

12   I will come up with something.  That's number one.

13          Number two, I want to talk about this issue of the

14   jury trial and the degree.  Okay?  What I asked the Court to

15   do, Mr. DeBruin is also incorrect on this.  I asked -- my

16   client has now amassed, on his own, 55 credit hours, as the

17   Court may or may not recall.

18          THE COURT:  Away from the University of Michigan?

19          MS. GORDON:  Yes.  At the cost of the $30,000.

20          THE COURT:  No, I understand.

21          MS. GORDON:  He only needed 13.5 hours to graduate

22   from the University.  I begged them to let him take the

23   courses remotely, because the whole point of Title IX, if

24   you're accusing somebody of sexual misconduct, is that the

25   person who says she has been harassed does not have to be

1    subjected to it again, and he would be off campus.  They said

2    no.  That's what they decided to do, which has now placed me

3    in the position of standing here and saying, I want them to

4    take a look at the 55 hours and I want them -- because I have

5    given you the link to the business school where they have

6    discretion to award hours from other schools.  So I say to the

7    Court today, my client took it upon himself in an unbelievable

8    amount of work and effort to amass 60 credit hours in one

9    year's time period.

10            THE COURT:  You mean he needed to do that because

11   they wouldn't transfer some credits, is that why?

12            MS. GORDON:  Because the school he graduated from did

13   not -- they require you to take prerequisites.  You can't

14   parachute in and say --

15            THE COURT:  Got it.  I got it.

16            MS. GORDON:  You understand.

17            THE COURT:  So why is that not simply an element of

18   damages to your due process claim?

19            MS. GORDON:  Well, it is an element of damages, but

20   if the Court would say, as part of equitable relief, which you

21   can do, that they need to consider giving him -- crediting

22   some of those 55 hours and hopefully it would be enough for

23   him to obtain the 13.5, he would then have his degree, because

24   he has earned the degree.

25            Mr. DeBruin --

 1          THE COURT:  Doesn't he have a degree, an

 2  undergraduate degree from another university?

 3          MS. GORDON:  He does.  Yes.  But it is not a business

 4  degree.  It's a degree in accounting.  And it is not from the

 5  University of Michigan Ross School of Business, which they

 6  tout on their website as being one of the top three degrees in

 7  the country one can obtain in business.

 8          THE COURT:  I understand the difference.

 9          MS. GORDON:  So you understand.  And my client's

10  lifetime earnings will undoubtedly be affected in that he

11  doesn't have the Ross degree that he earned.  So all I said

12  in my papers was, I would like this Court to order, as part of

13  equitable relief, that they take a look at crediting him and

14  then we can go on from there with regard to whether he

15  actually engaged in misconduct if that becomes necessary.

16          Okay.  The next thing I want to talk about is with

17  regard to the money damages and the degree.  If this Court is

18  not going to adopt my suggestion on the degree, then we do

19  want a jury trial to seek money damages if the jury finds that

20  he would not have been found to have engaged in a misconduct

21  had he been given due process.

22          We are going to seek money damages for the value of

23  the degree he lost.  And I do take that position in my papers.

24  Again, Mr. DeBruin is wrong.  He said I have come in here

25  today with a new argument.  On page 8 of my brief as to

1    imposition of a remedy, I ask for legal relief, damages.

2    "Beyond injunctive relief, plaintiff has the ability to

3    receive compensatory damages.  This will require a jury trial.

4    Plaintiff acknowledges that the jury would first have to find

5    that plaintiff had not violated the policy."  I'm well aware

6    of that.  So that's what we are seeking.

7            THE COURT:  So why shouldn't I approach the awarding

8    of a degree in the same way?

9            MS. GORDON:  That's fine.  That is fine.  I would

10   agree to.  Let's have a --

11           THE COURT:  I think -- hear me out.

12           MS. GORDON:  Yes.

13           THE COURT:  I think maybe the sensible way is to

14   proceed to a jury trial on that issue, however, in terms of

15   equitable relief you would be trying that claim to the Court.

16           MS. GORDON:  I agree.

17           THE COURT:  With perhaps an advisory jury.

18           MS. GORDON:  I think that's right.  Or I could come

19   to you after the jury rules.  I did have another case in this

20   building where my client got -- had the option of money

21   damages or being instated to a position that she was passed

22   over for because of her gender, and that was an equitable

23   relief claim at the end.

24           THE COURT:  That was probably a Title VII claim;

25   right?

```
 1            MS. GORDON:  Yes, it was.

 2            THE COURT:  Yeah.

 3            MS. GORDON:  No, it was actually -- Title IX or

 4   Title VII.  She was a teacher, so I'm not sure.

 5            THE COURT:  I asked you about discovery with respect

 6   to Title IX.  I presume you're pretty much along parallel

 7   course with Title -- with your due process claim as well?

 8            MS. GORDON:  Exactly.

 9            THE COURT:  Yeah.

10            MS. GORDON:  It would be exactly parallel and it

11   would be really duplicative to have to do this twice, as the

12   Court understands, I'm sure.

13            THE COURT:  Yeah.  All right.  Thank you.

14            MS. GORDON:  Judge, what's the next step?  We wait

15   for your order on this and then you will direct us as to when

16   we can begin discovery?

17            THE COURT:  Yes.  I will enter an order on this.

18   Depending on which way we go, I may issue a scheduling order,

19   having considered this dialogue here essentially a Rule 16

20   conference.

21            I will direct, however, now, Mr. DeBruin, that the

22   defendant should -- oh, do you have an amended complaint or is

23   it just --

24            MS. GORDON:  I do, and I am glad you mentioned that,

25   Judge.  I had an amended complaint that I came to you on with
```

```
 1    my motion for reconsideration which was denied.  So --

 2              THE COURT:  Did I allow you to file that?

 3              MS. GORDON:  No.

 4              THE COURT:  All right.  Since the -- you know, maybe

 5    the best thing to do is, since the Sixth Circuit thinned out

 6    some of the counts, that I direct -- I'll direct you to file

 7    an amended complaint.

 8              MS. GORDON:  I think that's right.

 9              THE COURT:  So two weeks?

10              MS. GORDON:  Absolutely.

11              THE COURT:  All right.  I'm going to direct you to

12    file an amended complaint by the 28th of February and then the

13    response will be due the 14th of March --

14              MS. GORDON:  Okay.

15              THE COURT:  -- to the amended complaint, and then we

16    will proceed from there.  And hopefully in the interim I'll

17    have a decision in writing based on this.

18              Mr. DeBruin, did you want to be heard one more time?

19              MR. DeBRUIN:  Can I just say three things, one in

20    response, that have come up?

21              THE COURT:  Three things?

22              MR. DeBRUIN:  Three things.

23              THE COURT:  Can I negotiate you down to two?

24              MR. DeBRUIN:  One, in terms of -- I just want to make

25    clear that in terms of the discovery that she is identifying
```

1    as to why we had the policies that we had, we will object that

2    that's not relevant to any claim in this case.

3              THE COURT:  Okay.  Well, we'll take it as it comes.

4              MR. DeBRUIN:  I just want to make that clear.

5              Secondly, in terms of the letter that he had to stay

6    away from the university, if she had raised that as an issue,

7    I mean, we could have dealt with that.

8              MS. GORDON:  I did raise it.  I said the no-contact

9    order --

10             THE COURT:  No, please don't interrupt.

11             MS. GORDON:  I apologize.

12             MR. DeBRUIN:  Again, if we're talking about

13   attendance at Michigan football games, it would -- potentially

14   as an initial -- there was a charge pending, so sometimes

15   those kind of issues of attendance where the complainant could

16   be exist just because there is a pending charge.

17             THE COURT:  Actually, there may be a charge pending,

18   but there is an exoneration at the investigatory level, and

19   there is an appeal that might be pending, so if he is placed

20   in status quo ante there is no adjudication of responsibility.

21             MR. DeBRUIN:  All I'm saying is, these are often

22   dealt with by policies in terms of how to reconcile the

23   competing interests that we're forced to try to reconcile with

24   both the complainant and the respondent.

25             THE COURT:  All right.

1          MR. DeBRUIN:  But the last thing I just want to leave

2    you with is that we believe it would be inappropriate to

3    basically lay -- leave on the table these equitable requests

4    for a degree and credits and deny the university the right to

5    have determination under procedures consistent with due

6    process as to whether or not he is guilty of misconduct,

7    because if he is, he is not entitled to a degree, he is not

8    entitled to the relief that he is seeking.

9          And under Alger, under all the cases that we have

10   cited, that is not a decision that is made by the court, that

11   is a decision that is made by the university.  And so if

12   equitable relief is on the table, as it clearly is, we believe

13   we have the right to proceed with the charge.  And if he

14   declines to go forward with that, we will object to equitable

15   relief on the ground that we never had that opportunity.

16         THE COURT:  Okay.  Well, you will have an opportunity

17   to object if we go in that direction.

18         MR. DeBRUIN:  I think it's also appropriate to you

19   in terms of what relief and procedures you set forth going

20   forward.  We have said in our papers we believe this case

21   should go forward now to a hearing and consistent with the due

22   process the Circuit has required.

23         THE COURT:  The matter is under advisement, except

24   with respect to the filing and scheduling that I just

25   mentioned.

Motion as to Imposition of a Remedy - February 14, 2019                63

```
 1           Anything further for the record from the plaintiff?

 2           MS. GORDON:  Thank you for your time, your Honor.

 3           THE COURT:  For the defendant?  From the defendant?

 4           MR. DeBRUIN:  No, your Honor.  Thank you.

 5           THE COURT:  Thank you, Counsel.

 6           You may recess court.

 7           THE CLERK:  All rise.  Court is now in recess.

 8                (Proceedings adjourned at 3:27 p.m.)

 9                          *       *       *

10

11

12               CERTIFICATE OF COURT REPORTER

13

14       I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   _____   s/ Rene L. Twedt                  June 14, 2019
     RENE L. TWEDT, CSR-2907, RDR, CRR, CRC      Date
18       Federal Official Court Reporter

19

20

21

22

23

24

25
```